**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ZOGENIX, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DEVAL PATRICK, in his official | ) |
| capacity as GOVERNOR OF THE | ) Civil Action No. _____ |
| COMMONWEALTH OF | ) |
| MASSACHUSETTS, | ) **REQUEST FOR ORAL** |
| | ) **ARGUMENT** |
| and | ) |
| | ) |
| CHERYL BARTLETT, RN, in her | ) |
| official capacity as DEPARTMENT OF | ) |
| PUBLIC HEALTH COMMISSIONER, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

Plaintiff Zogenix seeks a temporary restraining order and preliminary injunction staying implementation of the Commonwealth's unconstitutional emergency ban of Plaintiffs' Zohydro™ ER (Hydrocodone Bitartrate Extended-Release Capsules), which has been approved by the U.S. Food and Drug Administration (FDA) for the management of severe pain in patients requiring continuous opioid therapy.  The emergency declaration issued by Governor Patrick, and related order by the Commissioner of the Department of Public Health (DPH), purported to ban Zohydro™ ER based on safety concerns that squarely conflict with - and are therefore preempted by – FDA's determination that Zohydro ER® is safe and effective and may be marketed and sold in the United States.  Zogenix will suffer irreparable harm to its reputation and goodwill if the ban is not stayed.  Moreover, Massachusetts patients with chronic pain who require an acetaminophen-free, extended-release drug for treating chronic pain will also suffer irreparable harm, as Zohydro ER™ is the only FDA-approved opioid with those characteristics.

Defendants' conduct is unconstitutional.  First, it is preempted by federal law: FDA, not Defendants, has the authority to approve new drugs, to determine the formulations that are safe and effective for use, and to authorize their introduction into the interstate market.  Defendants' conduct also runs afoul of the dormant Commerce Clause, which prohibits a state from taking a regulatory action that has impact outside its borders, or if which replicated would result in the effective dismantlement of a national regulatory scheme.  And it violates the federal Contracts Clause, because the Order impairs private contracts between Zogenix and other contracting parties for services in Massachusetts, all without sufficient justification.

## BACKGROUND

**1.  FDA's Statutory Authority:**  Congress has vested the FDA with responsibility for reviewing and approving all new prescription drugs sold in the United States.  Compl. ¶ 14.  To

that end, the Food, Drug, and Cosmetic Act (FDCA) requires all new prescription drugs to obtain

FDA approval of a marketing application before they can enter the marketplace.  21 U.S.C.

§§ 331(d), 355(a), (b), (j).  Specifically, before receiving FDA approval, drug manufacturers

must demonstrate through submission of a new drug application (NDA) that the drug is both *safe

and effective* for its intended use.  *See* 21 U.S.C. § 355(b).  Congress has instructed FDA to

assess the safety of a drug by determining whether its benefits outweigh its risks. Compl. ¶ 19.

An NDA applicant is required to submit extensive clinical evidence that the drug product

is safe and effective.  Compl. ¶¶ 15-16.  And when it receives an NDA, FDA is charged with

performing a thorough analysis of the drug's safety and effectiveness—a process that requires

the agency to carefully balance the benefits and risks to patients.  *Id.* ¶ 17; 21 U.S.C. §§ 355(c),

(d).  FDA will approve an NDA only when all necessary data are submitted or referenced to

establish the product's safety and effectiveness.  *Id.*; 21 C.F.R. § 314.125.

**2.**      **Zohydro™ ER :**  Zogenix conducted a comprehensive development program and

submitted an NDA for its drug Zohydro™ ER  in May 2012.  Compl. ¶ 21, Ex. B at 4.  After

eighteen months of careful scrutiny, FDA approved Zohydro™ ER for the management of pain

severe enough to require daily, around-the clock, long-term opioid treatment for which

alternative treatment options are inadequate.  *Id.*, Ex. C at 1.

Unlike all other hydrocodone analgesics products on the market, Zohydro™ ER is the

only one whose sole active pharmaceutical ingredient is hydrocodone.  Compl. ¶ 22.  Because it

does not contain acetaminophen, it avoids the potential for acetaminophen toxicity in patients for

whom Zohydro™ ER is indicated.  Zohydro™ ER provides an important treatment option for

patients suffering from severe chronic pain on immediate release hydrocodone combined with

acetaminophen who need an extended-release product; for patients who are at risk for hepatic

(liver) injury from acetaminophen; and for patients on other ER opioids in which another option for opioid rotation is of value. *Id.*

During the approval process for Zohydro™ ER, FDA considered requiring an abuse-deterrent formulation for the drug, but ultimately concluded that the overall risk-benefit balance of Zohydro™ ER was sufficient to support approval of the NDA without an abuse-deterrent formulation. *Id.* ¶ 24, Ex. B at 33, Ex. E at 3. FDA instead determined that there were effective measures in place to protect patients while still making Zohydro™ ER available for patients in need: The labeling of the product includes prominent warnings about abuse, a boxed warning about the known serious risks of addiction, abuse, and misuse, and statements urging prescribers to assess each patient's risk before prescribing the drug and to monitor patients regularly for the development of addiction, abuse, and misuse. Compl. ¶ 25. And Zohydro™ ER – unlike immediate-release hydrocodone products – is included in the Extended Release/Long-Acting Opioid Analgesics risk evaluation and mitigation strategy designed to reduce serious adverse outcomes resulting from inappropriate prescribing, misuse, and abuse. *Id.* ¶ 25. FDA concluded that these measures combined were sufficient to support approval of the product. Ex. B at 31.

3. **Governor Patrick's Declaration of a Public Health Emergency:** On March 27, 2014, Massachusetts Governor Deval Patrick issued a one-page Declaration of Emergency under M.G.L. chapter 17, section 2A, citing concerns about opioid addiction and concluding that "an emergency exists which is detrimental to the public health" in Massachusetts. Compl. ¶¶ 28-29, Ex. G at 2. An accompanying press release announced that the Governor had declared a public health emergency and had directed the Department of Public Health (DPH) to take several steps aimed at combatting opioid overdoses. *Id.*, Ex. F. The Press Release announced that DPH Commissioner Bartlett had "emergency powers" to, among other things: "[i]mmediately prohibit

the prescribing and dispensing of any hydrocodone-only formulation (commonly known as

Zohydro) until determined that adequate measures are in place to safeguard against the potential

for diversion, overdose, and misuse." *Id*. at 1-2.

That same day, Commissioner Bartlett and the state Public Health Council (PHC)

approved an emergency order providing: "No registered individual practitioner shall prescribe or

order, and no one shall dispense or administer any hydrocodone bitartrate product in

hydrocodone-only extended-release formulation until the Commissioner has determined that

adequate measures are in place to safeguard against the potential for diversion, overdose and

abuse." *Id*. ¶¶ 30-31, Ex. A.  There is exactly one "hydrocodone bitartrate product in

hydrocodone-only extended-release formulation": Zohydro™ ER.  *Id*. ¶ 30.  The Commissioner

and DPH explained the Order in a March 27, 2014 memorandum:

> This order will protect against overdose and abuse of hydrocodone-only extended-
> release formulation, and provides the means for the Commissioner to lift the
> prohibition when there are *adequate safety measures, such as an abuse-deterrent
> formulation*, which will then allow for the prescribing of hydrocodone-only
> products to patients with severe pain without running as great a risk that the
> medication will be diverted or abuse[d].  *Id*. ¶ 31, Ex. G (emphasis added).

This memorandum came as a surprise to Zogenix; it was never consulted before it issued.  *Id*. ¶

32.  And the memorandum doubtless came as a surprise to FDA.  For as previously noted, during

the course of the approval process for Zohydro™ ER, FDA *expressly* considered whether abuse-

deterrent technology should be required for the drug, and concluded that the benefits of the

formulation outweighed any attendant risks.  Ex. B at 30-33.

**4.  The Need for Prompt Judicial Intervention:**  Defendants' actions will cause real

and irreparable harm for patients in Massachusetts with severe chronic pain.  Compl. ¶ 34.

Zohydro™ ER fills an important gap for chronic pain patients – an acetaminophen-free,

extended-release product suitable for the management of pain severe enough to require daily,

around-the-clock, long-term opioid treatment for which alternative treatment options are inadequate. *Id.* While there are other opioid products on the market, some patients are unable to achieve adequate pain relief from, or unable to tolerate, any of the other active ingredients in FDA-approved opioid products. *Id.*

Defendants' conduct, unless enjoined, also will cause immediate and irreversible harm to Zogenix. *Id.* ¶ 37. The Commonwealth's actions are likely to cause physicians, pharmacists, and patients – both in Massachusetts and across the country – to wrongly believe that Zohydro™ ER is not safe and effective for its intended use. *Id.* Zogenix has invested over $75 million on the research and development of Zohydro™ ER since 2007 and has projected sales in the millions of dollars in the coming years. *Id.* ¶¶ 40-41. In short, Zogenix's ability to generate additional revenue, achieve profitability, and continue as a going concern, will depend largely on the commercial success of Zohydro™ ER.

## ARGUMENT

A party seeking a temporary restraining order or preliminary injunction must show (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008); *see also Voice of The Arab World v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 70 (D. Mass. 1993) (applying test to TRO). Zogenix plainly satisfies each of these criteria.

## I.    Zogenix Is Likely To Succeed On The Merits.

To put it in plain terms: the Order banning Zohydro™ ER is unconstitutional.

To begin with, it is preempted by federal law.  FDA, not Governor Patrick and not the State DPH, has the authority to approve new drugs, to determine the formulations that are safe and effective for use, and to authorize their introduction into the interstate market.  And after extensive consideration, FDA approved Zohydro™ ER in its current formulation, finding it safe and effective for use in treating patients with chronic pain for whom their physicians conclude Zohydro™ ER is indicated.  Neither Governor Patrick nor the state DPH has the authority or the ability to countermand that determination and declare Zohydro™ ER *unsafe* in its current formulation.  The Order also runs afoul of the dormant Commerce Clause, which prohibits a state from taking a regulatory action that has impact outside its borders, or if which replicated would result in the effective dismantlement of a national regulatory scheme.  And it violates the federal Contracts Clause, because the Order undoes private contracts between Zogenix and other contracting parties for services in Massachusetts, all without sufficient justification.

### A.  The State's Order is Preempted.

"[S]tate law that conflicts with federal law is without effect."  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992).  The Supremacy Clause of Article VI of the Constitution invalidates state laws that conflict or interfere with Acts of Congress, *Rose v. Arkansas State Police*, 479 U.S. 1, 3 (1986), and interference is implied if state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  Congressional purpose is "the ultimate touchstone of every pre-emption case."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  And Congress gave the FDA – not the Governor of Massachusetts – authority to determine when and under what circumstances a drug is "safe" for marketing.  Congress also assigned to the FDA – not any State – the dual aims of both *protecting* the public health from harm and *promoting* it by facilitating

access to therapeutic treatment where it concludes that such treatment is safe and effective.  *See* 21 U.S.C. § 393(b).  Defendants' ban on single-entity, extended-release hydrocodone stands as an impermissible obstacle to both legislative goals.

### 1. Congressional Objectives for the FDA Drug Approval Process Include Prevention of Harm and Facilitation of Treatment.

To determine whether a state law poses an obstacle to the full objectives of Congress, courts consider "the entire scheme of the statute," including its text, context, and policies.  *Hines,* 312 U.S. at 67 n.20.  Congress outlined dual objectives for the FDA's work: protecting the public health from dangerous drugs, and promoting it by facilitating access to effective treatments.  *See* 21 U.S.C. § 393(b).  To accomplish the objectives with which it is charged, the agency engages in detailed and exacting procedures designed to weigh the scientific merits of drug products presented to the agency for approval.  *See* 21 U.S.C. § 355(d); 21 C.F.R. § 314.125.

The FDA's analysis of any NDA entails detailed scientific consideration of the known risks *and* benefits to patients.  *See* Compl. ¶¶ 17-20.  Accordingly, courts typically find that the FDA's "evaluations of scientific data within its area of expertise . . . [are] entitled to a high level of deference."  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998) (internal quotation marks and citation omitted).  Indeed, the FDA's "judgment[ ] as to what is required to ascertain the safety and efficacy of drugs falls squarely within the ambit of the FDA's expertise and merit[s] deference" from the courts.  *See, e.g.*, *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1490 (D.C. Cir. 1995) (citation omitted); *Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 653–54 (1973) ("The determination whether a drug is generally recognized as safe and effective . . . necessarily implicates complex chemical and pharmacological considerations" and is "peculiarly suited to initial determination by the FDA").  And where FDA undertakes an especially "close and careful review" of a given drug, such action constitutes further grounds for

deference.  *See Sanofi-Aventis U.S. LLC v. FDA*, 842 F. Supp. 2d 195, 209 (D.D.C. 2012);

*Bristol–Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 218–19 (D.D.C. 1996).

The FDA's review of Zogenix's application considered the potential for opioid abuse

and, conversely, the drug's unique benefits – most notably, its acetaminophen-free formulation

appropriate for patients with liver toxicity concerns.  Compl. ¶ 24.  In rendering a considered

decision that the benefits of Zohydro™ ER outweighed the drug's potential risks, the FDA

satisfied Congress's dual mandate of promoting and protecting public health by classifying

Zohydro™ ER as "safe and effective," consistent with its obligations under 21 U.S.C. §

393(b)(2)(B).  That determination reflects the FDA's expert conclusion that public access to the

drug "promote[s]" the public health.  21 U.S.C. § 393(b)(1).

Yet despite the FDA's approval, the Massachusetts DPH has now issued a blanket ban on

public access to the medication – and only *this* medication – even prior to one prescription being

filled.  That blanket ban improperly contravenes the FDA's expert determination.

### 2.  The DPH Drug Ban Undermines the FDA's Mandate to Make Particularized Evaluations of Drug Safety.

Where Congress strikes a balance between competing policy objectives, states may not

"second-guess" it through contrary regulations.  *See Bonito Boats, Inc. v. Thunder Craft Boats,*

*Inc.*, 489 U.S. 141, 152 (1989).  And once a federal agency has determined that a product is, on

balance, "safe," states typically may not countermand the determination by imposing alternative

legal obligations for regulated parties.  For example, after the Environmental Protection Agency

undertook to "balance [ ] public and private interests" under federal water pollution laws, a state

was barred from using nuisance law to "upset" the agency determination.  *Int'l Paper Co. v.*

*Ouellette*, 479 U.S. 481, 494 (1987).  Similarly, where the FDA was tasked with striking a

"delicate balance of statutory objectives" and chose to accept a manufacturer's medical device

application, the Supreme Court found it would contravene that delicate balance to allow state law tort claims to challenge fraud by the applicant. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001).  Moreover, where an agency scheme as a whole is specifically designed to promote a full *range* of "safe" product choices, state action cannot constrain the "variety and mix" of options the agency sought to make available to the public.  *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000) (internal citation omitted).

To be sure, the Supreme Court also has held in the FDA context that *labeling* requirements constitute a "floor" upon which *state tort* requirements may build.  *See Wyeth v. Levine*, 555 U.S. 555, 575 (2009).  But this is not a labeling case; it is a case about the safety and efficacy vel non of a drug already found to be safe and effective.  Nor is this a case about state tort remedies layered over a federal regulatory "floor"; this is a case where the state has removed the floor entirely by imposing an outright prohibition on a product.

Defendants' ban on Zohydro™ ER thus stands as an impermissible obstacle, in two ways, to the FDA's mandate to make particularized drug approvals for the protection and promotion of the public health.  First, as in *Oullette* and *Buckman*, state drug prohibition decisions contrary to those of the FDA – such as the Massachusetts ban here – would harmfully undermine the authoritative character of federal safety decisions designed to have national effect. The FDA cannot maintain a functional national program for drug approvals if they can be overturned by state second-guessing.  Indeed, prohibiting the sale of Zohydro™ ER in Massachusetts also is inconsistent with the Commonwealth's obligations under the drug rebate Medicaid statute.  *See* Compl. 32.  Second, the Massachusetts order plainly conflicts with the scientific predicates supporting the FDA's approval of the same drug Massachusetts wants

banned – and thus with Congress' objective to promote public health by facilitating access to important treatments.

This case thus presents a conflict similar to that in *Geier*, where federal automobile safety regulation "deliberately provided the manufacturer with a range of choices" among seatbelt restraint devices, intended to "bring about a mix of different devices introduced gradually over time." 529 U.S. at 864-65, 875. The Supreme Court held that products liability claims premised on different state tort rules were preempted, because they would have presented an obstacle to the "mix of devices" sought by the regulation. *Id.* at 881. In issuing its device regulations, the DOT had noted that it sought to spur innovation among regulated products while promoting public use. *See Geier v. Am. Honda Motor Co., Inc.*, 166 F.3d 1236, 1242-43 (D.C. Cir. 1999). Similarly here, the FDA seeks to make publicly available a range of safe and effective drug products in keeping with its Congressional mandate to promote the public health. Zohydro™ ER was found by the FDA to be within that range. *See* Ex. B at 24. Indeed, FDA concluded as a matter of law that *greater* restrictions on access to Zohydro™ ER would not comport with Congressional objectives. *See id.* at 31. The agency undertook an extensive expert review of the drug and determined that it should be included in the range of "safe and effective" hydrocodone-based treatments on the market. *Geier* does not permit states to stand as an obstacle to this goal of making available to the public a range of safe treatment options. Should the result be different, Congress's objectives to *promote* the public health through FDA drug approvals could be directly contravened by a potential flood of state policy disagreements.

## B. Defendants' Ban Violates the Contract Clause.

Under the federal Contract Clause, "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. CONST. art. I, § 10, cl. 1. The language of the Clause is

facially absolute, and its protections for the contracts of citizens may be permissibly abrogated only where necessary for states to "safeguard the vital interests" of their people. *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 439 U.S. 400, 410 (1983). In assessing Contract Claims related to private agreements, courts look to whether: (1) state action substantially impairs a contract, (2) the state acted with a "significant and legitimate public purpose," and (3) the action is "reasonably" tailored to be "appropriate to the public purpose justifying" its adoption. *See id.* at 410-13; *Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete Through Ins. Comm'r of Puerto Rico*, 125 F.3d 9, 12-13 (1st Cir. 1997) (citations omitted). Zogenix is likely to establish each of these elements.

### 1.   Defendants' Actions Substantially Impair Zogenix's Contracts.

State action unconstitutionally impairs a contract where the court finds that a contractual relationship exists, a change in law impairs the relationship, and the resulting impairment is "substantial." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). Whether a contract exists is a federal question for purposes of Contact Clause analysis, *see Irving Trust Co. v. Day*, 314 U.S. 556, 561 (1942), and Zogenix's existing agreements surely qualify. It maintains contracts with wholesalers who supply, and retailers who operate, Massachusetts pharmacies and have, in fact, already stocked local pharmacy shelves with Zohydro™ ER that will have to be returned. Compl. ¶ 26. It also contracts with Inflexxion, a Massachusetts company that developed cutting-edge abuse tracking methods in conjunction with NIH. *Id.* ¶ 27. These agreements unquestionably have been impaired by DPH's new ban on the prescription and dispensation of single-entity, extended release hydrocodone products. Zogenix is the sole manufacturer of products with the specified formulation, *id.* ¶ 30, which may no longer be made available to patients anywhere in Massachusetts. The ban is complete and immediate.

The impairment visited upon Zogenix's supply agreements is thus, within the meaning of *Romein*, "substantial."  "Total destruction" of a contract is not necessary to find that state action substantially impairs it – although such is essentially the case here for Zogenix.  *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 26-27 (1977).  Its contracts with the wholesalers who supply Zohydro™ ER to Massachusetts have been significantly impaired, because there is no need to distribute within Massachusetts; its contract with Inflexxion is impaired, because there is no need to track use patterns within Massachusetts.  Because Massachusetts patients will no longer be prescribed Zohydro™ ER, the benefits to Zogenix of the federal agreement—conferring on the company the immeasurable benefits of patient coverage for its drug—are a dead letter.

The reasonable expectations of the contracting parties play "an important role in determining the substantiality of the contractual impairment."  *Mercado-Boneta*, 125 F.3d at 13. Where plaintiffs operate in heavily regulated industries, they often are on the losing end of a Contracts Clause claim, because they are on notice of future regulation involving their contracts. *See Energy Reserves Grp.*, 439 U.S. at 410 (plaintiff could expect that gas price-setting regulation would affect the substance of its contract).  That plainly is not the case here.  True, Zogenix operates under extensive federal regulation – but it could hardly expect that *after* successfully navigating the rigorous and exacting federal approval process for its product, that product suddenly would become entirely banned in one state.  Rather, the state "impose[d] a completely unexpected liability in potentially disabling amounts . . . [without] even any provision for gradual applicability or grace periods."  *Allied Structural Steel Co. v. Spannaus*, 384 U.S. 234, 246, 248 (1978) (decided on other grounds but finding substantial impairment where a state retroactively imposed pension funding charges on companies closing state offices).

## 2.   Defendants Acted Without a "Legitimate Public Purpose".

The Massachusetts DPH ban on the prescription and dispensation of Zohydro™ ER does not respond to an appropriate legislative purpose. *Mercado-Boneta*, 125 F.3d at 13. The First Circuit has explained that this inquiry is "more searching than the rational basis review employed in Due Process or Equal Protection analysis." *Id.* Before a state may impair a private contract, it must do more than "mouth the vocabulary of the public weal in order to reach safe harbor; a vaguely worded or pretextual objective, or one that reasonably may be attained without substantially impairing the contract rights of private parties" will not suffice. *McGrath v. Rhode Island Retirement Bd.*, 88 F.3d 12, 16 (1st Cir. 1996).

Defendants, however, provided little more than lip service to justify its action. DPH vaguely purports to "respond to this public health emergency" of the "number of opiate-related overdoses and amount of opiate addiction in the Commonwealth." Ex. G at 1-2. However, the state has yet to provide few if any public findings of fact related to the emergency – nor how it would be mitigated by banning one single product that has not yet even been prescribed to a single patient. Moreover, the DPH did nothing to address any other hydrocodone products or any other opioid drug currently being abused and resulting in overdose and death in the Commonwealth; its narrow applicability criteria applied *only* to Zohydro™ ER. For the same reason, the purported agency objective is unreasonably discriminatory, if not pretextual.

## 3.   The Ban Is Not Reasonably Tailored to the Accomplishment of Its Cited Public Safety Objectives.

Where state actions impair private contracts, courts typically defer to legislative judgments as to the necessity and reasonableness of the contours of particular measures. *Mercado-Boneta*, 125 F.3d at 15. But even under such deferential review, the ban does not pass muster. To begin with, and again, the FDA, not Massachusetts, has the authority to approve or

ban a drug from distribution into the interstate market.  The State's ban cannot be adequately "tailored" where the authority to impose the ban does not exist in the first place.

What is more, the ban is both underinclusive and overinclusive, meaning it is not "tailored" at all.  It is grossly underinclusive because it applies to only single-entity, extended-release hydrocodone without reference to other hydrocodone products or other immediate release or extended-release opioid products potentially contributing to overdose and abuse concerns.  In face of the fact that *every* hydrocodone and *every* opioid product poses some risk to patients or abusers, the Massachusetts ban applies only to *one*.  State action cannot plausibly be considered reasonably tailored where it arbitrarily singles out only one member of a class of products.

The ban is also *overinclusive*.  Defendants have banned the prescription and dispensation of Zohydro™ ER within Massachusetts, to anyone, for any reason, even where the medication may be sought by patients living out of state or with health conditions suitable for its unique acetaminophen-free formulation.  Most patients will not abuse Zohydro™ ER; yet the State's action presumes that all doctors over-prescribe, all pharmacies over-dispense, and all patients will abuse the drug if it is prescribed and dispensed.  In other contexts where drugs have been found to pose a high risk of complications, more moderate regulatory measures have allowed for drug availability while appropriately reducing risks to the affected populations.

### C.  The Ban Violates the Dormant Commerce Clause.

Article 1, § 8, cl. 3 of the United States Constitution expressly authorizes Congress to regulate commerce among the states.  However, the Commerce Clause is more than an affirmative grant of power; it also has a "negative sweep," known as the "dormant" or "negative" Commerce Clause, by which "[a] State is . . . precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 278, n.7 (1977).

14

Among the circumstances in which the dormant Commerce Clause plays a role are those where state action imposes significant burdens on interstate commerce through inconsistent regulation of activities that are inherently national or require a uniform system of regulation. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997); *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88 (1987); *see also Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 128 (1978) (Commerce Clause precludes state regulation in a particular field because "a lack of national uniformity would impede the flow of interstate goods").

For example, in *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529-30 (1959), the Supreme Court held that while states typically have great leeway in establishing laws relating to public health and safety, a state statute regulating the type of mud flap used on trucks traveling through the state imposed too significant a burden on interstate commerce. Requiring truckers to change mud flaps every time they entered the state would cause too much delay and inconvenience; national uniformity outweighed the state's traditional power. *Id.* The Supreme Court also noted the problems that would arise if different states were allowed to impose differing requirements on these issues, concluding that the conflict between two (or more) states' regulations was impermissibly burdensome. *Id.*; *see also Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945) (invalidating state statute regulating train lengths); *Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 671 (1981) (invalidating state statute governing freight truck length). Here, too, there is a clear need for national uniformity in how prescription drugs are regulated. Indeed, that is the very purpose of the FDA. The ban, on the other hand, imposes burdens both inside and outside Massachusetts – and if replicated across multiple states, will significantly burden interstate commerce.

To begin with, the ban will not only harm patients living in Massachusetts with chronic pain, but it will also harm patients residing *outside* Massachusetts who see providers in Massachusetts.  In a March 31, 2014 Circular Letter to health care providers regarding the ban, DPH supplied sample "Q&A".  Compl. ¶ 33, Ex. A at 2.  When asked whether a Massachusetts provider could still prescribe hydrocodone-only extended release drugs, i.e., Zohydro™ ER, to residents of other states, the DPH responded with a categorical "no."  *Id.*  Thus, not only does the ban prohibit prescriptions of Zohydro™ ER for patients residing within the borders of Massachusetts, but it also means that certain patients in neighboring states – not to mention patients across the country, who seek care at a number of preeminent Massachusetts health care organizations – will not be able to access this safe and effective pain medication.  The tentacles of Defendants' actions thus reach far beyond the borders of the state.

In addition, if other states follow Massachusetts and prohibit the prescribing or dispensing of FDA-approved drugs like Zohydro™ ER because those states question aspects of the drugs' formulation, the result would cripple not just one company, but the entire pharmaceutical industry.  A patchwork of state-specific regulation governing how prescription drugs are designed and formulated would eviscerate the mission of the FDA and create 50 different fiefdoms deciding what constitutes safe and effective pharmaceuticals, precisely the type of problem the Supreme Court decided was unacceptable in *Bibb* and *Southern Pacific*.

In cases where there is a need for national uniformity in interstate commerce, courts apply the *Pike* undue burden test, which holds that a state action may be invalid under the dormant Commerce Clause when "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  Here, the burden imposed on health care providers in Massachusetts and on their

patients across several states is clearly excessive.  The ban does not seek to limit excessive

access to hydrocodone drugs; it prohibits the prescribing or dispensing of Zohydro™ ER

altogether.  Nothing is more "excessive" than a total prohibition.

And the putative benefits ascribed to the ban are not only unfounded, but they fly in the

face of the careful and considered judgment of the FDA in finding Zohydro™ ER safe and

effective.  The hypothetical and minimal benefits of lessening opioid abuse from one drug are

dwarfed by the remaining threat posed by the dozens of other hydrocodone drugs and other

immediate release and extended release opioids that would still be available for purchase – and

misuse and abuse – by patients in and around Massachusetts.  Targeting Zohydro™ ER simply

will not have a significant impact on opioid abuse.  It *will* have a significant impact on patients

deprived of access to a safe and effective FDA-approved pain medication.

## II.    Zogenix Has Suffered and Will Continue to Suffer Irreparable Harm.

The Massachusetts DPH ban has caused and, absent an injunction, will continue to cause

overwhelming and irreparable harm to Zogenix.  The First Circuit has recognized that a plaintiff

need not demonstrate that denial of injunctive relief would be completely fatal to its business.

*See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (citation

omitted).  Rather, it is typically adequate for a plaintiff to show that it has suffered a substantial

injury and that alternative legal remedies are inadequate or unavailable to provide relief.  *See id.*

(citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (collecting cases)).  Where

harms cannot be accurately measured or compensated by money damages, a finding of

irreparable harm is a "natural sequel."  *Id.* at 19 (collecting cases).

If the DPH ban on Zohydro™ ER remains in place, Zogenix is certain to suffer

irreparable injury to the goodwill and positive reputation that the company carefully has

developed nationwide among patients, prescribers, and pharmacists, as well as the potential for future sales.  These harms are incalculable and incapable of later compensation.  The First Circuit explicitly has recognized that the threat of harm to business reputation constitutes irreparable harm sufficient to warrant immediate injunctive relief.  *See Hyperthern, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987) (citation omitted).  Indeed, the "availability of a product line is as important, if not more important, than the amount of sales generated."  *See Ross-Simons*, 102 F.3d at 19-20.  The threat is twofold.  A company's inability to supply products as advertised can alienate potential customers and "wreak substantial (but immeasurable) damage to the [company's] goodwill."  *Id.* at 19.  In addition, loss of a product line can create a threat of irreparable injury if customers turn to competitors not laboring under the same handicaps.  *Id.* (citing, e.g., *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14-15 (1st Cir. 1986)).  Defendants' ban here is likely to harm Zogenix's reputation and goodwill among physicians and pharmacists not just in Massachusetts, but nationwide, who may now be wary of prescribing Zohydro™ ER despite its clear benefits to patients at risk of liver toxicity.  Compl. ¶¶ 37-38.  They may also have to turn to competing hydrocodone-based products, regardless of health risks.  *Id.* ¶ 39.

Those goodwill and reputational injuries are not easily measured or fully compensable in damages.  Accordingly, they are irreparable.  *See Ross-Simons*, 102 F.3d at 20.  Moreover, Zogenix must seek relief against the backdrop of Eleventh Amendment precedents.  Although it may obtain an injunction against state officers acting in their official capacities, *Ex Parte Young*, 209 U.S. 123, 155-56 (1908), any injunction issued governs only the official's future conduct and does not allow for damages, *Edelman v. Jordan*, 415 U.S. 661, 666-67 (1974).

In addition to lost goodwill and customers, because the Massachusetts ban prohibits *any* prescription or dispensation of Zohydro™ ER in the state, Zogenix's lost sales have the potential to be substantial.  Compl. ¶ 40.  That the company's sales in Massachusetts constitute only a percentage of its nationwide sales is not dispositive.  *See Ross-Simons*, 102 F.3d at 18 (fact that plaintiff stood to lose less than one percent of its annual sales did not foreclose an analysis of whether its economic viability could be jeopardized).  Moreover, Zogenix has already seen its stock price drop significantly since the announcement of the ban.  Compl. ¶ 41.  And given the media attention on Massachusetts' actions, moreover, Zogenix' lost sales will extend well beyond Massachusetts.  Those lost sales, coupled with the lost goodwill and customers preceding them, plainly are irreparable harm.  The clock is also ticking for Zohydro™ ER; its FDA approval, gained after tens of millions of dollars in investment and eighteen months of consideration, conferred three years of market exclusivity on Zogenix, and that time is running.

## III.   Zogenix's Harm Outweighs Any Claimed Harm To Defendants and the Public Interest Strongly Favors an Injunction.

Zogenix faces irreparable harm if Defendants' actions are not enjoined.  Defendants, on the other hand, will not suffer *any* harm if an injunction issues requiring them to rescind the ban.  The only harm to Defendants would be the de minimis cost of communicating with providers throughout the state that they may prescribe Zohydro™ ER once again.  Defendants quickly communicated the ban; they will be able to just as quickly communicate its lifting.

The public, on the other hand, stands to suffer significantly.  "The public has no interest in the enforcement of what is very likely an unconstitutional statute."  *Odebrecht Const., Inc. v. Secretary, Florida Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013).  And the public *does* have an interest in favor of enjoining the ban so that patients at risk for liver toxicity and suffering from chronic pain have a viable treatment option.  *Stormans, Inc. v. Selecky*, 586 F.3d

1109, 1139 (9th Cir. 2009) ("There is a general public interest in ensuring that all citizens have timely access to lawfully prescribed medications."). Here, the public will be greatly harmed by Defendants' actions because it will be denied access to a uniquely beneficial pain medication. By depriving them of this option, the ban is putting patients at further risk and compromising the ability of health care providers to consider all available options and make the best decision.

Zogenix understands the need for further efforts to curtail opioid abuse. But the ban will not be an effective tool to meet that goal. For as the FDA has already concluded, it is not "in the interest of public health at this time to require all opioid products or all [extended release/long-acting] opioid products" to feature the abuse deterrent formulation the Defendants are requiring of Zohydro™ ER. Compl. ¶ 24, Ex. E at 3. The ban also does nothing to address the dozens of other hydrocodone and other opioid drugs that remain on the market and that arguably pose a greater risk of abuse. Thus, the public interest in access to FDA-approved safe, effective, and unique pain medications far outweighs any perceived gain in fighting opioid abuse.

## CONCLUSION

For the foregoing reasons, Zogenix respectfully requests that the Court issue a temporary restraining order and preliminary injunction (i) declaring pursuant to 28 U.S.C. § 2201 that the Governor's and Commissioner's conduct in effectuating a ban on the prescription, ordering, dispensing, and administration of Zohydro™ ER violates the United States Constitution; and (2) enjoining Defendants from implementing or enforcing the Declaration of Emergency, the Commissioner's Order or any other action banning the prescription, ordering, dispensing, and administration of Zohydro™ ER or, in the alternative, vacating the Governor's Declaration of Emergency, the Commissioner's Order, and any other conduct undertaken by or at the direction of Defendants relating to the Commonwealth's effort ban Zohydro™ ER.

Dated: April 7, 2014                         Respectfully Submitted,

                                             /s/ Kenneth J. Parsigian
                                             Kenneth J. Parsigian (BBO # 550770)
                                             Steven J. Pacini (BBO # 676132)
                                             LATHAM & WATKINS LLP
                                             John Hancock Tower, 20th Floor
                                             200 Clarendon Street
                                             Boston, MA 02116
                                             Tel:  (617) 948-6000
                                             Fax:  (617) 948-6001
                                             kenneth.parsigian@lw.com
                                             steven.pacini@lw.com

                                             HOGAN LOVELLS US LLP
                                             Steven P. Hollman (*pro hac vice*
                                             forthcoming)
                                             Susan M. Cook (*pro hac vice* forthcoming)
                                             555 Thirteenth Street, N.W.
                                             Washington, D.C. 20004
                                             (202) 637-5672 (Telephone)
                                             (202) 637-5910 (Fax)
                                             steven.hollman@hoganlovells.com
                                             susan.cook@hoganlovells.com

                                             *Attorneys for Plaintiff Zogenix, Inc.*