IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZOGENIX, INC.<br>　　　　Plaintiff,<br>v.<br><br>DEVAL PATRICK, in his official capacity as the GOVERNOR OF MASSACHUSETTS<br><br>and<br><br>CHERYL BARTLETT, RN, in her official capacity as DEPARTMENT OF PUBLIC HEALTH COMMISSIONER,<br><br>　　　　Defendants. | Civil Action No. 1:14-cv-11689 |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

The plaintiff, Zogenix, Inc. ("Zogenix"), seeks to market in Massachusetts a new opiate painkiller known as Zohydro ER. This drug is available with dosages of hydrocodone that are *five times greater* than the highest dose in other hydrocodone-containing products on the market. Because hydrocodone depresses the respiratory system, and because Zohydro may be crushed and then inhaled or injected, this drug is especially susceptible to misuse and overdose fatalities.

As is detailed herein, Zohydro will exacerbate a severe public health crisis in the Commonwealth resulting from an epidemic of opiate abuse and a substantial increase in opiate-related overdoses and related fatalities. In the face of what is already tremendous suffering by affected individuals in the Commonwealth and their families, the Governor and state public health officials determined that Zohydro poses an unacceptable risk of additional abuse and fatalities and may not be marketed in Massachusetts in its non-abuse-deterrent form.

1

As is detailed in the next section, Zogenix acknowledges that the Governor's swift action conditionally banning Zohydro in Massachusetts has thus far kept this non-abuse-deterrent drug out of the hands of those who might abuse it. The Governor's prompt action affords time for evaluation of Zogenix's legal claims without exacerbation of a public health emergency.

Zogenix asks the court, within a week of receiving Zogenix's complaint and without an appropriate record, to overrule the defendants' exercise of traditional state police powers to protect the health, safety, and welfare of its residents. Zogenix makes this request despite the tremendous market confusion and potential health risks associated with allowing Zohydro to be marketed in the state pending the outcome of this litigation, when it could be removed from the market again. And Zogenix makes this request without citing a single case that stands for the proposition that the pre-market approval process, pursuant to the Food, Drug, and Cosmetic Act, 21 U.S.C. § 355, *et seq.,* ("FDCA") is anything other than a gateway approval that allows a drug to move forward and address stricter requirements imposed by individual states. Decisions of the Supreme Court in fact signal that the FDCA does not preempt this exercise of state police power.

As will be demonstrated herein, Zogenix has not begun to prove that it is likely to succeed on the merits of its preemption claim, and this court should await a full record before resolving that significant constitutional question. The public interest demands that a state's exercise of its sovereign powers to protect its citizens in an area traditionally entrusted to state authority receive at least that much deference, especially in the circumstance of a public health emergency.

### I.     Zohydro Will Exacerbate a Public Health Crisis.

Massachusetts is currently experiencing a public health crisis in opioid abuse and addiction.  Between 2000 and 2012, the rate of death caused by unintentional or undetermined opioid overdoses surged by 90%. Jacobs Aff. ¶ 8(1), Defts' Ex. A.  In 2012 alone, 668 Massachusetts residents died from unintentional opioid overdoses, a 10% increase from 2011. *Id.* ¶ 8(2).  In that same year, one-third of all injury deaths were poisonings, and opioid overdoses accounted for 69% of the poisoning deaths. *Id.* ¶ 8(3).  Since 2005, the number of opioid overdose deaths in the Commonwealth has exceeded the number of motor vehicle deaths. *Id.* ¶ 8(5).

The skyrocketing rate of opioid abuse has been fueled in large part by the proliferation of prescriptions of opioid pain relievers.  From 2000 to 2011, the number of prescriptions written for Schedule II opioids increased by 88%, from 1.4 million to 2.6 million. *Id.* ¶ 10.  According to the Drug Enforcement Administration and the Centers for Disease Control and Prevention, as prescription opiate sales have increased nationally, so too have opiate overdose deaths. *Id.* ¶ 13.

A damaging side effect of swelling opioid prescriptions is the propensity of opioid abusers to transition into heroin use.  The Substance Abuse and Mental Health Services Administration reports that 79.5% of recent heroin initiates have previously used prescription pain relievers non-medically, and that people aged 12 to 49 who had used prescription pain relievers non-medically were 19 times more likely to have initiated heroin use recently than others in the age group. *Id.* ¶¶ 11–12.  Indeed, in the short period between November 2013 and February 2014, overdose deaths related to heroin use in Massachusetts numbered at least 140, a sum that does not include overdose deaths in Boston, Springfield, and Worcester. *Id.* ¶ 9.  This heroin-related fatality rate surpasses any previously seen in the Commonwealth. Pltf's Ex. G.

Against this backdrop, the Governor of Massachusetts, Deval Patrick, recently declared a public health emergency in the Commonwealth related to the opioid abuse epidemic. *Id.* The Governor's March 27, 2014 declaration empowered the Commissioner of the Department of Public Health ("DPH"), Cheryl Bartlett, RN, to order broader access to, and permit first responders to carry and administer, an anti-opioid drug that can reverse the effects of overdose. *Id.* It also empowered the Commissioner to accelerate the mandatory use of what was previously a voluntary prescription monitoring program by physicians and pharmacies. *Id.* In addition, the Governor directed the Commonwealth's interagency Council on Substance Abuse and Prevention to make recommendations on how to improve treatment and addiction services, and dedicated an additional $20 million to those services. *Id.*

Zogenix challenges a separate provision of the Governor's declaration. That provision empowered the Commissioner to "prohibit the prescribing and dispensing of any hydrocodone-only formulation" of pain relievers, "(commonly known as Zohydro)[,] until [it is] determined that adequate measures are in place to safeguard against the potential for diversion, overdose, and misuse" because the introduction of Zohydro into the Commonwealth would "pos[e] a significant risk to individuals already addicted to opiates and to the public at large." *Id.* In accordance with that instruction, Commissioner Bartlett issued the following emergency order:

> No registered individual practitioner shall prescribe or order, and no one shall dispense or administer any hydrocodone bitartrate product in hydrocodone-only extended-release formulation[,] until the Commissioner has determined that adequate measures are in place to safeguard against the potential for diversion, overdose and abuse.

Pltf's Ex. G, at 2 ("Emergency Order"). The Emergency Order clarified that it contained a "means for the Commissioner to lift the prohibition when there are adequate safety measures . . . which will then allow for the prescribing of hydrocodone-only products to patients with severe pain without running as great a risk that the medication will be diverted or abuse[d]." *Id.*

4

The drug identified in the Governor's declaration—Zohydro ER (hereinafter Zohydro)—received pre-market approval from the U.S. Food and Drug Administration ("FDA"), pursuant to the FDCA, in October 2013 after a controversial and widely criticized review process. Pltf's Ex. C, at 1; Defts' Ex. D, at 5-6.[1]  Zohydro is a 12-hour extended release pill marketed by Zogenix. Defts' Ex. D, at 2.  It is the first pill to consist entirely of hydrocodone, as opposed to hydrocodone plus acetaminophen (such as Vicodin) or hydrocodone plus ibuprofen (such as Vicoprofen). *Id.*  Zohydro is available in 50-milligram doses of hydrocodone.  Allwes Aff. ¶ 10, Defts' Ex. B.  Other products using hydrocodone in combination with another drug contain doses of 2.5 to 10 milligrams of hydrocodone. *Id.*[2]   Thus, Zohydro is available with dosages of hydrocodone that are five times greater than the highest dose in other hydrocodone-containing products on the market, a fact that gives rise to dangers not seen in other hydrocodone products. *Id.* ¶¶ 3–4.  In particular, in light of its higher dosage, Zohydro creates a greater risk of severe or fatal respiratory depression than other hydrocodone products, even when taken as directed. *Id.* ¶¶ 5–6.

When Zohydro is not taken as directed, the results can be catastrophic.  Because Zohydro is not crush-resistant, it can be crushed and then inhaled or injected, making the entire dose of hydrocodone immediately available. *Id.* ¶ 8.  When inhaled or injected, that dose "is enough to create a high risk of severe respiratory distress or fatal overdose." *Id.* ¶ 9.

---

[1] Food and Drug Administration, Center for Drug Evaluation and Research, *Summary Minutes of Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee* (Dec. 7. 2012), available at http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/AnestheticAndAnalgesicDrugProductsAdvisoryCommittee/UCM336475.pdf, and attached as Exhibit D.

[2] In her original affidavit dated April 8, Ms. Allwes indicated that "[c]urrently used hydrocodone combination products contain between 5 and 10 milligrams of hydrocodone." April 8, 2014 affidavit of Deborah Allwes, ¶ 10.  She has since determined that some contain only 2.5 milligrams, and has made that change in her new affidavit. *See* Allwes Aff. ¶ 10, Defts' Ex. B.

Zohydro's product label confirms these concerns. It warns: "Accidental consumption of even one dose of Zohydro ER, especially by children, can result in a fatal overdose of hydrocodone." Exhibit A to Aff. of Daniel P. Alford, MD, MPH, FACP, FASAM, Defts' Ex. C.[3] And it directs physicians to "[i]nstruct patients to swallow Zohydro ER capsules whole" because "crushing, chewing, or dissolving Zohydro ER capsules can cause rapid release and absorption of a potentially fatal dose of hydrocodone." *Id.*

When FDA considered the new drug application for Zohydro, its expert Anesthetic and Analgesic Drug Products Advisory Committee recommended, by a vote of 11 to 2, that the FDA not approve Zohydro. Defts' Ex. D, at 6. Only a bare majority of the committee considered Zohydro even effective for pain management. *Id.* at 5 (reflecting 7 affirmative votes, 6 negative votes, and 1 abstention on the question). And a solid majority of the committee believed Zohydro was not safe for its intended population due to the risk of addiction. *Id.* (reflecting a vote of 9 to 5). Those committee members also "noted that drug diversions and deaths still occurred in clinical trials despite close monitoring, and that the frequency of these adverse outcomes would likely be worse in real life clinical practice in the absence of close monitoring." *Id.* They further "stated that the FDA should not approve [extended-release/long-acting] opioids without tamper-resistant or abuse-deterrent formulations." *Id.* at 6. The Committee's conclusions were consistent with those of the FDA's Controlled Substances Staff, who explained that should Zohydro be approved and marketed, it "will be associated with higher levels of abuse

---

[3] Zohydro's product label is publicly available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/202880s000lbl.pdf.

than the hydrocodone combination products" currently available on the market.  Defts' Ex. E, at 35.[4]

Despite the Advisory Committee's vote and the safety concerns voiced in its meeting, the FDA approved Zohydro in October 2013.[5]  That decision has drawn widespread criticism.  In March 2014, a bipartisan group of congressmen introduced bills in the Senate and House of Representatives, both titled "Act to Ban Zohydro," to revoke FDA approval of Zohydro. S. 2134, 113th Cong. (2014); H.R. 4241, 113th Cong. (2014).  Both bills cite the Advisory Committee's 11-to-2 vote against approval of Zohydro and note the Committee's conclusion that "if approved and marketed, Zohydro ER will be abused, possibly at a rate greater than that of currently available hydrocodone combination products." S. 2134, § 2(5)-(6); H.R. 4241, § 2(5)-(6).  In December 2013, Attorneys General from 28 states, including Massachusetts, sent a letter urging the FDA to reconsider its approval of Zohydro or require the drug to be reformulated with abuse-deterrent features. Defts' Ex. F.[6]  The letter explained that Zohydro "has the potential to

---

[4] FDA Center for Drug Evaluation and Research, *Background Materials: Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee* (Dec. 7, 2012), available at http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/AnestheticAndAnalgesicDrugProductsAdvisoryCommittee/UCM330683.pdf, and attached as Exhibit E.

[5] It is rare for the FDA to disregard the recommendation of its advisory committees.  According to an independent study of FDA new drug application decisions between 2001 and 2010, the FDA follows advisory committees' recommendations over 86% of the time.  *See* McKinsey Center for Government, FDA Advisory Committee Outcomes, at 3 (Oct. 2013), available at http://www.mckinsey.com/~/media/McKinsey/dotcom/client_service/Public%20Sector/Regulatory%20excellence/FDA_advisory_committee_outcomes.ashx, and attached as Exhibit G.

[6] Letter of the Attorneys General of Alaska, Arizona, Arkansas, Connecticut, Delaware, Florida, Georgia, Guam, Hawaii, Illinois, Indiana, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Mississippi, Nevada, New Hampshire, North Carolina, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Utah, Vermont, and Washington to Commissioner Margaret Hamburg, M.D. (Dec. 10, 2013), available at http://www.oag.state.md.us/Press/Zohydro.pdf, and attached as Exhibit F.

exacerbate our nation's prescription drug abuse epidemic" because its dosage is five to ten times higher than other hydrocodone products and it lacks abuse-deterrent properties. *Id.*

Nor does the medical community perceive a need for a hydrocodone-only pain reliever. Dr. Daniel P. Alford, an Associate Professor and Assistant Dean at the Boston University School of Medicine and a primary care physician at Boston Medical Center specializing in pain management, explains that "[t]here are many options for controlling pain available to physicians," and "there is no need for an additional opioid for pain management at this time." Alford Aff. ¶ 4, Defts' Ex. C. Several of these options are available in extended release form with abuse-deterrent properties, "making them safer than Zohydro ER." *Id.* ¶ 6. Dr. Alford would not prescribe Zohydro for his patients because "there are many available medications that effectively treat chronic pain, including opioids available in extended release, abuse-deterrent forms." *Id.* ¶ 7.

## II. Zogenix Has Not Demonstrated that it will Likely Succeed on its Preemption Claim.

### A. The Court must presume that Congress did not intend to preempt.

"[T]wo cornerstones" anchor preemption jurisprudence. *Wyeth v. Levine,* 555 U.S. 555, 565 (2009). "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.' . . . Second, '[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Id.* (internal citations omitted). Federal courts "rely on the presumption [against preemption] because respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt" state law. *Id.* at 1195 n.3.

8

The Supreme Court has acknowledged "the historic primacy of state regulation of matters of health and safety," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), and accordingly has applied a "presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation," *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716 (1985). The FDCA exemplifies this presumption of constitutional coexistence. The 1962 amendments to the Act added "a saving clause, indicating that a provision of state law would only be invalidated upon a 'direct and positive conflict' with the Act." *Wyeth,* 555 U.S. at 567. As the Supreme Court explained in *Wyeth,* when Congress enacted its "first significant public health law, the Federal Food and Drugs Act, ch. 3915, 34 Stat. 768," in 1906, "which prohibited the manufacture or interstate shipment of adulterated or misbranded drugs," that statute

> supplemented the protection for consumers already provided by state regulation and common-law liability. In the 1930's, Congress became increasingly concerned about unsafe drugs and fraudulent marketing, and it enacted the [FDCA]. The Act's most substantial innovation was its provision for premarket approval of new drugs. . . .
>
> . . .
>
> As it enlarged the FDA's powers to "protect the public health" and "assure the safety, effectiveness, and reliability of drugs," [citation omitted] Congress took care to preserve state law [by enacting the saving clause]. Consistent with that provision, state common-law suits 'continued unabated despite . . . FDA regulation.' [citations omitted]

*Id.* at 566-67.

Moreover, "when Congress enacted an express pre-emption provision for medical devices in 1976, [21 U.S.C. § 360k(a)], it declined to enact such a provision for prescription drugs." *Id.* at 567. This significant, deliberate omission sets the FDCA apart from many laws that have broad, express preemptive effect, such as ERISA.

9

It is Zogenix's burden to show that, despite the FDCA savings clause, Congress "implied" that some state laws would be preempted. To satisfy this difficult burden, and overcome the presumption against preemption, Zogenix must demonstrate a "direct and positive conflict," Drug Amendments of 1962, § 202, Pub. L. No. 87-781, 76 Stat. 780 (1982), between the exercise of state police powers at issue here and the FDCA for the Court to conclude that the Massachusetts conditional ban on Zohydro is preempted.

### B. There is no direct and positive conflict between the Massachusetts conditional ban on Zohydro and the FDCA.

State and federal law conflict for purposes of implied preemption only if it is "impossible for a private party to comply with both state and federal requirements," *English v. General Electric Co.*, 496 U.S. 72, 79 (1990), or if a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law," *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1136 (2011) (internal quotation marks omitted). The Supreme Court has made clear that neither form of implied preemption justifies "a 'free-wheeling judicial inquiry into whether a state statute is in tension with federal objectives'" because "such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.' " *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1985 (2011) (quoting *Gade v. Nat'l Solid Waste Mgmt. Assn.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). Instead, a court must carefully evaluate whether Congress intended to supersede state law through the specific statute or regulation at issue. "[A] high threshold must be met," the Court has explained, "if a state law is to be pre-empted for conflicting" with a federal law. *Id.*

Zogenix has not begun to meet this demanding threshold. Indeed, Zogenix does not even argue that it would be impossible for it to comply with both the FDCA and the state order, and

10

any such argument would clearly fail. Unlike the situation presented by a generic drug, where the manufacturer lacks the ability to modify the drug's composition, the manufacturer of Zohydro controls its design and is free to seek FDA approval of an abuse-deterrent formulation. *Compare Mutual Pharmaceutical Co., Inc. v. Bartlett,* 133 S. Ct. 2466, 2474-77 (2013) (finding preemption of design-defect claim under state law on impossibility grounds due to drug manufacturer's inability under federal law to redesign a generic drug or change the label). Accordingly, unlike the state-law duty at issue in *Bartlett,* the Massachusetts conditional ban of in-state Zohydro sales pending development of an abuse-deterrent formulation does not force Zohydro's manufacturer to stay out of the Massachusetts market permanently in order to comply with both federal and state requirements. *See id.* at 2477-78.[7]

Apparently recognizing that there is no "impossibility preemption" here, Zogenix stakes its case on so-called "obstacle preemption," arguing that the Massachusetts Emergency Order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the FDCA. *Williamson*, 131 S. Ct. at 1136. But Zogenix ignores the fact that *Wyeth* rejected, for purposes of the FDCA, this more amorphous brand of implied preemption. *See Wyeth,* 555 U.S. at 573. Indeed, Zogenix does not show, through legislative history, statutory terms or structure, or any other competent indications that Congress intended, with the FDCA premarket approval process, to prohibit supplemental state regulation of prescription drugs. Instead Zogenix simply assumes, without any support, that Congress gave the FDA *exclusive* authority to determine "when and under what circumstances a drug is 'safe' for marketing," just because Congress gave the FDA *certain* authority to protect the public from harm and promote public

---

[7] Moreover, *Bartlett* twice notes that in the "rare case," like this one, "where state or federal law actually requires a product to be pulled from the market," a manufacturer's ability to stop selling could "turn impossibility into possibility." 133 S. Ct. at 2477, n. 3, 2478 n. 5.

11

health in the realm of pharmaceutical marketing. *See* Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Zogenix Memorandum") at 6–10. And, of course, it is utterly irrelevant that the FDA has a judicially recognized level of expertise warranting deference in contexts having nothing to do with preemption analysis. *See* Zogenix's Memorandum at 6–10.[8]

Zogenix never even attempts to reconcile its unsupported assumption about the exclusivity of FDA authority with the compelling fact that Congress considered and rejected an express preemption provision for prescription drugs when it adopted such a provision for medical devices. *See Wyeth,* 555 U.S. at 567.  As the Court explained in *Wyeth*, "[i]f Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history." 555 U.S. at 574.  Zogenix offers no basis to conclude differently with respect to the Massachusetts Emergency Order.[9]

A decision of this court involving a Massachusetts ban on the sale and use of certain space heaters demonstrates the significance to the preemption analysis of the FDCA's inclusion

---

[8] Zogenix also cites inapposite cases involving the discernment of congressional intent under other federal statutory and regulatory schemes, like environmental protection and automobile safety. *See* Zogenix's Memorandum at 8 – 10.  The issue here is specific to congressional intent as reflected in the FDCA.  And it is irrelevant that the FDA's initial pre-market approval is meant to protect and promote the public health, which may be furthered by a range of product choices.  None of that is inconsistent with continued recognition of pre-existing authority on the part of state public health officials to protect their citizenry.  Nor does a perceived, general desire for pre-market approval of multiple drug options turn a preliminary approval of a particular drug for general entry into the marketplace into a guarantee that it may thereafter be marketed in every state.

[9] In fact, even the express FDCA preemption for medical devices includes a provision for waiver based on "compelling local conditions," 21 U.S.C. § 360k(b)(2)(A), indicating congressional solicitude for localized public health and safety concerns such as the public health emergency facing the Commonwealth.

of an express preemption provision that does not extend to the subject matter at issue here. In *National Kerosene Heater Ass'n v. Commonwealth,* 653 F. Supp. 1079 (D. Mass. 1987), the court rejected a preemption challenge to two Massachusetts statutes that banned the sale and use of unvented liquid-fired space heaters. The federal Consumer Product Safety Commission had promulgated a voluntary standard allowing continued use of portable kerosene heaters, after thoroughly considering articulated safety concerns. The court first found an express preemption provision in the Consumer Product Safety Act ("CPSA") inapplicable. *Id.* at 1089. Then turning to obstacle preemption, the court observed that one purpose of the CPSA was to "develop uniform safety standards for consumer products and to minimize conflicting State and local regulations." *Id.* at 1090 (quoting 15 U.S.C. § 2051(b)(3)). This purpose is, of course, comparable to a purpose that Zogenix attributes to the FDCA's pre-market approval process. However, because the CPSA had an express preemption provision that was inapplicable to the Massachusetts statutes, and in light of the presumption against preemption, the court concluded that Congress did not view the Massachusetts ban as an obstacle to the federal objectives. *See id.*[10]

In *Wyeth,* the Supreme Court expressly rejected the drug manufacturer's argument "that the FDCA establishes both a floor and a ceiling for drug regulation," finding that the argument

---

[10] To the extent Zogenix argues that a state's ban of a product is necessarily preempted when a federal agency, acting pursuant to its federal enabling statute, has permitted the product, its position is clearly incorrect. *See, e.g.*, *Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 672 (9th Cir. 2003) (California ban on gasoline containing certain additives was not preempted by the Clean Air Act because it did not conflict with the goals and purposes of the Act); *Oxygenated Fuels Ass'n, Inc. v. Pataki*, 293 F. Supp. 2d 170, 172 (N.D.N.Y. 2003) (New York statute "prohibiting the use, sale, or importation in New York of gasoline containing" certain additives was not subject to conflict preemption by the Clean Air Act); *Chinatown Neighborhood Ass'n v. Harris*, 12-cv-03759-WHO, 2014 WL 1245047 (N.D. Cal. Mar. 25, 2014) (California statute that makes it "unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin" did not conflict with and was not preempted by the Magnuson Stevens Act).

"relies on an untenable interpretation of congressional intent and an overbroad view of an agency's power to pre-empt state law." 555 U.S. at 573.[11] *See also Bartlett,* 133 S. Ct. at 2479 ("[F]ederal law establishes no safe-harbor for drug companies[.]")  While the holding in *Wyeth* is that state tort claims for failure to warn do not stand as an obstacle to the accomplishment of Congress' purposes in promulgating the FDCA, 555 U.S. at 581, the Court's analysis of congressional intent is equally relevant here.  Thus, the Court explained that "Congress enacted the FDCA to *bolster* consumer protection against harmful products," not replace state consumer protection; Congress did not provide a federal remedy for injured consumers because it concluded that state law provided appropriate relief and served a motivational and deterrent purpose vis-à-vis drug manufacturers. 555 U.S. at 574 (emphasis added).  The Massachusetts conditional ban on Zohydro is similarly a state law designed to protect consumers from a harmful product and incentivize the manufacture of a safer drug.

*Wyeth* should control this Court's analysis here.  If, as in *Wyeth,* a single individual is free, after first having to suffer injury, to pursue a state tort claim for an unsafe drug, it follows that health officials of a state may exercise their powers on behalf of the public interest to prevent injury from occurring in the first place to thousands of individuals.  Zogenix has cited no precedent for its surprising and illogical conclusion to the contrary. And because *Wyeth* equates common-law tort remedies for unsafe drugs with "drug regulation," 555 U.S. at 573, the

---

[11]Justice Thomas's concurring opinion in *Wyeth* similarly rejects the notion that FDA approval is a ceiling.  While focused on drug labeling, his rationale would apply equally to pre-market approval of the drug generally.  *See Wyeth,* 555 U.S. at 1210 (Thomas, concurring) ("To say, as the statute does, that Wyeth may not market a drug without federal approval (i.e., without an FDA-approved label) is not to say that federal approval gives Wyeth the unfettered right, for all time, to market its drug with the specific label that was federally approved.  Initial approval of a label amounts to a finding by the FDA that the label is safe for purposes of gaining federal approval to market the drug.  It does not represent a finding that the drug, as labeled, can never be deemed unsafe by . . . the application of state law.").

Supreme Court has in fact signaled that other forms of state drug regulation—like the Massachusetts Emergency Order—will also survive preemption claims. *See also Bartlett,* 133 S. Ct. at 2473 (rejecting assertion that "the purpose of New Hampshire's design-defect cause of action 'is compensatory, not regulatory,' and explaining that the state cause of action "imposes affirmative duties on manufacturers") (internal citation omitted) and 2479 (dismissing a proffered distinction between common and statutory law as irrelevant to the preemption analysis because "[i]n violating a common-law duty, as surely as by violating a statutory duty, a party contravenes the law"); *Wyeth,* 555 U.S. at 578 (noting that "[i]n keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation" and rejecting "the FDA's newfound opinion, expressed in [the preamble to a 2006 regulation] that state law 'frustrate[s] the agency's implementation of its statutory mandate[.]' ").[12]

Thus, Supreme Court decisions indicate that state regulatory measures such as Massachusetts' conditional ban on Zohydro do not serve as an obstacle to accomplishing the full objectives of the FDCA's pre-market approval process for prescription drugs. Perhaps a state measure that adopted, for effect within its borders, a general, premarket approval system for all new prescription drugs could be viewed as such an obstacle. However, Massachusetts has not interfered with the FDA's pre-market approval system by temporarily suspending the sale of a particular drug in order to allow for essential, abuse-prevention measures. Permitting this regulatory action, designed to benefit the public as a whole, is entirely consistent with *Wyeth*

---

[12] The Court also cites to reports concluding that the FDA " 'suffers from serious scientific deficiencies and is not positioned to meet current or emerging regulatory responsibilities' " and " 'lacks the resources needed to accomplish its large and complex mission.' " *Wyeth,* 555 U.S. at 578 n.11. This practical reality supports the need for combined federal and state regulatory efforts to protect the public from harmful drugs.

having allowed single individuals to enforce state common-law duties. Both the public and private actions serve the purposes of incentivizing conduct that protects health and safety and deterring conduct that harms the public, and neither interferes with the FDA's authority to make initial, pre-market safety decisions.

For all of these reasons, Zogenix has not begun to meet its burden of overcoming the presumption against preemption. It has, in fact, completely begged the issue. The question is, what is FDA premarket approval? Is it a ceiling, or just a floor? The Massachusetts conditional ban does not disturb the floor – Zohydro still has general pre-market approval and may be marketed in other states. The Massachusetts measure simply constitutes another hurdle that Zogenix must surpass in order to market a pure hydrocodone extended-release drug in the Commonwealth.

## CONCLUSION

Zogenix has failed on this limited record to prove that it is likely to succeed on the merits. The preemption issue here is, at the very least, highly debatable. Indeed, the Supreme Court has itself noted "the difficult pre-emption questions that arise in the prescription drug context," observing that the issue "has repeatedly vexed the Court—and produced widely divergent views—in recent years." *Bartlett,* 133 S. Ct. at 2480. On that basis, the Court has indicated that it "would welcome Congress' 'explicit' resolution" of these difficult questions. *Id.* It cannot possibly be, then, that the question here is so clear as to permit injunctive relief, within a week of suit and without a full record, against a state experiencing a public health crisis that will thereby be exacerbated, resulting in increased addiction, overdoses, and related fatalities and suffering.

While the Court asked that Defendants focus this submission on whether Zogenix is likely to succeed on the merits of its preemption claim, it would be remiss not to note that the

balance of harms weighs overwhelming in the defendants' favor here.  There can be no serious question but that the health and safety of Massachusetts residents takes precedence over the business interests of a single company.  Just as Defendants will not purport to know better than Zogenix what is in its economic interests, Zogenix is not in charge of the question of what is in the best interests of the citizens of Massachusetts.  That is the prerogative of the Governor and state public health authorities, who have determined that Zohydro is both unnecessary as a pain-relief option and unsafe in its current form.  If it enters into use in the Commonwealth in its current, non-abuse-deterrent form, Zohydro will likely be abused and cause severe harm to the public, including possible fatalities.

This harm to the public is avoidable.  The manufacturer of Zohydro is reportedly already working on an abuse-deterrent formulation for its drug.  Any interim harm to Zogenix results from the manufacturer's failure to produce that abuse-deterrent formulation to date, is both temporary and self-inflicted, and in any event pales markedly by comparison to the harm that will result to Massachusetts residents if Zohydro is available for use in its current, unsafe form.

Zogenix's request for preliminary injunctive relief should be denied.

Respectfully submitted,

DEFENDANTS

By their attorneys,

MARTHA COAKLEY, ATTORNEY GENERAL


/s/ Jo Ann Shotwell Kaplan
Jo Ann Shotwell Kaplan (BBO #459800)
Assistant Attorney General
Julia Kobick (BBO # 680194)
Assistant Attorney General
Eric Gold (BBO # 660393)
Assistant Attorney General
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108-1698
(617) 963-2085; Facsimile (617) 727-5785
JoAnn.Kaplan@state.ma.us;
JuliaKobick@state.ma.us

Dated:  April 11, 2014

## Certificate of Service

The undersigned counsel hereby certifies, this 11th day of April, 2014, that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to any parties indicated on the NEF as non-registered participants.

 /s/ Jo Ann Shotwell Kaplan
Jo Ann Shotwell Kaplan (BBO #459800)