UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZOGENIX, INC.,<br><br>                Plaintiff,<br><br>v.<br><br>DEVAL PATRICK, in his official capacity as the GOVERNOR OF MASSACHUSETTS,<br><br>CHERYL BARTLETT, RN, in her official capacity as DEPARTMENT OF PUBLIC HEALTH COMMISSIONER, and<br><br>CANDACE LAPIDUS SLOANE, M.D., et al., in their official capacities as members of the MASSACHUSETTS BOARD OF REGISTRATION IN MEDICINE, and<br><br>KAREN M. RYLE, MS, R.PH et al., in their official capacities as members of the MASSACHUSETTS BOARD OF REGISTRATION IN PHARMACY, and<br><br>DIPU PATEL-JUNANKAR, PA-C, et al., in their official capacities as members of the MASSACHUSETTS BOARD OF REGISTRATION OF PHYSICIAN ASSISTANTS,<br><br>                Defendants. | CIVIL ACTION<br>No. 1:14-cv-11689-RWZ |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S VERIFIED SECOND AMENDED COMPLAINT</u>

Jo Ann Shotwell Kaplan (BBO #459800)
Anne Sterman (BBO #650426)
Eric Gold (BBO #660393)
Julia Kobick (BBO #680194)
Assistant Attorneys General
One Ashburton Place, 20th Floor
Boston, MA 02108

On March 27, 2014, Governor Patrick declared the Commonwealth's opioid addiction epidemic a public health emergency. Verified Second Amended Complaint ("AC"), ¶ 41, Ex. L. Mindful of this crisis, the Massachusetts Board of Registration in Medicine ("BORIM"), Board of Registration in Pharmacy ("BORIP"), Board of Registration of Physician Assistants ("BOROPA"), and Department of Public Health ("DPH") (together, "the Boards")[1] have implemented a set of reasonable steps for prescribers and pharmacists to follow when prescribing and dispensing Zogenix Inc.'s new opioid analgesic, Zohydro[TM] ER ("Zohydro"), in Massachusetts.[2]   As the Commissioner of the Food and Drug Administration ("FDA") has explained, these emergency measures are rooted in best-practice procedures recognized in the medical community and are consistent with the traditional primacy of state government in regulating the medical and pharmacy professions.  The Boards' emergency regulations preserve the availability of Zohydro for qualified patients, while seeking to ensure that it does not become a further driver of the prescription opioid abuse that is rampant in the Commonwealth.

In its newest pleading Zogenix challenges these emergency regulations, asserting obstacle preemption, dormant Commerce Clause, Contracts Clause, and class-of-one equal protection claims.  All fail as a matter of law and should be dismissed under Federal Rule of Civil Procedure 12(b)(6).  Zogenix further lacks standing, necessitating dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

---

[1] BORIM consists of five physician members and two public members, *see* Mass. G. L. c. 13, § 10, and is the state body with "primary responsibility in the regulation of the practice of medicine in the Commonwealth in order to promote the public health, welfare, and safety." *Levy v. Bd. of Reg'n and Discipline in Medicine*, 378 Mass. 519, 524 (1979) (internal quotation marks omitted).  BORIP and BOROPA are also comprised of health professionals, *see* Mass. G. L. c. 13, §§ 11C, 22, and play roles with respect to pharmacists and physician assistants comparable to BORIM's oversight responsibility relative to the practices of physicians. *See, e.g.*, Mass. G. L. c. 112, §§ 9F, 42A.

[2] The Commissioner of DPH has permanently rescinded her earlier emergency order imposing a conditional ban on Zohydro prescriptions. *See* http://goo.gl/V54bqO.   Zogenix's claims regarding the conditional ban are, therefore, moot and will not be addressed herein, because there is "no ongoing conduct left for the court to enjoin." *Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013) ("[F]ederal courts 'are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong.'") (quoting *Spencer v. Kemna*, 523 U.S. 1, 18 (1998)).

# BACKGROUND

Zohydro is "the first single-entity hydrocodone product available on the market [and] the first extended release hydrocodone product[.]" AC, ¶ 5.  All other hydrocodone-containing products "are combination products with limited amounts of hydrocodone." FDA Center for Drug Evaluation and Research, *Background Materials: Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee*, at 33 (Dec. 7, 2012) ("FDA Background Materials"), http://goo.gl/yZIYJw.[3]  Zohydro, in contrast, contains up to five times more hydrocodone than the highest dose of hydrocodone in any other analgesic currently on the market. *See* http://goo.gl/RZpZsq (search by active ingredient for "hydrocodone").  Because of this higher dosage, and because Zohydro is not abuse-deterrent, AC, ¶ 12, the FDA's Controlled Substances Staff "expect[s] that Zohydro ER . . . will be associated with higher levels of abuse than the hydrocodone combination products." FDA Background Materials, at 35.   Moreover, as acknowledged by one of Zogenix's own affiants, products containing hydrocodone are the most widely used and most widely abused opioids on the market. *See* Decl. of David M. Fox (Dkt. No. 22) ("Fox Decl."), ¶ 15.  For this reason and others, some members of the FDA's own scientific advisory committee, which voted 11 to 2 against Zohydro's approval, concluded that Zohydro would, if approved for entry to the market, "most likely be abused more than other previously approved Schedule II extended-release opioids."[4]

---

[3] In addition to Zogenix's complaint, Defendants rely herein on public records susceptible to judicial notice.  *See Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (court may consider public records in resolving motion to dismiss).

[4] *Summary Minutes of Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee*, at 6 (Dec. 7, 2012), http://goo.gl/cAZi44 ("Given that combination hydrocodone/acetaminophen products are the most widely abused opioid, [these] members stated that Zohydro ER would be more likely to be diverted due to the absence of acetaminophen and the lack of a tamper-resistant formulation.").  As one committee member put it, "this will be the choice drug for diversion and extracting hydrocodone.  So that's what makes it different." Anesthetic & Analgesic Drug Products Advisory Committee, Meeting Transcript, at 347 (Dec. 7, 2012), http://goo.gl/w7FbQA.   Another committee member, bemoaning the prevalent misuse of hydrocodone-containing Vicodin by grade-school children and other "uneducated substance abuser[s]," used even starker terms in describing the unique risk of Zohydro, given

Federal regulators have themselves treated Zohydro differently than other hydrocodone-containing analgesics.  The Drug Enforcement Administration ("DEA") scheduled Zohydro as a Schedule II drug, even though the hydrocodone-combination products are Schedule III medications subject to lesser restrictions.  *See* AC, ¶¶ 5 and 34 & n.1.  While DEA has since issued a notice of proposed rulemaking to make the hydrocodone-combination products Schedule II medications, *see id.*, the agency singled out Zohydro for placement on Schedule II before making that subsequent proposal, which may or may not become a final rule.  As Zogenix's declarant attests, "Schedule II represents the most restrictive level of control for FDA-approved drugs" and "substances in [that] schedule have the highest potential for abuse."  Fox Decl., ¶ 12.[5]  Currently, under federal law, Zohydro is the only hydrocodone analgesic treated as having that elevated potential for abuse.

In response to the extraordinary risk posed by this new drug, the Boards have implemented a set of emergency measures that preserve its availability for qualified patients, while seeking to minimize its contribution to opioid abuse.  On April 22, 2014, DPH issued an emergency order that requires Massachusetts practitioners holding a Controlled Substances Registration to "utilize the Prescription Monitoring Program (PMP) to evaluate a patient's prescription history" each time they prescribe Zohydro.  AC, Ex. C, at 1.  The PMP compiles information on dispensing trends and patients' prescription histories with respect to drugs with recognized potential for abuse.  *See* Mass. G. L. c. 94C, § 24A; 105 Code Mass. Regs. ("CMR") § 700.012.

---

its potentially fatal dose of hydrocodone:  "[H]e has a friend who took some Vicodin and had a good time.  He's got some hydrocodone in his cabinet.  Why can't he take that?  And that will be his last choice." *Id.* at 355–56.
[5] Indeed, the Supreme Court has noted that a "State no doubt could prohibit entirely the use of particular Schedule II drugs[.]" *Whalen v. Roe*, 429 U.S. 589, 603 (1977).

Also in April, BORIM adopted emergency regulations that require physicians, before prescribing Zohydro, to:

> (a)      Thoroughly assess the patient, including an evaluation of the patient's risk factors, substance abuse history, presenting condition(s), current medication(s) and a check of the online Prescription Monitoring Program;
>
> (b)      Discuss the risks and benefits of the medication with the patient;
>
> (c)      Enter into a Pain Management Treatment Agreement with the patient that shall appropriately address drug screening, pill counts, safe storage and disposal and other requirements based on the patient's diagnoses, treatment plan, and risk assessment;
>
> (d)      Supply a Letter of Medical Necessity as required by the Board of Registration in Pharmacy that includes the patient's diagnoses and treatment plan, verifies that other pain management treatments have failed, indicates that a risk assessment was performed and that the licensee and the patient have entered into a Pain Management Treatment Agreement; and
>
> (e)      Document 243 CMR 2.07(25)(a)–(d) in the patient's medical record.

243 CMR § 2.07(25); AC, ¶¶ 10, 49, Ex. D.[6]

On May 6, BORIP adopted emergency regulations that require pharmacists to store Zohydro in a securely locked cabinet, dispense it with a child-proof safety cap or a locked box, provide patients a written warning about its dangers, and provide counseling. 247 CMR § 9.04(8)(a)–(b), (d)–(e); AC, ¶¶ 51–52, Ex. O.  The regulations also prohibit pharmacy interns, technicians, and trainees from handling Zohydro, and require pharmacists to check the PMP and ensure that "the prescriber has supplied a Letter of Medical Necessity for each prescription that is compliant with" BORIM's regulation.  247 CMR §§ 8.05(3), 9.04(8)(c), (f); AC, ¶ 52, Ex. O.[7]

It is these emergency regulations that are the subject of Zogenix's constitutional claims.

---

[6] BOROPA subsequently adopted emergency regulations that apply the same requirements to physician assistants. *See* AC, ¶ 53, Ex. P.

[7] BORIM's emergency regulations are nearly identical to steps taken by Vermont to address Zohydro's unique dangers.  Rule Governing the Prescription of Extended Release Hydrocodones Manufactured Without Abuse-Deterrent Formulations, http://goo.gl/LfUINu.  Vermont additionally requires urine testing and specifies that "non-pharmacological treatments" must be deemed ineffective, not tolerated by patients, or inadequate before Zohydro may be prescribed. *Id.*

## ARGUMENT

The Boards' emergency regulations are not preempted by the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, ("FDCA") because, as the FDA itself has repeatedly acknowledged, States retain their traditional authority to regulate the medical and pharmacy professions, including the prescribing and dispensing of medications.  Nor do these emergency regulations begin to constitute an "effective ban" on Zohydro.  As the FDA Commissioner has indicated, they are instead reasonable requirements consistent with both best medical practices and longstanding parallel federal and state responsibilities in the field of drug regulation.  And Zogenix's class-of-one equal protection claim is equally unavailing, because (1) the claim is not available in the circumstances present here, (2) critical elements of the claim are not (and cannot be) alleged, and (3) clear rational basis exists for the Board's emergency regulations.[8]

## I.     The FDCA Does Not Impliedly Preempt the Boards' Emergency Regulations.

Zogenix claims that the Commonwealth's emergency regulations conflict with and are therefore preempted by FDCA provisions and corresponding regulations governing premarket approval of new drugs.  Conflict preemption "occurs when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109 (2000) (internal quotation marks omitted).  Perhaps recognizing that it has no claim of impossibility preemption, Zogenix claims only obstacle preemption. *See* AC, ¶¶ 95–96.  The sole question for this Court, therefore, is whether the emergency regulations "stan[d] as an obstacle to

---

[8] Zogenix's dormant Commerce Clause and Contracts Clause claims should be dismissed for the reasons stated in the Defendants' Supplemental Memorandum filed on April 14, 2014 (Dkt. 24).  As directed by the Court, the Defendants have not briefed these claims herein, but incorporate by reference their previous arguments.  Indeed, the argument for dismissal of the Contracts Clause claim based on Zogenix's failure to allege substantial impairment is even stronger now given the scores of state laws regulating the prescribing and dispensing of prescription drugs discussed herein and Vermont's specific regulation of Zohydro.  Zogenix plainly could foresee that the Boards would impose similar measures.

the accomplishment and execution of the full purposes and objectives" of the FDA premarket approval process. *Hines v. Davidowitz*, 312 U. S. 52, 67 (1941).  They do not.

### A. The Emergency Regulations Fall Squarely Within the Commonwealth's Authority to Regulate the Practices of Medical and Pharmacy Professionals and Therefore Pose No Obstacle to the Federal New-Drug-Approval Process.

Obstacle preemption analysis is guided by the "two cornerstones of . . . preemption jurisprudence." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  First, the "purpose of Congress is the ultimate touchstone." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  Second, the analysis begins with "'the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  There is, in other words, a "presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716 (1985).

It has long been clear, in fact, that state governments have not only concurrent, but primary, authority to regulate matters of health and safety, including the practices of health professionals. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 270–71 (2006) (recognizing state authority over the "general regulation of medical practice"); *Medtronic*, 518 U.S. at 485 (recognizing "the historic primacy of state regulation of matters of health and safety"); *Whalen*, 429 U.S. at 603, n.30 ("It is, of course, well settled that the State has broad police powers in regulating the administration of drugs by the health professions.").  More specifically, it is well established that "the FDA regulates the marketing and distribution of drugs in the United States, not the practice of medicine, which is the exclusive realm of individual states." *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006); *see United States v.*

*Caronia*, 703 F.3d 149, 153 (2d Cir. 2012) ("FDA generally does not regulate how physicians use approved drugs").

The FDA itself has long acknowledged state authority to regulate how medical practitioners prescribe and pharmacists dispense prescription drugs. *See, e.g.*, Statement of Janet Woodcock, M.D., Director of the FDA Center for Drug Eval. & Research, Hearing Before the Subcomm. on Oversight & Investigations of the House Comm. on Commerce, 106th Cong. 99 (1999) ("FDA does not generally regulate the practice of pharmacy or the practice of medicine— the States traditionally have regulated both the prescribing and dispensing of drugs."), http://goo.gl/Kil6Xi;[9] 48 Fed. Reg. 26,720, 26,733 (June 9, 1983) ("State laws on medical practice" are one of "[t]he primary legal constraints" in off-label prescribing); 37 Fed. Reg. 16,503, 16,504 (Aug. 15, 1972) ("it is clear that Congress did not intend the [FDA] to regulate or interfere with the practice of medicine").  Last year, the U.S. Department of Health and Human Services ("HHS"), which superintends the FDA, reaffirmed this position, explaining that

> States regulate the practice of the health professions and can foster the implementation of evidence-based guidelines for the safe and effective use of opioid analgesics and other prescription drugs prone to abuse.  In addition, states can enact and enforce laws to prevent the operation of rogue pain clinics or "pill mills," doctor shopping, and other laws to reduce prescription drug diversion and abuse while safeguarding legitimate access to pain management.

HHS, *Addressing Prescription Drug Abuse in the United States: Current Activities and Future Opportunities*, at 28 (2013), http://goo.gl/bXLWdU.

Still more recently, the FDA Commissioner announced that the Massachusetts emergency regulations and Vermont's comparable restrictions are fully compatible with FDA's premarket approval of Zohydro.  She explained:

---

[9] Another federal agency, the Centers for Disease Control and Prevention ("CDC"), agrees.  *See* CDC, Prescription Drug Overdose:  State Laws, Types of Laws, Law:  Prescription Limits, ("CDC, Prescription Drug Overdose"), http://goo.gl/infHgz ("States have broad authority to regulate the prescribing and dispensing of prescription drugs and do so in a variety of ways.").

> The most recent state actions in Massachusetts and Vermont would require healthcare providers to take certain steps such as screening for abuse risk and documenting medical need before prescribing the opioid Zohydro ER. They would also require prescribers to participate in and regularly check state databases that track how often the drug is prescribed to a given patient—a measure that can help identify misuse. *Such requirements are consistent with the essential tenets of numerous medical society guidelines on appropriate pain management and—simply put—are precisely what responsible physicians should be doing.* As the entities with responsibility for overseeing the practice of medicine, the states have an important role to play in addressing a critical driver of opioid abuse—inappropriate prescribing practices.

Margaret A. Hamburg, M.D., FDA Commissioner, *The way forward on opioid abuse: A call to action for science-based, comprehensive strategies* (Apr. 29, 2014) ("FDA Blog"), http://goo.gl/Uy6kNs (emphasis added). Clearly, the FDA does not regard the Boards' emergency regulations as an obstacle to its new-drug-approval process. And, of course, "the agency's own views should make a difference." *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1139 (2011); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000).

The FDA's position is plainly correct. The FDCA evidences no congressional purpose to displace state laws regulating how medical practitioners prescribe and pharmacists dispense prescription drugs. In relevant part, the FDCA requires FDA approval before a new drug may be introduced into the market, 21 U.S.C. § 355(a); establishes a process for submitting and reviewing new drug applications, *id.* § 355(b)–(d), (j); specifies the contents of new drug applications, *id.* § 355(b); instructs the FDA to consider the risks and benefits of any new drug, *id.* § 355(d); and requires the FDA to withhold approval from a drug unless it determines the drug is safe and effective, *id.* FDA's regulations elaborate on these requirements. *See* 21 C.F.R. § 314.1 *et seq.* Nowhere do these provisions indicate that once a new drug receives premarket approval, a state loses its traditional power to regulate health professionals. And nowhere do

they suggest that state laws restricting the prescribing and dispensing of drugs disrupt or otherwise stand as an obstacle to FDA's premarket approval process.

Quite the opposite is true.  The text of the FDCA makes clear that Congress intended state law to supplement FDA approval of prescription drugs.  On at least six occasions, Congress has expressly preempted state laws regulating other products within FDA's jurisdiction. *See* 21 U.S.C. § 343–1 (nutrition labeling); § 346a(n)(4) (pesticide residue); § 360k(a) (medical devices); § 379r (labeling requirements for non-prescription drugs); § 379s (labeling and packaging requirements for cosmetics); 42 U.S.C. § 300aa–22(e) (vaccines).  However, Congress "repeatedly declined to pre-empt state law" more generally, and its "silence" on preemption of state prescription drug regulation "is powerful evidence that [it] did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness."  *Wyeth*, 555 U.S. at 575, 581; *see Riegel v. Medtronic, Inc.*, 552 U.S. 312, 327 (2008) ("Congress [in 1962] could have applied the pre-emption clause to the entire FDCA.  It did not do so, but instead wrote a pre-emption clause that applies only to medical devices.").

Moreover, Congress "took care to preserve state law" even as it enlarged the FDA's authority to assure the safety and reliability of drugs. *Wyeth*, 555 U.S. at 567.  In the Drug Amendments of 1962, § 202, Pub. L. No. 87–781, 76 Stat. 780, 793 (1962), Congress enacted a saving clause, "indicating that a provision of state law would only be invalidated upon a 'direct and positive conflict' with the FDCA." *Id.*  The stated purpose of the 1962 enactment—"[t]o protect the public health by amending the [FDCA] to assure the safety, effectiveness, and reliability of drugs," Pub. L. No. 87–781, 76 Stat. 780—mirrors the FDA's mission to "protect the public health by ensuring that . . . human . . . drugs are safe and effective." 21 U.S.C. § 393(b)(2)(B).  There can be no reasonable suggestion that Congress regards intentionally

preserved state regulation designed to help ensure drug safety as an "obstacle" to an FDA process having the same goal. *See Wyeth*, 555 U.S. at 575 (1989) ("'The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them.'") (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989)).  As *Wyeth* held, the FDCA simply does not establish "a ceiling for drug regulation," and the argument to the contrary ignores "decades of coexistence" of state and federal regulation in the field. 555 U.S. at 573–74, 577.

The reality is that scores of state laws regulate how FDA-approved prescription drugs are prescribed and dispensed.  Thirty-five states, for example, limit the number of days after a prescription is written that it may be filled, the quantity of a drug that may be prescribed or dispensed, and the number of refills allowed. CDC, Prescription Drug Overdose.  Twenty-six states mandate tamper-resistant prescription forms for prescription drugs, and forty-two require physicians to conduct a physical examination, patient history, or patient evaluation before prescribing a controlled substance. *Id.*  No court has found these laws preempted by the FDCA.

### B.  Zogenix's Arguments in Favor of Preemption are Without Merit.

Zogenix asserts that the Commonwealth's emergency regulations impose an "effective ban" on Zohydro that conflicts with FDA's approval. AC, ¶¶ 89–92.[10]  However, as the FDA Commissioner has recognized, *see supra*, at 7–8, the regulations instead preserve Zohydro's availability for qualified patients, while imposing perfectly reasonable restrictions, consistent with pre-existing guidance regarding best medical practice, designed to prevent abuse.  A

---

[10] Zogenix effectively acknowledges that its contention is based on pure speculation about future events, and that even it is unsure that its speculation will prove true. Thus, Zogenix hedges its bets (and defeats its own claim) by alleging that, according to its crystal ball, physicians and pharmacists are "unlikely" to prescribe and dispense Zohydro given the requirements of the emergency regulations. AC, ¶ 89.  Where even Zogenix acknowledges that Zohydro may still be prescribed, there can be no determination that the regulations constitute an effective ban.

medical practitioner who believes Zohydro is necessary for her patient must conduct an evaluation, discuss the risks and benefits of Zohydro, enter into a pain-management-treatment agreement, consult the PMP, and supply a letter of medical necessity indicating that other pain management treatments have proven unsuccessful.

None of these requirements is overly burdensome, and each codifies pre-existing best medical practice.  For instance, the Federation of State Medical Boards ("FSMB") advises that before an opioid analgesic is prescribed, a physician should: (1) conduct a detailed patient evaluation, which includes, at a minimum, a systems review, a physical examination, a mental health screening, and a review of the patient's personal and family history of alcohol and drug use; (2) consult any state prescription drug monitoring program available; (3) enter into a pain treatment plan with the patient; (4) counsel the patient on the risks and benefits of opioid analgesics and on safe storage and disposal methods; (5) consider safer alternative treatments before initiating opioid therapy for chronic pain; (6) monitor the patient on an ongoing basis, possibly through periodic drug testing or pill counts; (7) and document all aspects of treatment in the patient's medical record.  FSMB, Model Policy on the Use of Opioid Analgesics in the Treatment of Chronic Pain, at 8–14 (July 2013), http://goo.gl/9EW1il.  The FSMB Model Policy further counsels that opioid therapy should begin "with a short acting opioid and rotate to a long acting/extended release if indicated." *Id.* at 11.  An earlier version of the Model Policy was adopted by BORIM in 2004 for *all* opioid analgesics and is appended to BORIM guidelines. *See* BORIM, Prescribing Practices and Policy Guidelines, Nov. 17, 2010, http://goo.gl/2VtgeY.

It is surprising that Zogenix would challenge these reasonable restrictions, sanctioned by the FDA Commissioner, aimed at preventing abuse of Zogenix's powerful opioid medication, given the company's purported concerns about such abuse.  Is it suggesting that Zohydro should

be prescribed when not medically necessary, when non-opioid pain relief has proven successful, when the risks of the drug outweigh the benefits, or when the patient appears from the PMP database to be doctor-shopping so as to abuse prescription drugs?  Does it contend that no doctor will ever prescribe Zohydro except in such unacceptable circumstances?   If Zogenix does not so argue, then these requirements cannot constitute an "effective ban" on the drug.[11]

Zogenix complains most strenuously about the BORIM requirement that physicians provide to pharmacists a letter of medical necessity stating that alternative pain-management treatments "have failed" before prescribing Zohydro. AC, ¶ 63.  Remarkably, Zogenix contends that this requirement—promulgated by the physicians and others who serve on the state regulatory body overseeing the practice of medicine in the Commonwealth—will "interfere with the medical judgment of physicians" and their ability "to ensure appropriate patient treatment and comply with ethics obligations." AC, ¶¶ 13, 70.  The BORIM regulations, however, do not prescribe any particular alternative treatments (whether involving no medications at all, non-opioid medications, or other opioid medications) that must have been tried and failed, leaving that matter entirely to the prescriber's medical judgment.[12]

Furthermore, the Boards' requirement mirrors the FDA-approved label for Zohydro, which warns that the drug is indicated only for the management of severe pain "for which alternative treatment options are inadequate."   Zohydro Label, Indications for Usage, http://goo.gl/EkZRzG.  Zogenix speculates, in an effort to help its "effective ban" theory, that the phrase "other pain management treatments have failed" will have a substantially different meaning, as interpreted and applied by BORIM, than the phrase "alternative treatment options

---

[11] Notably, Zogenix does not appear to have sued Vermont or claimed that its comparable restrictions on Zohydro prescriptions constitute an "effective ban."

[12] Zogenix is, therefore, simply wrong when it asserts that the regulations require physicians to prescribe other opioid medications first before prescribing Zohydro or to subject patients to inappropriate treatment, such as exposing a patient to acetaminophen, where contraindicated. *See* AC, ¶¶ 55, 66.

pcase

are inadequate." AC, ¶ 64.  But Zogenix does not, and cannot, cite to any guidance or other pronouncement by BORIM so indicating.[13]  As the First Circuit has explained, it is improper for a court to conclude, before a state or local law that does not constitute a ban on its face has been interpreted and applied, that it will necessarily be interpreted and applied so as to effectuate a ban. *See Town of Amherst v. Omnipoint Communications Enterprises, Inc.*, 173 F.3d 9, 16 (1st Cir. 1999) (town's denial of cell phone provider's application to build a tower did not "have the effect of prohibiting" wireless services in the town and therefore was not expressly preempted by a federal statutory provision).

Moreover, the FDA Commissioner has explained that the FDA approved Zohydro only for patients for whom "alternative treatment options *have proved* inadequate," a formulation of the Zohydro label's requirement that means exactly the same thing as BORIM's requirement that other treatments "have failed."  FDA Blog (emphasis added).  And even more to the point, Zogenix itself alleges that the FDA has required, in the case of other drugs, an indication that alternative treatment options have failed before the drugs may be prescribed. AC, ¶ 64.  If FDA *approves* drugs for use on the condition that other treatments have failed, that condition cannot, as a matter of law and logic, impose an "effective ban" on a drug.  For all of these reasons, and others, Zogenix's "effective ban" argument is to no avail.[14]

---

[13] Moreover, an emergency regulation is effective for three months only.  Mass. G. L. c. 30A, § 2.  The promulgating agency must schedule a public comment period and a public hearing to invite opinion on whether the emergency regulation should be modified or made permanent.  *Id.*  To that end, BORIM and BORIP have given notice of public hearings, to be held on June 4 and June 13, 2014, respectively, *see* http://goo.gl/DBI4b2 and http://goo.gl/4f2FY5, and related public comment periods.  Zogenix may, of course, participate in the hearings and submit comments.  Thus, this requirement of the BORIM emergency regulation could be clarified, revised, or rejected entirely for purposes of any permanent regulations. Mass. G. L. c. 30A, § 2.

[14] Zogenix also complains about the BORIP requirement that pharmacists provide patients with a written warning of Zohydro's risks, asserting in error that BORIP has not approved the substance of that warning. *See* AC, ¶ 68.  At the same meeting at which it approved the emergency regulations, BORIP adopted the FDA Medication Guide for Zohydro as the approved written warning. *See* http://goo.gl/rF7INF.  Zogenix further speculates, illogically, that the requirement that pharmacies store Zohydro in a locked cabinet will somehow bar them from stocking it at all, because of a perceived risk that technicians and interns, who are prohibited from handling Zohydro, will therefore be unable to avoid handling it. *See* AC, ¶ 69.  To the contrary, it is common sense that the requirement of locked

Zogenix may argue that, even if BORIM's requirement that other treatments have failed does not amount to an effective ban, it is still preempted because the "FDA did not find [Zohydro] to be safe and effective specifically and only for patients who have failed other pain management treatments" and "FDA would have required a different set of data than that submitted . . . to approve the product with such a condition of use." AC, ¶ 32.   This is simply a more specific version of a general argument that the FDA's premarket determination that Zohydro is safe and effective preempts any additional safety measures states might impose.   For all of the reasons discussed above, this is simply not so.   Indeed, the Supreme Court rejected a comparable argument in determining, in *Wyeth*, that state law failure-to-warn claims are not preempted by the FDCA.   There, the drug manufacturer contended that because "the FDCA requires the FDA to determine that a drug is safe and effective under the conditions set forth in its labeling, the agency must be presumed to have performed a precise balancing of risks and benefits and to have established a specific labeling standard that leaves no room for different state-law judgments." 555 U.S. at 575.   The Court thought otherwise, explaining that the argument was "at odds with what evidence we have of Congress' purposes" and that "the FDA traditionally regarded state law as a complementary form of drug regulation."   *Id.* at 57–778. Thus, regardless of whether the FDA considered and rejected more stringent safety measures for Zohydro, state regulation that imposes supplemental safety requirements cannot be deemed an obstacle to the FDA's premarket approval process.   *Id.*

Notwithstanding *Wyeth*, Zogenix has relied on *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, to contend that "where an agency scheme as a whole is specifically designed to promote a

---

storage will help prevent inadvertent, inappropriate handling by such individuals.  And since certain pharmacy technicians are barred from handling (as opposed to transporting) any Schedule II controlled substances, and all pharmacy technicians may assist the transportation or handling of such substances only under the supervision of a pharmacist in accordance with written policies and procedures, *see* 247 CMR 8.05(1)–(2), the incremental burden of ensuring that technicians and interns do not handle Zohydro is insubstantial.

full range of 'safe' product choices," states may not constrain those choices by conditioning the product's availability on additional safety measures.  Pltf's PI Mem. (Dkt. 4), at 9–10.  *Geier* held that state tort actions that would force car manufacturers to install airbags instead of automatic safety belts stood as an obstacle to a regulation that preserved manufacturer choice over which type of passive restraint device to install. 529 U.S. at 874.  But in *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, the Court explained that *Geier*'s holding applied only to a portion of the regulation at issue in the case, and only because preserving manufacturer choice "among different kinds of passive restraint devices was a *significant objective*" of that part of the regulation. *Id.* at 1136 (emphasis in original); *see Geier*, 529 U.S. at 877–81 (agency concerned that mandating particular device would trigger public backlash endangering overall program).  Addressing a different part of the *same* regulation—one that preserved manufacturer choice over whether to install lap seatbelts only or lap-and-shoulder belts—*Williamson* concluded that tort suits that would force manufacturers to install lap-and-shoulder belts were *not* preempted. 131 S. Ct. at 1140.  The history of that part of the regulation indicated that preserving manufacturer choice was not a significant federal regulatory objective, because the agency "was not [then] concerned about consumer acceptance." *Id.* at 1138.  Accordingly, with *Geier*'s unique circumstances not present, state tort suits that would constrain manufacturer choice did not pose an obstacle to the accomplishment of the regulation, even though the federal agency had weighed the benefits and drawbacks of requiring shoulder-and-lap belts. *Id.* at 1137–40.

*Geier* and *Williamson* teach that obstacle preemption claims turn on the regulatory "history, the promulgating agency's contemporaneous explanation of its objectives, and the agency's current views of the . . . pre-emptive effect" of the specific provision at issue. *Williamson*, 131 S. Ct. at 1136.  *Geier* does not, as Zogenix maintains, establish that whenever a

federal agency conducts a risk-benefit assessment in reviewing a product's safety, states are barred from imposing additional safety requirements affecting that product.   Indeed, by acknowledging that "FDA regulation of drugs is intended to be a floor and there's room for other state restrictions that go to safety," Zogenix has already conceded the premise of its own argument. Transcript of 4/14/14 Hearing, at 17, ll. 16–18.

## II.    Zogenix's Equal Protection Claim is Unavailing.

Zogenix purports to allege a "class-of-one" equal protection claim, in which a plaintiff does not claim discrimination based on membership in an identifiable class, but instead alleges that it was "impermissibly singled out for unfavorable treatment." *Cordi-Allen v. Conlon*, 494 F.3d 245, 250 (1st Cir. 2007).  For three reasons, the claim fails as a matter of law.

First, class-of-one claims may not be asserted where, as here, they challenge action entrusted by law to government discretion.  Two Supreme Court cases demarcate when class-of-one claims may be asserted:  *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), and *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591 (2008).  In *Olech*, a municipality conditioned the plaintiff's access to the local water supply on grant of a 33-foot easement. 528 U.S. at 563. The plaintiff alleged that similarly situated property owners were only required to cede a 15-foot easement, and that the municipality's disparate demand on her was irrational and arbitrary. The Court determined that the plaintiff had stated a valid claim. *Id.* at 564–65.

In *Engquist*, the Supreme Court revisited and significantly confined the availability of class-of-one claims.  In ruling that class-of-one claims may not routinely be used to challenge decisions made in the public-employment context, *Engquist* distinguished *Olech* as a case involving "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." 553 U.S. at 598, 602.  That standard—a 15-foot easement—was both

quantifiable and consistently applied to other similarly situated property owners.  The claim in *Engquist*, by contrast, contested "discretionary decisionmaking." *Id.* at 603.  The Court explained that in that circumstance, "the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id.*  "In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Id.*

Taken together, *Olech* and *Engquist* establish that one may challenge a government decision that involves a "clear standard against which departures [can] be readily assessed." *Id.* at 602.  But when the government acts in the exercise of its discretionary authority, class-of-one claims seeking to second-guess that exercise of discretion are barred.[15]

*Engquist* therefore bars Zogenix's class-of-one claim.  Zogenix challenges emergency regulations, promulgated in the midst of a declared public-health crisis, that "by their nature involve discretionary decisionmaking." 553 U.S. at 603.  By law, the Boards were empowered to adopt emergency regulations upon finding "that immediate adoption, amendment or repeal of a regulation *[wa]s necessary for the preservation of the public health*, safety or general welfare, and that observance of the requirements of notice and a public hearing would be contrary to the public interest." Mass. G. L. c. 30A, § 2 (emphasis added).  Similarly, Commissioner Bartlett acted pursuant to a statute that provides:

---

[15] Courts of appeals widely understand *Engquist* to foreclose class-of-one claims alleging disparate treatment in officials' exercise of discretionary authority. *See, e.g.*, *Towery v. Brewer*, 672 F.3d 650, 660–61 (9th Cir. 2012) (implementation of execution protocol); *Novotny v. Tripp County*, 664 F.3d 1173, 1179 (8th Cir. 2011) (enforcement of weed ordinance); *Srail v. Village of Lisle*, 588 F.3d 940, 944–45 (7th Cir. 2009) (decision not to extend water services); *Flowers v. City of Minneapolis*, 558 F.3d 794, 799–800 (8th Cir. 2009) (police investigative decisions). *See also Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 904 (7th Cir. 2012) (en banc) (aff'g by an equally divided court) (Easterbrook, C.J., concurring in the judgment) (*Engquist* "tells us that . . . the Constitution tolerates selective action, without requiring public officials to explain to a court's satisfaction why they exercised discretion in favor of one person and against another.").

> Upon a declaration by the governor that an emergency exists which is detrimental to the public health, the commissioner may, with the approval of the governor and the public health council, during such period of emergency, take such action and incur such liabilities *as [s]he may deem necessary* to assure the maintenance of public health and the prevention of disease."

Mass. G. L. c. 17, § 2A.  Both provisions commit to the agencies' discretion whether to take emergency action. *See Am. Grain Products Processing Inst. v. Dep't of Public Health*, 392 Mass. 309, 325, 467 N.E.2d 455, 467 (1984) (where there is substantial basis for DPH's emergency action, it is "irrelevant that the plaintiff or others may dispute that information").

Indeed, emergency actions taken amidst declared public-health emergencies are the prime example of government action not amenable to a class-of-one attack.  Public-health crises inherently involve novel circumstances that must be tackled quickly and decisively.  When the government confronts such an emergency—as when it must contain disease outbreaks, protect drinking water after storms, or combat sudden spikes in prescription opioid abuse—its actions cannot be "readily assessed" against an objective standard, precisely because there *is* no baseline standard that applies in such situations. *Engquist*, 553 U.S. at 602.  Accordingly, the regulations challenged here are not subject to a class-of-one claim.

Second, even if Zogenix could use a class-of-one claim to second-guess the Boards' exercise of emergency authority, the complaint fails to allege two of three elements of the claim. A class-of-one claim lies only when the plaintiff alleges that it "was intentionally treated differently from others similarly situated, that no rational basis exists for that difference in treatment, and that the different treatment was based on a malicious or bad faith intent to injure." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006).  Zogenix has not alleged, nor could it, that the purported difference in treatment between Zohydro and other opioid analgesics was "based on" the Boards' "malicious or bad faith intent to injure" the company. *Id.*  The standard

for malice in the class-of-one context is weighty; a plaintiff must allege that the government actor harbored personal hostility toward the plaintiff, *Tapalian v. Tusino*, 377 F.3d 1, 6 (1st Cir. 2004), or undertook a "malicious orchestrated campaign" against the plaintiff, *Rubinovitz v. Rogato*, 60 F.3d 906, 912 (1st Cir. 1995). Zogenix's understandable failure to allege such personal hostility or orchestrated malicious action is fatal to its claim. *See Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011); *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 10 (1st Cir. 2001).

A class-of-one claim must further allege "with reasonable particularity" that the plaintiff and its purported comparators are "similarly situated *in all relevant respects.*" *Barrington Cove*, 246 F.3d at 8 (emphasis in original). The First Circuit has therefore affirmed the dismissal of equal protection claims where "the complaint included allegations which arguably intimated that [the plaintiff] was not similarly situated to the other applicants in several important respects." *Id.*; *see also Freeman v. Town of Hudson*, 714 F.3d 29, 39 (1st Cir. 2013). Here, Zogenix claims that Zohydro was treated differently from other "Schedule II extended-release/long-acting opioids," AC, ¶ 59, of which "there are more than 30 . . . marketed in the US." *Id.* ¶ 34. Zogenix admits, however, that Zohydro "is the *first* single-entity *hydrocodone* product available on the market, the *first* extended release *hydrocodone* product, and the *only hydrocodone* product subject to schedule II controls . . . ." *Id.* ¶ 5 (emphasis added).

These latter allegations alone justify the different treatment of Zohydro compared to the other, non-hydrocodone extended-release/long-acting opioids. *See Barrington Cove*, 246 F.3d at 8. Moreover, for all of the reasons outlined at the outset of this memorandum, *see supra*, at 2, Zohydro poses substantial, unique risk. And because Zohydro is new to the market, the Boards'

emergency regulations do not disrupt existing patient treatment plans as would comparable restrictions suddenly imposed with respect to other opioid analgesics.

Given these distinctions, Zogenix cannot show that Zohydro is "situated similarly in all relevant aspects" to other opioid medications. *Cordi-Allen*, 494 F.3d at 250–51.  And for these same reasons, Zogenix cannot demonstrate that its differential treatment lacked "rational basis." *Buchanan*, 469 F.3d at 178.  Zogenix's class-of-one equal protection claim should be dismissed.

### III.    Zogenix Lacks Standing to Contest the Boards' Regulation of Health Professionals.

Finally, as Defendants will explain in detail in opposing Zogenix's motion for a preliminary injunction, the complaint should be dismissed because Zogenix has failed to allege facts sufficient to demonstrate standing to sue.  "[W]hen," as here, "the plaintiff is not [itself] the object of the government action or inaction [it] challenges, standing . . . is ordinarily substantially more difficult to establish." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotation omitted).  Given the many actions taken by other governmental and private actors relative to Zohydro, Zogenix cannot show, as it must, that its purported injury is "fairly . . . traceable to the challenged action of the defendant[s], and not the result of the independent action of some third party[.]" *Id.* at 560 (internal quotation omitted).

### CONCLUSION

For these reasons, Zogenix's complaint should be dismissed in its entirety.

By their counsel,
MARTHA COAKLEY, ATTORNEY GENERAL

 /s/ Jo Ann Shotwell Kaplan
Jo Ann Shotwell Kaplan (BBO #459800)
Assistant Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2085; fax: (617) 727-5785
JoAnn.Kaplan@state.ma.us

May 23, 2014

<u>Certificate of Service</u>

     The undersigned counsel hereby certifies, this 23rd day of May, 2014, that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to any non-registered parties so indicated on the NEF.

                                        <u>/s/ Jo Ann Shotwell Kaplan</u>
                                        Jo Ann Shotwell Kaplan
                                        Assistant Attorney General