## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSSACHUSETTS

| | |
|---|---|
| ZOGENIX, INC.,<br>                    Plaintiff,<br><br>            v.<br><br>DEVAL PATRICK, in his official capacity as<br>GOVERNOR OF MASSACHUSETTS,<br><br>CHERYL BARTLETT, RN, in her official capacity<br>as DEPARTMENT OF PUBLIC HEALTH<br>COMMISSIONER,<br><br>CANDACE LAPIDUS SLOANE, M.D., KATHLEEN<br>SULLIVAN MEYER, ESQ., MARIANNE E. FELICE,<br>M.D., ROBIN RICHMAN, M.D., PAUL R. DeRENSIS,<br>ESQ., MICHAEL E. HENRY, M.D., in their official<br>capacities as members of the MASSACHUSETTS<br>BOARD OF REGISTRATION IN MEDICINE,<br><br>KAREN M. RYLE, MS, R.PH, PATRICK M. GANNON,<br>R.PH, MS, FABC, EDMUND TAGLIERI, MSM, R.PH,<br>NHA, JAMES T. DEVITA, R.PH, JANE F. FRANKE, RN,<br>ANTHONY PERRONE, MD, MBA, R.PH,<br>RICHARD TINSLEY, MBA, ME.D, JOANNE M.<br>TRIFONE, R.PH, ANITA YOUNG, ED.D, R.PH,<br>in their official capacities as members of the<br>MASSACHUSETTS BOARD OF<br>REGISTRATION IN PHARMACY, and<br><br>DIPU PATEL-JUNANKAR, PA-C, MIGUEL VALDEZ,<br>PA-C, EDWARD GLINSKI, MD, RICHARD BAUM, MD,<br>NICOLE MEREGIAN, PA-C, LAURA HILF, RN, MS,<br>SHANNON SHERIDAN-GELDART, PA-C,<br>JESSICA BRITNELL, PA-C, in their official capacities as<br>members of the MASSACHUSETTS BOARD OF<br>REGISTRATION OF PHYSICIAN ASSISTANTS,<br>                    Defendants. | Civil Action No. 1:14-cv-11689 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Zogenix seeks a preliminary injunction enjoining the Commonwealth from implementing a slate of recently announced draconian restrictions on Plaintiff's drug, Zohydro™ ER (Hydrocodone Bitartrate Extended-Release Capsules). This Court already preliminarily enjoined Defendants from implementing a previously announced ban on the prescription or administration of Zohydro™ ER.  The Court stayed its April 15, 2014 Order for seven days.  On the day the stay was to be lifted (and without any forewarning), Defendants announced a new set of onerous restrictions applicable to Zohydro™ ER – and only Zohydro™ ER – that have the cumulative effect of creating yet another implicit ban on the drug. This second set of measures suffers from the same preemption problem as the first ban the Court already enjoined.  It also violates the Equal Protection Clause by singling out Zohydro™ ER for draconian restrictions not applicable to any other extended-release opioid products.

## BACKGROUND

**1. FDA's Statutory Authority:**  FDA is responsible for reviewing and approving all new prescription drugs sold in the United States.  The Food, Drug, and Cosmetic Act (FDCA) requires drug manufacturers to obtain FDA approval of a marketing application before a new prescription drug can enter the marketplace.  21 U.S.C. §§ 331(d), 355(a), (b), (j).  Before receiving FDA approval, manufacturers must demonstrate through submission of a new drug application (NDA) that the drug is both *safe and effective* for its intended use.  *Id*. § 355(b). FDA must assess the safety of a drug by determining whether its benefits outweigh its risks.  21 U.S.C. §§ 355(c), (d).  FDA will approve an NDA only when all necessary data are submitted or referenced to establish the product's safety and effectiveness.  *Id*.; 21 C.F.R. § 314.125.

**2.  Zohydro™ ER :**  Zohydro™ ER is an extended release opioid whose sole active pharmaceutical ingredient is hydrocodone.  Farr Aff. ¶ 3.  FDA approved Zohydro™ ER for the

1

management of pain severe enough to require daily, around-the clock, long-term opioid treatment for which alternative treatment options are deemed "inadequate." *Id.* ¶ 4, Hagerty Aff., Ex. A at 30.  Although FDA has done so for other drugs, FDA did not require that patients be shown to have "failed" on another therapy before Zohydro™ ER could be considered.  Farr Aff. ¶ 4.

Zohydro™ ER was developed for patients on immediate-release hydrocodone products who would benefit from an extended release product and in whom prescribers determined it appropriate to continue with the same opioid active ingredient (hydrocodone). *Id.* ¶ 5.  Because Zohydro™ ER does not contain acetaminophen, it avoids the potential for acetaminophen toxicity in patients for whom Zohydro™ ER is indicated.  As a result, Zohydro™ ER provides an important treatment option for patients suffering from severe chronic pain on immediate release hydrocodone combined with acetaminophen who need an extended-release product; for patients who are at risk for liver injury from acetaminophen; and for patients on other ER opioids in which another option for opioid rotation is of value. *Id.*; Hagerty Aff., Ex. A at 31-32.

Zohydro™ ER is not the only extended release opioid product on the market.  Farr Aff. ¶ 6.  Currently, there are more than 30 extended-release/long-acting opioid products marketed in the U.S., including MS Contin, Opana ER, Duragesic, Exalgo, and OxyContin.  *Id.*  These medications contain active ingredients that can include fentanyl, morphine, oxymorphone, hydromorphone and oxycodone.  *Id.* Like Zohydro™ ER, the other extended release opioid drugs are subject to Schedule II controls, a set of restrictions and requirements applicable to those drugs that have a medical use but are susceptible to abuse.  *Id.* ¶¶ 6-7.  And the amount of hydrocodone in each Zohydro™ ER capsule is on a par with other long acting, extended release

2

(ER/LA) opioid drug products.  *Id.* ¶ 10.  Only one of the many extended-release opioid products on the market is produced with abuse-deterrent formulations.  *Id.* ¶ 6.

During the approval process for Zohydro™ ER, FDA considered requiring an abuse-deterrent formulation for the drug.  *Id.* ¶ 8, Hagerty Aff., Ex. A at 30-33.  But FDA determined that there were effective measures in place to protect patients while still making Zohydro™ ER available for patients in need:  The labeling of the product includes prominent warnings about abuse, a boxed warning about the known risks, and statements urging prescribers to assess each patient's risk and to monitor patients regularly for the development of addiction, abuse, and misuse.  Farr Aff. ¶ 8; Hagerty Aff., Ex. A at 30.  And Zohydro™ ER is included in the ER/LA Opioid Analgesics risk evaluation and mitigation strategy (REMS) designed to reduce serious adverse outcomes resulting from inappropriate prescribing, misuse, and abuse.  Hagerty Aff., Ex. A at 30.  FDA concluded that, in combination, these measures were sufficient to support approval so that the product may be made available to severe chronic pain sufferers who need it.  *Id.* at 31-32.

   **3.  The Initial Ban:**  On March 27, 2014, Governor Patrick issued a Declaration of Emergency citing concerns about opioid addiction and concluding that "an emergency exists which is detrimental to the public health" in Massachusetts.  Hagerty Aff., Ex. B at 2.  That same day, Commissioner Bartlett and the state Public Health Council (PHC) approved an emergency order banning Zohydro™ ER's prescription, dispensation, or administration.  *Id.*, Ex. C at 2.

   **4.  This Court's April 15 Order:**  Zogenix filed this action on April 7, alleging that the ban violated the United States Constitution.  On that same date, Zogenix also filed a motion for a temporary restraining order and/or preliminary injunction.  On April 15, this Court issued an order concluding that Defendants' actions likely were preempted by federal law and declaring

3

that Zogenix was entitled to a preliminary injunction.  The Court stayed the order for one week,
until April 22.  During that time, Plaintiff's counsel reached out to legal representatives in the
Governor's Office and Defendants' trial counsel several times to inquire whether Defendants
intended to appeal the April 15 Order and to discuss a process for resolving the lawsuit.
Although Defendants' counsel indicated that the Governor was unlikely to appeal, no mention
was made of the alternative measures the Governor was about to implement.

 **5.  Defendants' Efforts to Sidestep the Court's Order:** On April 22, without any
warning to Zogenix, Governor Patrick issued another press release announcing several new
actions designed "to restrict the availability of hydrocodone-only extended-release medication
that is not in abuse-deterrent form (commonly known as Zohydro)."  Hagerty Aff., Ex. D.  The
Commonwealth has instituted at least the following new restrictions on Zohydro™ ER:

- On April 22, **Commissioner Bartlett** issued an emergency order requiring doctors to
"utilize the Prescription Monitoring Program (PMP) prior to prescribing" Zohydro™ ER.
Hagerty Aff., Ex. E at 1-2.  Specifically, prescribers must use the PMP (a statewide online
system that summarizes a patient's prescription history) to evaluate a patient's prescription
history prior to each instance of issuing a prescription of Zohydro™ ER.  *Id*.  Because
prescriptions for Schedule II medication can be written for no more than a 30-day supply, the
PMP Order "will require the prescriber to check the patient's PMP record, at a minimum, every
30 days while he or she is being prescribed the medication."  *Id.*, Ex. F at 1.

- Also on April 22, the **Board of Registration in Medicine (BORIM)** promulgated
emergency regulations requiring medical licensees before prescribing Zohydro™ ER to:
"1) conduct a risk assessment for a patient, including an evaluation of the patient's risk factors,
substance abuse history, presenting conditions, current medications, and PMP data; 2) discuss

4

the risks and benefits of the medication with the patient; 3) enter into a pain management treatment agreement with the patient; supply a letter of medical necessity for the pharmacy that will fill the prescription; and 4) document this information in the patient's medical records." Hagerty Aff., Ex. G. The required letter of medical necessity must "verif[y] that *other pain management treatments have failed*." *Id.*, 243 CMR 2.07(25)(d) (emphasis added).  In other words, no physician is permitted to exercise her medical judgment and prescribe Zohydro ™ ER unless she has intentionally forced a patient to cycle through ineffective (or harmful) alternative treatments first and documented their failure.

- On May 6, the **Board of Registration in Pharmacy (BORIP)** promulgated emergency regulations applicable to "hydrocodone-only extended release medication that is not in an abuse deterrent form" (i) prohibiting a pharmacy technician, trainee, or intern from handling Zohydro™ ER; (ii) requiring Zohydro™ ER to be stored in a locked cabinet; (iii) requiring Zohydro™ ER to be dispensed in a childproof container; (iv) requiring pharmacists to review a Letter of Necessity for each prescription and refill of Zohydro™ ER; (v) requiring pharmacists to provide patients with a written warning "regarding the specific dangers of" Zohydro™ ER approved by BORIP (even though, to the best of Zogenix's knowledge, no such written warning has been approved by BORIP); (vi) requiring pharmacists to counsel patients on the dangers of Zohydro™ ER; and (viii) requiring pharmacists to check the patient's PMP history.  247 C.M.R. 8.05(3) and 9.04(8).  Hagerty Aff., Ex. H at 5; Ex. I at 4-5.

- On May 8, the **Board of Registration of Physicians Assistants (BOROPA)** promulgated emergency rules similarly restricting the ability of physician assistants to prescribe Zohydro™ ER.  Prior to prescribing Zohydro™ ER, a physician assistant must, among other things: (i) check the online PMP; (ii) discuss the risks and benefits with the patient; (iii) enter

5

into a Pain Management Treatment Agreement with the patient; (iv) supply a Letter of Medical Necessity that, among other things, *verifies that other pain management treatments have failed*; and (v) documents information in the patient's medical record.  Hagerty Aff., Ex. J at 4.[1]

**6.  The Need for Judicial Intervention:** The net effect of these draconian restrictions is to institute another *de facto* ban on Zohydro™ ER.  Lest there be any doubt about the intended effect of the BORIP regulations, at the public meeting at which the regulations were approved, Board members specifically noted that the intent of the regulations was to "deter people from going on this drug."  Hagerty Aff., Ex. P, Tr. 97:8-9.

<strong>ARGUMENT</strong>

A party seeking a preliminary injunction must show (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Voice of the Arab World v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011).  Zogenix plainly satisfies each of these criteria.

# I.   ZOGENIX IS LIKELY TO SUCCEED ON THE MERITS.

The challenged regulations are preempted by federal law, both because they constitute a *de facto* ban and because they seek to impose a new indication for Zohydro™ ER that is inconsistent with the indication for which the drug was approved by FDA.  And they violate the Equal Protection Clause by improperly singling Zohydro™ ER as a "class of one" targeted for crushing regulations not applied to the many other opioid medications that remain available.

---

[1] The Board of Registration in Dentistry also issued similar requirements.  Because relatively few dentists are expected to prescribe Zohydro™ ER, Zogenix has chosen not to burden the court by naming those regulations in the Second Amended Complaint.

6

**A.  Defendants' Regulations Are Preempted By Federal Law.**

At the public meeting at which the BORIP regulations were approved, Board members specifically noted that the intent of the regulations was to "deter people from going on this drug." Hagerty Aff., Ex. P, Tr. 97:8-9.  Defendants' efforts to redress their ban of Zohydro™ ER in the cloak of state regulation of physicians and pharmacists must fail for the same reasons as the initial ban.

The Commonwealth may regulate physicians, pharmacists and physicians assistants.[2] But it cannot do so in a way that is preempted by federal law.  As the Supreme Court has noted: "Pre-emption is not a matter of semantics.  A State may not evade the pre-emptive force of federal law by resorting to . . . description at odds with the statute's intended operation and effect."  *Wos v. E.M.A. ex rel. Johnson*, 133 S. Ct. 1391, 1398 (2013).  Thus, "[i]n a preemption case, a proper analysis requires consideration of what the state law in fact does, not how the litigant might choose to describe it."  *Id.*; *see also AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1747-48 (2011) (state could not evade preemptive effect of the FAA by characterizing its rule preventing class arbitrations as a general contract defense, where it foreclosed in practice the Congressional goal of enforcing arbitration agreements in order to streamline proceedings).

Congress made explicit in the FDCA its intention that FDA exercise its unique expertise to approve drugs as safe and effective for the promotion of public health nationwide.  *See* 21

---

[2] Defendants make much of two sentences taken out of context from Commissioner Hamburg's April 29, 2014 statement regarding Massachusetts and Vermont's efforts to regulate Zohydro™ ER.  Hagerty Aff., Ex. L.  Those sentences refer to two broad issues common to both states' regulations: screening for abuse risk and documenting medical need.  The comments do not address the specific Massachusetts regulations challenged here, particularly since the BORIP and BOROPA regulations had not even issued at the time. Moreover, the statement specifically criticized both states for inappropriately focusing on "one drug, Zohydro, alone" and "diverting attention from more comprehensive policy solutions that apply to all opioids."  *Id.* at 2.

7

U.S.C. § 393(b)(2)(B).  To determine the scope of Congressional intent, however, courts are not limited to considering legislative text; rather, they are to consider "the entire scheme of the statute." *Hines*, 312 U.S. at 67 n.20.  Specifically, where a federal regulatory regime is structurally designed to balance policy considerations to reach a safety determination, states typically may not impose alternative obligations on regulated parties.  *See, e.g.*, *Int'l Paper Co. v. Oullette*, 479 U.S. 481, 494 (1987) (state nuisance laws preempted due to conflict with the balance of "private and public interests" reflected in Environmental Protection Agency water pollution laws).  Moreover, where Congress intends for one agency to approve a range of safe choices for public consumption under one set of federal standards, states cannot constrain the "variety and mix" of those options.  *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000).  Instead, state restrictions—even those that might otherwise conceivably "stand in harmony with federal law"—must fall where Congress intended to "avoid conflict, uncertainty, cost, and occasional risk to safety itself that too many different safety-standard cooks might otherwise create." *Id.* at 871.  This Court already has agreed that Defendants' original ban likely was unconstitutional.  D.E. 26 at 3.  Yet in the wake of this ruling, Defendants introduced draconian regulations designed, again, to obliterate physicians' abilities to prescribe, and pharmacies' abilities to dispense, Zohydro™ ER anywhere in the state. Defendants' most recent restrictions offend the Supremacy Clause no less than the earlier actions this Court enjoined.

    **1.  The New Regulations Constitute an Effective Ban on Zohydro™ ER.**

    Taken together, Defendants' new restrictions on Zohydro™ ER constitute a *de facto* ban on the drug that fails to survive preemption analysis for much the same reason as the original ban.  Just like the initial ban, the restrictions are intended to "deter people from going on this drug."  Hagerty Aff., Ex. P, Tr. 97:8-9.  And the regulations accomplish that goal.  The requirement inherent in the BORIM, BORIP, and BOROPA regulations that physicians prepare a

\\DC - 040672/000004 - 5675063 v1

Letter of Necessity "*verify[ing] that other pain management treatments have failed*" presents an insurmountable hurdle to most physicians wishing to prescribe Zohydro™ ER based on sound medical judgment and in good conscience. 243 CMR 2.07(25)(d); 249 CMR 9.04(8); 263 CMR 5.07(12). Under the new restrictions, a physician must cycle a patient through pain treatment alternatives (notably, the referenced phrase "pain management *treatments*" is plural) and document the failure to achieve adequate pain management and/or unacceptable adverse events before prescribing Zohydro™ ER—even if the determination already has been made that Zohydro ER is the most appropriate choice for treating a given patient.  Take, for example, a patient whose pain is effectively treated by hydrocodone, but with liver toxicity concerns; she would be uniquely well-suited for treatment with Zohydro™ ER, and ill-suited for state-mandated preliminary courses of alternative drugs posing obvious risks to her wellbeing. Physicians should not subject that patient to such an inappropriate and potentially dangerous experiment.[3]

        The BORIP regulations requiring special handling and storage of Zohydro™ ER not applicable to other drugs in the same class also create an administrative burden likely to ensure that pharmacies do not stock the drug.  The BORIP regulations prohibit pharmacists from dispensing Zohydro™ ER unless each prescription "is accompanied by a written warning approved by the Board regarding the specific dangers of hydrocodone-only extended release medication that is not in an abuse deterrent form."  247 CMR 9.04(8)(d).  However, to Plaintiff's knowledge, no such written warning has been approved by BORIP, thus rendering pharmacists completely unable to dispense the drug at the present time.  In addition, the regulations broadly

---

[3]  *See also* Chou R., Fanciullo G.J., Fine P.G., Adler J.A., Ballantyne J.C., Davies P., *et al.*, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10(2) J. Pain 113-30 (Feb. 2009).

ban all certified pharmacy technicians, pharmacy technicians, pharmacy technician trainees, and pharmacy interns from handling Zohydro™ ER.  247 CMR 8.05(3).  Taken together, these burdensome regulations make it highly impracticable for pharmacies to carry the drug—just as the Board intended.  Hagerty Aff., Ex. P, Tr. 1:47-49.

By making Zohydro™ ER extremely difficult to prescribe or dispense, Defendants once again have violated federal preemption doctrines in several ways.  ***First***, they countermand FDA's approval of Zohydro™ ER as a safe and effective drug that ought to be available to patients nationwide consistent with the FDA approved indication.  Defendants' actions thus continue to pose a clear obstruction to FDA's decision that Zohydro™ ER be available nationwide as part of the mix of drugs available to promote the public health.  *See* 21 U.S.C. § 393(b).  This is not the intent of Congress, and it is not constitutional. *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000).

***Second***, Defendants' conduct impedes Congress' intent to guarantee Zogenix, as a pioneer drug-maker, a period of meaningful exclusive use of its patented formulation.  Under the express terms of the FDCA, Zogenix is entitled to three years of exclusive use of its formulation, running from the date of FDA's approval of its NDA.  21 U.S.C. §§ 355(c)(3)(E), (j)(5)(F).  But Defendants' actions, taken as a whole, deny Zogenix any real ability to sell its product in Massachusetts and thus compromise the material benefits of exclusivity guaranteed under federal law.  This outcome represents an unlawful obstacle to legislative intent—and it is bad policy.  Draconian and unexpected drug restrictions across states could drastically inhibit pioneer drug-makers' incentives to continue developing cutting-edge treatments, compromising the public health far into the future.  *See* Peter H. Schuck, *FDA Preemption of State Tort Law in Drug Regulation: Finding the Sweet Spot*, 13 Roger Williams U. L. Rev. 73, 78 (2008).

\\DC - 040672/000004 - 5675063 v1

**2. Even if Not an Effective Ban, The New Regulations Nonetheless Are Preempted.**

Defendants likely will protest that their new regulations do not impose a *ban* on Zohydro; they just make it very, very, very difficult to prescribe and dispense.  But even if not a *de facto* ban, the regulations nonetheless are preempted.

*a. The New Regulations Are Inconsistent with the FDA-Approved Indication***:** To begin with, Defendants' new restrictions are inconsistent with the FDA-approved indication for Zohdyro™ ER.  The new state regulations require physicians to prepare a letter of necessity "verify[ing] that other pain management treatments *have failed.*" 243 CMR 2.07(25)(d); 249 CMR 9.04(8).  This requirement is inconsistent with FDA's approved indication statement for Zohydro, which reads: "Indicated for the management of pain severe enough to require daily, around-the-clock, long-term treatment and for which alternative treatment options are *inadequate.*" Hagerty Aff., Ex. A at 29.  (emphasis added).  Notably, although it has done so for other drugs,[4] FDA did not require that other treatment alternatives must actually *fail* before a physician may prescribe Zohydro™ ER to a patient in need – just that they be viewed as *inadequate*.  *Id.*  By seeking to alter the circumstances in which Zohydro™ ER is indicated, the Commonwealth is undermining FDA's authority to approve drugs for specific indications supported by substantial evidence of safety and effectiveness.  Its efforts therefore are preempted.  *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000).

---

[4] *See, e.g.*, FDA-Approved Labeling for SERENTIL (indicated for "management of schizophrenic patients who fail to respond adequately to treatment with other antipsychotic drugs"); PROTOPIC (indicated as a "second-line therapy" for patients "who have failed to respond adequately to other topical prescription treatments" or when those treatments are not advisable); HYALGAN (indicated "in patients who have failed to respond adequately to conservative nonpharmacologic therapy, and to simple analgesics"); NIZORAL (indicated for treatment of fungal infections in patients "who have failed or are intolerant to other therapies"); NEORAL (indicated for patients "who have failed to respond to at least one systemic therapy").

This is problematic because, among other things, Zohydro™ ER was approved based on a clinical trial performed on a patient population determined to need around-the-clock opioid therapy and who were taking opioids for the four weeks prior to the trial at an equivalent daily dose of at least 45 mg of oral morphine.  Farr Aff. ¶ 9.  The trial conducted by Zogenix would not have justified its approval for patients for whom alternative therapies had *failed*, because all patients in the pivotal trial had been treated for four weeks on another opioid.  Moreover, as set forth in an FDA Industry Guidance, FDA would have required *two clinical trials* for approval of a drug with the indication imposed by Defendants, not the single trial supporting the proposed indication actually considered by FDA.  Hagerty Aff., Ex. N at 4-5.  A patient population in which previous opioid therapy has failed is far different from the Zohydro™ ER trial population. Patients in whom alternative therapies have failed are likely to have responded differently to Zohydro™ ER, requiring a different study design to develop the data necessary to support NDA approval. *Id.*

In addition, one of the medically appropriate uses of Zohydro™ ER is its use, along with other opioid therapies, in the treatment of chronic pain on a "rotation" basis – meaning that the patient is prescribed different opioids for a short period of time in order to reduce the chances of acclimation or addiction. Farr Aff. ¶ 5.  This acceptable usage also formed the basis of FDA approval, Hagerty Aff., Ex. A at 31-32, and is inconsistent with the requirement that other therapies be shown to have "failed."  Indeed, the entire premise of opioid rotation is that prior therapies have *not* failed, but are instead effective and well-tolerated.  *Id.* at 31.  By requiring prior therapies to fail *before* Zohydro™ ER may be prescribed, Massachusetts effectively bans its use in opioid rotation.  This is inconsistent with Congressional intent for the effect of FDA drug approvals and is unconstitutional.  *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 881

(2000); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154-55 (1982) (federal regulations can preempt state law where a regulator's choice represents a "reasonable accommodation of conflicting policies that were committed to the agency's care by the statute").

### b. The New Regulations Are Inconsistent with FDA Decision Not to Require ADT

The government's end goal is not difficult to discern: it is trying to coerce Zogenix to reformulate Zohydro™ ER with an abuse-deterrent formulation.  Thus, the new regulations provide Zogenix with an escape hatch: it may escape regulation under the new BORIM rules if it reformulates Zohydro™ ER with an abuse-deterrent formulation.  243 CMR 2.07(25).  But FDA already considered and rejected a requirement of abuse-deterrent technology for Zohydro™ ER.  Farr Aff. ¶ 8.[5]   As noted in Plaintiff's earlier motion, FDA carefully approved Zohydro™ ER, in non-abuse deterrent formulation, as part of the aggregate mix of drug options intended to be approved for public use under the agency's expertise.  The Commonwealth's efforts to induce Zogenix to reformulate Zohydro™ ER to include an abuse-deterrent formulation are in direct conflict with FDA's determination to make those options available.  *Geier*, 529 U.S. at 881.

### B.  Defendants' Actions Also Violate the Equal Protection Clause.

The Equal Protection Clause of the 14th Amendment to the U.S. Constitution guarantees that no state may "deny any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV § 1.  This language has been interpreted to mean that "all persons similarly situated should be treated alike," with respect to both legislative and executive conduct.  *Pagan v. Calderon*, 448 F.3d 16, 34 (1st Cir. 2006).  The Supreme Court has explained that an Equal

---

[5] Commissioner Hamburg has specifically commented that "the science of abuse-deterrence is still in its infancy and has yet to be fully tested or proven in actual market or use conditions." Hagerty Aff., Ex. M at 3.  The technology also does nothing to prevent oral overdose, the most common form of opioid analgesic abuse, and must be balanced against the needs of the estimated 100 million Americans coping with chronic pain.  *Id.* at 1, 3.

Protection claim may be brought not only on behalf of protected classes of claimants but also by a "class of one," where a plaintiff alleges that it (1) intentionally has been treated differently (2) from other similarly situated persons and (3) that there is no rational basis for the difference in its treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000). The purpose of the clause is to secure to all individuals protections against both "intentional and arbitrary discrimination" by the states, whether occasioned by the express terms of state statutes or improper execution by officials. *Id.* The discrimination here is both intentional and arbitrary – and evidences bad faith. The Commonwealth's regulations clearly were designed to sidestep this Court's April 15 Order and – in defiance of all logic – are exclusively focused on Zohydro™ ER.

It is undisputed that the new regulations single out Zohydro™ ER for unique restrictions. Indeed, not only do the restrictions impose draconian requirements on the prescription of Zohydro™ ER alone, to the exclusion of all other opioids, they specifically require physicians to prescribe *other* competing products in the class first, and document their "fail[ure]," all at patients' physical and financial expense. There also can be no question that this disparate treatment was intended. As noted, at the meeting at which the BORIP regulations were approved, Board members specifically noted that the intent of the regulations was to "deter people from going on this drug." Hagerty Aff., Ex. P, Tr. 97:8-9. Indeed, the Governor's own press release touts that the restrictions are designed "to restrict the availability" of Zohydro. *Id.*, Ex. D at 2.

This intentional and disparate regulatory treatment clearly burdens Zohydro™ ER more than other similarly situated drugs within the same class. In determining the "similar situation" of regulated parties, "[e]xact correlation is neither likely nor necessary, but the cases must be fair congeners . . . apples should be compared to apples." *Dartmouth Review v. Dartmouth Coll.*,

14

889 F.2d 13, 19 (1st Cir. 1989).  In one way, Zohydro™ ER is different from other hydrocodone products: it is acetaminophen-free.  Farr Aff. ¶ 5.  But in terms of the misuse concerns cited by the state, Zohydro™ ER matches its class – other opioids, many of which are, like Zohydro™ ER, extended-release and therefore have relatively high amounts of opioids in each dose.

The Drug Enforcement Agency (DEA) has explained that the abuse potential for hydrocodone combination products simply does not differ from the abuse potential for single ingredient opioids—*all* opioid products pose a risk of abuse, misuse, or addiction.[6]  In fact, Department of Justice studies have shown that combination products, not single ingredient opioids, currently are the most widely abused opioid products.[7]  And in terms of potency, Zohydro™ ER is less potent, on a milligram-to-milligram basis, than several other widely marketed opioid drugs.  Farr Aff. ¶ 10; *see also* FDA Approved Labeling for Zohydro ER, Table 1; FDA Provides Facts About Zohydro, FDA.Gov, http://www.fda.gov/Drugs/DrugSafety/ InformationbyDrugClass/ucm395456.htm (explaining that it would be "misleading to say that Zohydro ER is stronger than anything currently on the market," given the greater potency of other extended release, long-acting opioids like morphine sulfate, hydromorphone, oxymorphone, and oxycodone).[8]  Yet with respect to this class of drugs, Defendants have refused to regulate similar medications that, under any reasonable medical analysis, must be compared "apples to apples."

---

[6] *See* Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products from Schedule III to Schedule II, 79 Fed. Reg. 11,037, 11,041 (Feb. 27, 2014).

[7] Department of Justice (DOJ) Fact Sheet, Hydrocodone, available at: http://www.justice.gov/dea/druginfo/drug_data_sheets/Hydrocodone.pdf.

[8] FDA's Commissioner agrees: "[i]t's been said that Zohydro is super-potent. That surprises me because the highest dosage unit of Zohydro extended-release is lower than the highest dosage unit of all the other available extended-release products on a milligram basis." Hagerty Aff., Ex. K at 3.

15

For similar reasons, there also exists no rational basis to support Defendants' decision to single out Zohydro™ ER.  For purposes of Equal Protection claims not involving protected classes, rational basis review tracks arbitrary and capricious review under the APA.  *See Ursack, Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.2d 949, 955 (9th Cir. 2011).  Thus, even while granting deference to legislative policymaking, courts may overrule a restriction on a "class of one," *inter alia*, where it "relie[s] on improper factors, entirely fail[s] to consider an important aspect of the problem, or offer[s] an explanation that runs counter to the evidence."  *Id.* at 956. For example, in *Milnot Co. v. Arkansas State Bd. of Health*, 388 F. Supp. 901, 905 (E.D. Ark. 1975), a state Board of Health was found to have violated the Equal Protection Clause when it discriminatorily enforced a ban against one product that was largely of the same composition, use, and appearance as other, similar products allowed to reach the market.  And in *Muhammad Ali v. Div. of State Athletic Comm'n of Dep't of State of State of New York*, 316 F. Supp. 1246, 1253 (S.D.N.Y. 1970), a state's denial of a boxing license to the plaintiff, based on his criminal conviction and refusal to serve in the Armed Forces, violated Equal Protection as an "arbitrary and unreasonable departure" from the Commission's practice of granting licenses to other applicants convicted of crimes or military offenses.  Extending deference to policymaking does not mean granting the state *carte blanche* to act unreasonably.

In this case, Defendants' targeted restrictions on Zohydro™ ER manage to raise all of the tailoring concerns highlighted in *Ursack*: they rely on improper factors, cite to justifications contrary to medical evidence, and—perhaps most glaringly—blatantly ignore important factual aspects of the misuse epidemic related to the entire class of opioids.  The fact is that Zohydro™ ER does not contain more opioid drug than other members of its class: FDA has approved more than 30 other extended release, long-acting opioid drugs for the same use as Zohydro™ ER, and

16

several (including MS Contin®, Kadian®, and Opana®) contain higher quantities of the active opioid drug.  Farr Aff. ¶ 10.[9]  Zohydro™ ER also is not more potent than other members of its class: as noted above, on a milligram-to-milligram basis, it is actually less potent than other extended release, long-acting opioids that Defendants have ignored.  *Id.* And to the extent that Defendants find abuse deterrent technology (ADT) significant to their regulations, Zohydro™ ER is hardly unique: of the more than 30 extended ER/LA opioids approved by FDA, only one has ADT meeting FDA standards.[10]  Like all opioids, Zohydro™ ER poses some risk of misuse. But compared to many other extended release/long acting opioids, Zohydro™ ER is neither more potent than other opioids, *id.*, nor more likely to cause addiction, *supra* n.2-3.  No rational basis exists to subject it to unique restrictions not levied upon the rest of its class.

### C. Defendants Have Violated the Dormant Commerce Clause and Contract Clause.

For the same reasons articulated in Zogenix's earlier motion, D.E. 3-4, incorporated herein by reference, Defendants' conduct violates the dormant Commerce and Contract Clauses.

## II.   Zogenix Has Suffered and Will Continue to Suffer Irreparable Harm.

Defendants' conduct has caused and, absent an injunction, will continue to cause overwhelming and irreparable harm to Zogenix.  A plaintiff need not demonstrate that denial of injunctive relief would be completely fatal to its business.  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (citation omitted).  Rather, it is adequate for a plaintiff to show that it has suffered a substantial injury and that alternative legal remedies are inadequate or unavailable to provide relief.  *See id.*  Where harms cannot be accurately measured

---

[9] *See also* List of Extended-Release and Long-Acting Opioid Products Required to Have an Opioid REMS, FDA website, available at: http://www.fda.gov/drugs/drugsafety/ Informationbydrugclass/ucm251735.htm; FDA Approved Labeling for Zohydro ER, Table 1.
[10] *See* Health Education Labor and Pensions Committee Hearing, "Protecting the Public Health: Examining FDA's Initiatives and Priorities," Transcript (Mar. 13, 2014) (Hamburg testimony).

\\DC - 040672/000004 - 5675063 v1

or compensated by money damages, a finding of irreparable harm is a "natural sequel." *Id.* at 19. The First Circuit also explicitly has recognized that the threat of harm to business reputation constitutes irreparable harm sufficient to warrant immediate injunctive relief. *See Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987) (citation omitted).

If Defendants' restrictions remain in place, even if only for the three-month "emergency" period, Zogenix is certain to suffer irreparable injury to the goodwill and positive reputation that the company carefully has developed nationwide among patients, prescribers, and pharmacists, as well as the potential for future sales.  Notably, the Commonwealth's restrictions do not just disincentivize physicians from prescribing Zohydro™ ER – they actually require physicians to prescribe a competitor's product first, and document failure.  There simply can be no doubt that the restrictions will result in loss of market share and product reputation for Zogenix.  These harms are incalculable and incapable of later compensation. Indeed, the "availability of a product line is as important, if not more important, than the amount of sales generated." *See Ross-Simons*, 102 F.3d at 19-20.  A company's inability to supply products as advertised can alienate potential customers and "wreak substantial (but immeasurable) damage to the [company's] goodwill." *Id.* at 19.  And loss of a product line can create irreparable injury if customers turn to competitors not laboring under the same handicaps. *Id.* (citing, e.g., *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14-15 (1st Cir. 1986)).

Defendants' restrictions are likely to harm Zogenix's reputation and goodwill among physicians and pharmacists not just in Massachusetts, but nationwide, who may now be wary of prescribing Zohydro™ ER despite its clear benefits to patients at risk of liver toxicity.  Farr Aff. ¶ 19.  They may also have to turn to competing hydrocodone-based products, regardless of health risks.  Those goodwill and reputational injuries are not easily measured or fully compensable in

18

damages – making them irreparable. *See Ross-Simons*, 102 F.3d at 20.  Moreover, Zogenix must seek relief against the backdrop of Eleventh Amendment precedents:  it may seek an injunction against state officers acting in their official capacities, *Ex Parte Young*, 209 U.S. 123, 155-56 (1908), any injunction issued governs only the official's future conduct and does not allow for damages, *Edelman v. Jordan*, 415 U.S. 661, 666-67 (1974).

The same is true even if the emergency measures are not made permanent.  Zogenix's lost sales have the potential to be substantial.  Farr Aff. ¶ 14-15.  That the company's sales in Massachusetts constitute only a percentage of its nationwide sales is not dispositive.  *See Ross-Simons*, 102 F.3d at 18 (fact that plaintiff stood to lose less than one percent of its annual sales did not foreclose an analysis of whether its economic viability could be jeopardized).  Moreover, Zogenix has already seen its stock price drop significantly since the announcement of the ban and follow-up restrictions.  Farr Aff. ¶ 20.  And given the media attention on Massachusetts' actions, Zogenix's lost sales will extend well beyond Massachusetts.  Those lost sales, coupled with the lost goodwill and customers preceding them, plainly constitute irreparable harm.  The clock is also ticking for Zohydro™ ER; its FDA approval, gained after tens of millions of dollars in investment and eighteen months of consideration, conferred three years of market exclusivity on Zogenix, and that time is running.  Farr Aff. ¶ 17.

## III.    Zogenix's Harm Outweighs Any Claimed Harm To Defendants, and the Public Interest Strongly Favors an Injunction.

Defendants will not suffer any harm if they are required to rescind their new restrictions. The only harm to Defendants would be the *de minimis* cost of communicating with providers that the restrictions are being lifted – or at least applied equally across the class.  The public, on the other hand, stands to suffer significantly.  "The public has no interest in the enforcement of what is very likely an unconstitutional statute." *Odebrecht Const., Inc. v. Secretary, Florida Dep't of*

19

*Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013).  And the public *does* have an interest in favor of enjoining the draconian restrictions imposed upon Zohydro™ ER so that patients at risk for liver toxicity and suffering from chronic pain have a viable option.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("There is a general public interest in ensuring that all citizens have timely access to lawfully prescribed medications.").

Zogenix understands the need for further efforts to curtail opioid abuse.  But Defendants' restrictions do not meet that goal.  As FDA concluded, it is not "in the interest of public health at this time to require all opioid products or all [ER/LA] opioid products" to feature the abuse deterrent formulation Defendants are seeking to force onto Zohydro™ ER.  Hagerty Aff., Ex. O at 3.  The restrictions also do nothing to address the dozens of other opioids that remain on the market that arguably pose a greater risk of abuse.  Thus, the public interest in access to FDA-approved safe, effective, and unique pain medications far outweighs any perceived gain in banning the drug.

## CONCLUSION

For the foregoing reasons, Zogenix respectfully requests that the Court issue a preliminary injunction enjoining Defendants from enforcing the latest restrictions on Zohydro™ ER, including but not limited to the BORIM, BORIP, and BOROPA regulations.

Dated: May 23, 2014                                  Respectfully Submitted,

                                                     /s/  Steven P. Hollman

                                                     Kenneth J. Parsigian (BBO # 550770)
                                                     Steven J. Pacini (BBO # 676132)
                                                     LATHAM & WATKINS LLP
                                                     John Hancock Tower, 20th Floor
                                                     200 Clarendon Street
                                                     Boston, MA 02116
                                                     Tel:  (617) 948-6000
                                                     Fax:  (617) 948-6001

kenneth.parsigian@lw.com
steven.pacini@lw.com

HOGAN LOVELLS US LLP
Steven P. Hollman (*pro hac vice*)
Susan M. Cook (*pro hac vice*)
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5672 (Telephone)
(202) 637-5910 (Fax)
steven.hollman@hoganlovells.com
susan.cook@hoganlovells.com

*Attorneys for Plaintiff Zogenix, Inc.*

## CERTIFICATE OF SERVICE

I certify that this document was filed through the ECF system on the date set forth above and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Steven P. Hollman

21