UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZOGENIX, INC.,<br><br>                      Plaintiff,<br><br>v.<br><br>DEVAL PATRICK, in his official capacity as the GOVERNOR OF MASSACHUSETTS,<br><br>CHERYL BARTLETT, RN, in her official capacity as DEPARTMENT OF PUBLIC HEALTH COMMISSIONER, and<br><br>CANDACE LAPIDUS SLOANE, M.D., et al., in their official capacities as members of the MASSACHUSETTS BOARD OF REGISTRATION IN MEDICINE, and<br><br>KAREN M. RYLE, MS, R.PH, et al., in their official capacities as members of the MASSACHUSETTS BOARD OF REGISTRATION IN PHARMACY, and<br><br>DIPU PATEL-JUNANKAR, PA-C, et al., in their official capacities as members of the MASSACHUSETTS BOARD OF REGISTRATION OF PHYSICIAN ASSISTANTS,<br><br>                      Defendants. | CIVIL ACTION<br>No. 1:14-cv-11689-RWZ |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Jo Ann Shotwell Kaplan (BBO #459800)
Anne Sterman (BBO #650426)
Eric Gold (BBO #660393)
Julia Kobick (BBO #680194)
Assistant Attorneys General
One Ashburton Place, 20th Floor
Boston, MA 02108

Plaintiff Zogenix, Inc. ("Zogenix") challenges an emergency order of the defendant Department of Public Health ("DPH") and emergency regulations of the defendants Board of Registration in Medicine ("BORIM"), Board of Registration in Pharmacy ("BORIP"), and Board of Registration of Physician Assistants ("BOROPA"). The regulations contain reasonable prescribing and dispensing requirements to help prevent abuse of Zogenix's new opioid painkiller, Zohydro[TM] ER ("Zohydro"), while preserving its availability for qualified patients.

Zogenix seeks a preliminary injunction suspending these emergency regulations.[1] However, it has no likelihood of succeeding on its challenge to this exercise of traditional state police powers in service of the public interest. Moreover, Zogenix has not, and cannot, prove any actual or imminent injury traceable to the emergency regulations, and therefore cannot demonstrate either standing to sue or irreparable harm.

## FACTUAL BACKGROUND

Defendants have previously provided the Court with extensive briefing and evidence on the crisis facing the Commonwealth with respect to prescription opioid abuse. *See*, *e.g.*, Defts' PI Mem. (Doc. #20) at 3 and Ex. A (Doc. #19) (Affidavit of Hilary Jacobs, attached as Defts' Ex. A). The Court has also heard of the unique, substantial risk posed by the introduction of Zohydro to the Massachusetts market in the midst of this public health crisis and of the emergency regulations adopted by the defendants to help prevent Zohydro's diversion and abuse. *See*, *e.g.*, *id.* at 5–6 and Ex. B (affidavit of Deborah Allwes, attached as Defts' Ex. B ("Allwes Aff.")); Defts' Mem. in Support of Motion to Dismiss ("MTD Mem.") (Doc. #45), at 2–4.[2]

---

[1] Zogenix additionally seeks to suspend the Governor's March 27, 2014 declaration of a public health emergency related to opioid abuse, but that request is improper. The Court lacks basis or authority to overturn that declaration.

[2] In its efforts to downplay the elevated risk of Zohydro, as compared with the hydrocodone-combination products, Zogenix cites the DEA's Drug Fact Sheet on hydrocodone for the proposition that hydrocodone "combination products, not single ingredient opioids, currently are the most widely abused opioid products." *See* Pltf's PI Mem., at 15 & n. 7. What Zogenix fails to mention is that, as of the preparation of that fact sheet, the hydrocodone

The Commonwealth's response to the opioid crisis has not been limited to actions regarding Zohydro.  In conjunction with his declaration of emergency, Governor Patrick announced that the executive committee of the Interagency Council on Substance Abuse and Prevention would be re-tasked to make recommendations for stemming the crisis, including improving treatment and addiction services. *See* http://goo.gl/tFr6zM.[3]  And on May 13, 2014, the Massachusetts Senate unanimously passed a bill aiming to combat the opioid abuse epidemic that would, among other things, "toughen the state's prescription drug monitoring program and require pharmacists to dispense an interchangeable abuse deterrent drug unless a physician has indicated that a substitution should not be made." A.P., *State Senate approves substance abuse bill,* Boston Globe, May 14, 2014, http://goo.gl/8WGcYa.[4]

As regards Zohydro, the Governor and DPH initially took action conditionally banning prescriptions, but this Court preliminarily enjoined that action.  DPH thereafter notified medical practitioners of the Court's injunction, *see* Verified Second Amended Complaint ("AC"), Ex. C at 1, and formally rescinded the conditional ban. *See* http://goo.gl/V54bqO.  The Court's order was also discussed in staff memoranda presented to BORIM and BORIP members (and the full order provided to BORIM members) before they issued their emergency regulations that are the

---

products on the market were "[a]ll . . . combination products." *See* http://goo.gl/J5fCQc.  In other words, there was at the time no ability to compare Zohydro, with its far greater dose of hydrocodone, to the hydrocodone-combination products.  The DEA Fact Sheet is relevant because it demonstrates that hydrocodone products (of which Zohydro is now one) are the most abused opioid drugs. *See also* Affidavit of Christopher William Shanahan, M.D., M.P.H., F.A.C.P., Defts' Ex. C ("Shanahan Aff."), ¶ 4 (Zohydro "is of greater concern than other [ER/LA] opioids that are not abuse-deterrent because hydrocodone opioids are the most commonly abused.").  And Zogenix continues to discuss the relative potency, on a mg to mg basis, of the hydrocodone in Zohydro vis-à-vis the opioid in other ER/LA drugs, when the issue is instead the fact that Zohydro contains five times more hydrocodone than any other hydrocodone opioid and can thereby readily deliver a fatal dose if misused. *See* Allwes Aff., ¶¶ 9–10.

[3] The Governor also dedicated an additional $20 million to treatment and addiction services and directed the DPH (1) to order broader access to, and permit first responders to carry and administer, an anti-opioid drug that can reverse the effects of overdose and (2) to accelerate the mandatory use of the previously voluntary prescription monitoring program. *See* http://goo.gl/tFr6zM.

[4] The bill, as approved by the Senate, is available at https://malegislature.gov/Bills/188/Senate/S2133.

subject of Zogenix's new application for a preliminary injunction. *See* Affidavit of Katherine B. Dudich, Defts' Ex. D ("Dudich Aff."), Attachment 2, at 1–2 & Tab E; http://goo.gl/u3OZ40. Thus, there has been no attempt to "sidestep" the Court's order enjoining the conditional ban, as Zogenix asserts. Pltf's PI Mem., at 4.  To the contrary, Defendants chose not to appeal that order, immediately and fully implemented it, voluntarily made it permanently effective, and have at all times honored both its letter and its spirit, adopting alternative measures that preserve Zohydro's availability for appropriate patients while seeking to minimize its abuse.  During the public meeting at which BORIM adopted its emergency regulations, BORIM's Chair made a special point of explaining that the regulations were not intended to prohibit Zohydro prescriptions. *See* Dudich Aff., Attachment 1, at 3 ("Dr. Sloane stated that the Board was not attempting to interfere with the marketing of extended release hydrocodone, only trying to ensure the safe prescribing of such medications to patients.").

The Commissioner of the U.S. Food and Drug Administration ("FDA"), specifically addressing BORIM's emergency regulations and comparable Vermont restrictions, has described these requirements as "consistent with the essential tenets of numerous medical society guidelines on appropriate pain management and . . . precisely what responsible physicians should be doing.  As the entities with responsibility for overseeing the practice of medicine, the states have an important role to play in addressing a critical driver of opioid abuse—inappropriate prescribing practices." Margaret A. Hamburg, M.D., *The way forward on opioid abuse: A call to action for science-based, comprehensive strategies*, Apr. 29, 2014, Declaration of Elizabeth M. Hagerty ("Hagerty Aff."), Ex. L ("FDA Blog"), at 1–2 (emphasis added).[5] *See also* AC, Ex. G,

---

[5] The Commissioner's comments were made on April 29, 2014, addressing the "most recent state actions in Massachusetts and Vermont" that "would require healthcare providers to take certain steps such as screening for abuse risk and documenting medical need before prescribing" Zohydro. FDA Blog, at 1–2.  Contrary to Zogenix's claims, therefore, the Commissioner was directly addressing the BORIM regulations; she also referred to more than

Remarks by Comm'r Hamburg at 2014 Rx Prescription Drug Abuse Summit, at 4, Apr. 22, 2014.[6]  As Dr. Shanahan, "a national educator on opioid prescribing for chronic pain" attests, "physicians remain insufficiently knowledgeable about appropriate prescribing of these dangerous medications and in particular do not routinely screen for and assess risk of misuse in patients to whom they prescribe" them. Shanahan Aff., ¶¶ 1, 4.  Dr. Shanahan agrees with Commissioner Hamburg that the emergency regulations "codify best clinical practices, are reasonable, and are already followed by well-informed and competent clinicians." *Id.*, ¶ 2.

Defendants have provided the Court with affidavits from two physicians and two pharmacists, all with extensive experience practicing in Massachusetts, who attest to the reasonableness of the Boards' emergency regulations, indicating that they pose no undue burden and will not prevent the prescribing, stocking and dispensing of Zohydro as appropriate. *See* Shanahan Aff., ¶¶ 1–6; Affidavit of Jane Liebschutz, M.D., M.P.H. (Doc. #35), attached as Defts' Ex. E ("Liebschutz Aff."), incl. ¶¶ 1, 7 ("[I]f I had need to prescribe [Zohydro] to a patient, the requirements that I check the patient's PMP data, conduct a risk assessment, discuss the risks and benefits of the medication with the patient, enter into a pain management treatment agreement, and write a letter of medical necessity would not deter me from prescribing" it.)[7];

---

just "two broad issues." Pltf's PI Mem. at 7, n. 2.  Indeed, her comments touched on all aspects of BORIM's emergency regulations except for the counseling requirement, and explicitly supported the BORIM requirement most significant to Zogenix, the letter of medical necessity. *See* FDA Blog, at 1.

[6] Commissioner Hamburg explained that "the potential for abuse begins in the doctor's office with the choice of a particular drug.  Therefore it is vital that the doctor be well informed about when to prescribe that drug, how to use it safely and have the tools and know-how to convey that information to the patient." AC, Ex. G, Remarks by Comm'r Hamburg at 2014 Rx Prescription Drug Abuse Summit, at 4, Apr. 22, 2014.  She further noted FDA's concerns regarding proper storage and disposal of prescription drugs, proper prescriber/patient agreements, and effective use of state prescription drug monitoring programs. *See id.*  The DPH, BORIM, BORIP, and BOROPA (collectively, "Boards") emergency actions ("emergency regulations") are directly responsive to these FDA concerns.

[7] Dr. Liebschutz is Associate Chief for the section of General Internal Medicine, Director of the General Internal Medicine Fellowship program, and the Wellness Director for Boston Medical Center's medical-dental staff. Liebschutz Aff., ¶ 1. Like Dr. Shanahan, she is a national educator on prescribing opioids for chronic pain. *See id.*

Affidavit of Michael Reppucci, R.Ph., Defts' Ex. F ("Reppucci Aff."), incl. ¶¶ 1-2 ("These regulations would not prevent me from stocking and dispensing Zohydro because they are a reasonable means of ensuring that pharmacists take appropriate measures to safely store and dispense Zohydro, which is an opioid with a high risk of abuse or misuse."); Affidavit of Paul Frederick Hackett, R.PH., Defts' Ex. H ("Hackett Aff."), incl. ¶¶ 1, 3 (regulations "do not create any operational hurdles to" stocking and dispensing Zohydro). Zogenix has submitted no contrary evidence of any kind. It submits only self-serving, speculative assertions by its own president, who is not a practicing physician or pharmacist anywhere and is apparently a registered pharmacist only in the United Kingdom. *See* Declaration of Stephen J. Farr, Ph.D. (Doc. #48), ("Farr Aff.") ¶¶ 2, 11–13.[8]

Zogenix complains most vigorously about the BORIM requirement that physicians provide to pharmacists a letter of medical necessity stating that alternative pain-management treatments "have failed" before prescribing Zohydro. Zogenix suggests that there is a significant distinction between this requirement and FDA's requirement that Zohydro is indicated only when "other treatments are inadequate." However, as Dr. Shanahan explains, "there is no difference between these requirements" because "[a] prescriber must have actual clinical experience with a treatment modality in order to determine if the medication is adequate or inadequate for a patient, and if . . . inadequate, that means that it has failed to meet [treatment] goals." Shanahan Aff., ¶ 7. FDA Commissioner Hamburg agrees, describing Zohydro as indicated only where "alternative treatment options *have proved inadequate*." FDA Blog, at 2 (emphasis supplied). And both Dr. Shanahan and Dr. Liebschutz agree that the BORIM

---

[8] Apparently recognizing the utter insufficiency of the Farr declaration, Zogenix has filed an untimely motion seeking to file under seal an additional affidavit that would purportedly address the impact of the BORIP regulations. While that motion should be denied, its filing confirms Zogenix's failure to substantiate its allegations and justify the extraordinary preliminary relief it requests.

requirement is consistent with best practice because patients should first have "tried and failed to obtain sufficient pain relief and restoration of function using various combinations of non-opioid medications" before being prescribed Zohydro or another opioid medication intended to treat severe, chronic non-cancer pain. Shanahan Aff., ¶ 2; *accord* Liebschutz Aff., ¶ 2.

Zogenix further relies on a February 2014 draft guidance document (which post-dates Zohydro's premarket approval) to suggest that the FDA would have required two clinical trials, rather than just the one conducted, to adopt an "other treatments have failed" indication for Zohydro prescriptions.  However, the draft guidance says nothing whatsoever about requiring two clinical trials on that basis.  It calls instead for two clinical trials to support a finding of efficacy for analgesics used to treat "specific pain condition[s]," such as "the pain of osteoarthritis, chronic low back pain, [the] pain of fibromyalgia," or "breakthrough pain," or where there are "new routes of administration [or] new patient populations" or "special concerns based on formulation or toxicity profile." Hagerty Aff., Ex. N, at 4–5.[9]

Nor do BORIM's emergency regulations require physicians to prescribe other opioid medications first before prescribing Zohydro, as Zogenix suggests.  The regulations do not specify what particular alternative treatments must have been tried and failed before Zohydro is prescribed.   As Dr. Shanahan attests, prescribers may therefore prescribe Zohydro after determining that *non-opioid medications* have failed to provide sufficient pain relief. *See* Shanahan Aff., ¶¶ 2, 7.  Dr. Liebschutz agrees. *See* Liebschutz Aff., ¶¶ 2, 3.  These affidavits

---

[9] The last two circumstances for conducting two trials are arguably applicable to Zohydro. *See id.* at 4 ("An example of a new patient population is a drug intended only for use in patients who have developed opioid tolerance as a result of prior exposure to opioids as this may be the only population that can tolerate a new formulation with doses larger than would be safe in an opioid-nontolerant population"; and "one example" of a drug posing "special concerns based on formulation or toxicity profile . . . is the use of modified-release opioids for chronic cancer pain. These drugs can contain large amounts of opioid in each dose resulting in serious safety concerns including those associated with accidental overdose or misuse.").  Thus, had this guidance been final as of Zohydro's FDA approval process, Zogenix would likely have been subject to a two-clinical-trials requirement for this entirely independent reason. *See also* Liebschutz Aff., ¶ 3 ("In my professional opinion, [Zohydro] is only suitable for patients who are already opioid tolerant, as there is [otherwise] too much risk of a respiratory event or an unintentional overdose[.]").

belie Zogenix's unsubstantiated speculation that prescribers will be unable to prescribe Zohydro consistently with their ethical obligations and patient needs, and Dr. Shanahan expressly rejects that suggestion. Shanahan Aff., ¶ 6.

Zogenix also makes repeated, inaccurate representations regarding the transcript of the public meeting at which BORIP adopted its regulations.  The transcript contains 86 pages of detailed discussion about approaches to regulating pharmacy practices so as to help prevent diversion and abuse of Zohydro, all of which discussion presumes that Zohydro will in fact be prescribed and dispensed in the Commonwealth.[10]  Zogenix ignores this extensive discussion, focusing instead on a single comment by a single unidentified individual (not multiple BORIP members, as Zogenix asserts), taken out of context and addressing a *BORIM requirement*, not a proposed BORIP requirement.  Zogenix characterizes this single comment as revealing an intention on the part of the Defendants generally to prevent any Zohydro prescriptions in the Commonwealth and force Zogenix to develop an abuse-deterrent formulation of Zohydro.[11]  As appears from the context of the discussion, however, BORIP members were simply suggesting that BORIM's requirement of a letter of medical necessity for each Zohydro prescription was likely designed to discourage prescribers from putting patients on Zohydro unless they have

---

[10] Board members (1) rejected a requirement that two pharmacists be involved in data entry and the final check process because that would preclude one-pharmacist pharmacies from prescribing Zohydro, *see* Hagerty Aff., Ex. P, at 72–74; (2) discussed the risk of diversion and the need for restrictions to help prevent it, *see id.* at 72–74, 76–85; (3) addressed  accommodating incapacitated patients who "really need[ ] this medication" and send a caregiver to pick it up, *see id.* at 86–87; (4) stated a preference for using the FDA Medication Guide as the written warning because sick patients will not take the time to read multiple warnings, *see id.* at 88; (5) raised concerns about robberies of stocked Zohydro, as occurred with Oxycontin, *see id.* at 92; and (6) discussed whether the BORIM emergency regulations require a new letter of medical necessity with each prescription, *see id.* at 96–99.

[11] Zogenix makes this suggestion even though the very next page of the BORIP transcript contains a clear statement of a contrary intention by another BORIP member. *See* Hagerty Aff., Ex. P, at 98 ("And I'm not trying to make it difficult for patients who absolutely need it.  I think the best, the most important piece is people get what they absolutely need for their condition.  I support that.  But I think we have the other responsibility to also make sure that we have a tight, as tight as we can within human possible means to control the prescribing and the required documentation that goes with it.").

chronic pain conditions that justify the risks of long-term dependence, addiction, diversion, and abuse. *See* Hagerty Aff., Ex. P at 96–97.[12]

## ARGUMENT

### I.     The public would be harmed if the emergency regulations were suspended.

For the reasons outlined above and in prior filings, Massachusetts public health officials, exercising traditional state police powers, determined that the emergency regulations are necessary and appropriate to protect public health.  Zohydro undeniably poses substantial risks of diversion and abuse, and the Boards have enacted reasonable regulations, consistent with best medical practices, to help address those risks.  Prescribers will be required to assess the risk of prescribing Zohydro to a particular patient, assure that the prescription is medically necessary and unlikely to fall into the wrong hands, and enter into a treatment plan with the patient seeking to ensure proper use and prevent diversion.  Pharmacists, in turn, will be required to limit access to Zohydro that could result in diversion, ensure that a prescriber has found the medication medically necessary, and counsel patients on Zohydro's risks and appropriate precautions.

It is irrelevant that Zogenix takes issue with the Boards' rationale for action. *See Am. Grain Products Processing Inst. v. Dep't of Public Health*, 392 Mass. 309, 325, 467 N.E.2d 455, 467 (1984) (where there is substantial basis for DPH's emergency action, it is "irrelevant that the plaintiff or others may dispute that information").   The public health of state residents is undeniably a matter in which "the general public has an interest," *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (internal quotation omitted), and the Court "should give due weight to the serious consideration of the public interest in this case that has already been undertaken by the responsible state officials . . . who unanimously passed the [emergency]

---

[12] Zogenix announced in November 2013 that it would develop an abuse-deterrent version of Zohydro. *See* http://goo.gl/CS9qYL.  Thus, Massachusetts' actions cannot possibly be viewed as intended to coerce Zogenix into developing an abuse-deterrent form of Zohydro against its will.

rules[.]" *Id.* at 1140; *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (internal quotation omitted)).[13]  Far from favoring issuance of a preliminary injunction, the public interest necessitates continued implementation and enforcement of the Boards' emergency regulations.

## II.     Zogenix is unlikely to succeed on the merits.

Zogenix does not point to anything in the text or structure of the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, ("FDCA") that signals congressional intent to preempt state regulation governing the prescribing and dispensing of prescription drugs.  Nor could Zogenix do so, because "Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness." *Wyeth v. Levine*, 555 U.S. 555, 575 (2009).[14] Remarkably, Zogenix does not even discuss *Wyeth*, which controls the preemption analysis here. Zogenix relies exclusively on cases having nothing to do with the FDCA or FDA's regulations and that turn on analysis of the intent of other federal laws. *See, e.g.*, *Geier v. Am. Honda Motor Co.*, *Inc.*, 529 U.S. 861 (2000) (tort claim preempted due to specific and significant DOT regulatory objective to preserve auto manufacturer choice); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) (structure, text and purpose of the federal Clean Water Act did not leave role for

---

[13] Zogenix cites *Stormans* for the proposition that there "is a general public interest in ensuring that all citizens have timely access to lawfully prescribed medications." *Stormans*, 586 F. 3d at 1139.  But the emergency regulations determine when Zohydro may be "lawfully prescribed"; they do not restrict access to any lawfully prescribed medication.

[14] *Wyeth* expressly equates state failure-to-warn claims with state "drug regulation," 555 U.S. at 578–79, confirming that it is controlling authority here.  And the Schuck article cited by Zogenix, *see* Pltf's PI Mem., at 10, similarly explains that state tort judgments are "regulatory in every relevant sense of the word." Peter H. Schuck, *FDA Preemption of State Tort Law in Drug Regulation: Finding the Sweet Spot*, 13 Roger Williams U. L. Rev. 73, 78 (2009).

regulation by a neighboring state of a point source discharge); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) (California property and mortgage doctrine preempted due to history and intent of "due-on-sale" regulation of the Federal Home Loan Bank Board).

Zogenix similarly has no answer to the body of cases holding that "the FDA regulates the marketing and distribution of drugs in the United States, not the practice of medicine, which is the exclusive realm of individual states," *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006), or to the FDA Commissioner's confirmation that BORIM's regulations codify best practice and are compatible with FDA's approval of Zohydro. *See* FDA Blog, at 1–2.[15]   The problem for Zogenix is that none of the factors relevant to the preemption analysis—congressional intent, the primacy of state law in regulating the medical professions, the views of the FDA itself, and the presumption against preemption—so much as hints that the Boards' emergency regulations conflict with FDA's approval of Zohydro.  Indeed, each factor affirmatively indicates that the Boards' emergency regulations are not preempted.

Zogenix relies primarily on its "effective ban" theory in an effort to ward off this inevitable conclusion.   But on this critical point, Zogenix has submitted no competent evidence—simply broad, speculative assertions from its company president that the Boards' emergency regulations will have this effect.[16]

---

[15] While Zogenix is correct that the Commissioner expresses a policy view that "we can't just focus on one drug, Zohydro, alone" in attacking the problem of opioid abuse, *see* FDA Blog, at 2, Massachusetts has not done so. Moreover, the Commissioner does not, and could not, question the well established authority of public officials to govern in an iterative fashion. *See, e.g.*, *F.C.C. v. Beach Comm'ns, Inc.*, 508 U.S. 307, 315–17 (1993) ("legislature must be allowed leeway to approach a perceived problem incrementally"); *Zauderer v. Off. of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 n. 14 (1985) ("As a general matter, governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied.").

[16] Zogenix also cites one comment by one individual at a BORIP meeting in a futile effort to prove a general intention on the part of the Boards to secure this effect.  As was noted previously, the BORIP discussion has nothing to do with the intent of BORIP's emergency regulations, but instead entails speculation by a BORIP member about the intent behind BORIM's requirement of a letter of medical necessity.  Even if this individual had addressed BORIP's own regulations, however, comments by a single public official are insufficient evidence of governmental intent. *See, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979) ("[t]he remarks of a single legislator, even the

Zogenix points specifically to three provisions of the emergency regulations in connection with its "effective ban" argument. First, Zogenix attacks the requirement that patients obtain a letter of medical necessity verifying that other pain management treatments have failed. *See* Pltf's PI Mem., at 8–9. But, as was discussed *supra*, at 5, that requirement is not meaningfully different from FDA's requirement that alternative treatment options must be "inadequate" before Zohydro may be prescribed (or, as stated by the FDA Commissioner in the FDA Blog, that "alternative treatment options have proved inadequate"). The Commissioner has expressly endorsed this provision requiring Massachusetts prescribers to document medical necessity. *See* FDA Blog, at 1–2. And the provision cannot possibly amount to an effective ban anyway because, as Zogenix concedes, FDA itself approves drugs with indications requiring that alternative treatments "have failed." Pltf's PI Mem., at 11 & n. 4.[17]

While Zogenix claims that the clinical trial process it undertook would have been different had FDA's indication used the words "have failed" instead of "are inadequate," *id.* at 12, the draft FDA Guidance document on which Zogenix relies for this proposition had not been issued even in that draft form as of FDA's review of Zohydro and says nothing of the sort. *See supra*, at 6. There is, therefore, no evidence that FDA's use of the terms "have failed" and "are inadequate" in drug labeling turns on the number of clinical trials performed. Nor does the requirement that "other pain management treatments have failed" imperil the prescription of Zohydro as part of an opioid rotation or require doctors to prescribe medicine that is contraindicated, as Zogenix claims. *See* Pltf's PI Mem., at 9, 12. Dr. Shanahan expressly rejects

---

sponsor, are not controlling in analyzing legislative history"); Sutherland, <u>Statutory Construction</u>, § 48:17 (Individual lawmakers' reasons for enacting legislation are "uniformly disregarded for interpretative purposes except as expressed in the statute itself" because they "may be varied, conflicting and difficult to determine.").

[17] To the extent Zogenix has questions about BORIM's interpretation of this or any other aspect of its emergency regulations, it is free to seek clarification during the public hearing process on promulgation of permanent regulations, which is already underway.

those assertions. *See* Shanahan Aff., ¶ 6 (the regulations do not "conflict in any way with my ethical obligations or my patients' proper care or require that I subject patients to inappropriate or contraindicated treatment before prescribing Zohydro"). Zogenix's assertions flow from its inaccurate conclusion that the BORIM language necessitates failed trials of particular pain treatments (in the first case, opioid treatments; in the latter, treatment with a contraindicated medication) before Zohydro is prescribed. In fact, BORIM has not specified what other pain treatments must have been tried and failed, and failed trials of non-opioid pain treatments and/or other treatments that are not contraindicated are therefore sufficient.[18]

Zogenix also points to the BORIP regulation prohibiting pharmacy interns, technicians, and technician trainees from handling Zohydro, speculating that "[p]harmacies in Massachusetts are unlikely to choose to stock [Zohydro] under these restrictions." Farr Aff., ¶ 13.[19] Zogenix provides no evidence of any kind to support its conjecture, and the Reppucci and Hackett affidavits provides uncontradicted evidence to the contrary. *See* Reppucci Aff., ¶¶ 6–8 ("[P]rohibiting all pharmacy technicians from handling Zohydro does not add any substantial additional administrative burdens or present substantial logistical problems."); Hackett Aff., ¶ 2 (BORIP regulations "will not deter me from stocking and dispensing" Zohydro). In fact, other BORIP regulations already restrict the ability of pharmacy interns, technicians, and technician trainees to transport and handle Schedule II controlled substances generally, *see* 247 C.M.R.

---

[18] As Defendants discussed in Defts' MTD Mem., at 13 n. 14, Zogenix is also wrong in positing that BORIP has not approved the written warning that it is requiring pharmacists to provide to customers with Zohydro prescriptions. In fact, BORIP has adopted the FDA's Medication Guide for Zohydro as its approved written warning. *See id.* Requiring pharmacists to counsel patients in accordance with the FDA's own Medication Guide obviously does not conflict with FDA's approval of Zohydro or effectively ban the drug; it simply makes patients more informed about Zohydro's risks and benefits.

[19] In addition to being speculative, conclusory, and self-serving, this affidavit of Zogenix's president makes assertions not based on either personal knowledge or qualified expert knowledge and experience. Farr further offers incompetent legal opinions and inadmissible lay opinion on ultimate issues. His affidavit highlights the complete absence of any competent, unbiased evidence supporting Zogenix's motion.

§ 8.05(2), and those regulations have by no means "effectively banned" all Schedule II drugs in the Commonwealth.

In short, the Boards' emergency regulations are reasonable measures, sanctioned by the FDA, rooted in best medical practice, and designed to promote safe practices with respect to a drug that poses serious risk of abuse.[20]  The regulations are not preempted by the FDCA.

Zogenix's class-of-one equal protection claim fares no better. First, Zogenix conspicuously fails to mention the Supreme Court's most recent class-of-one decision, *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), which bars its claim.  Zogenix argues in error that the class-of-one doctrine applies to all "legislative and executive conduct." Pltf's PI Mem., at 13.  In fact, it applies only to "legislative or regulatory *classifications*," and only when there is "a clear standard against which departures, even for a single plaintiff, [can] be readily assessed." *Engquist*, 553 U.S. at 602 (emphasis supplied).  Thus, the plaintiff asserting a class-of-one claim must be a member of a legislative or regulatory class subject to a clear, legislative or regulatory standard who is then treated differently than other class members subject to the standard.  For example, when a state agency's decision to deny a license to a putative member of a licensed industry is constrained by a clear standard, that denial may be subject to a class-of-one challenge based on differential treatment vis-à-vis other members of the industry

---

[20]  The Chou article cited by Zogenix reinforces the medical justification for each provision of the BORIM regulations. Pltf's PI Mem. at 9, n. 3.  In particular, the article explains that "randomized trials that demonstrate the benefits of [chronic opioid therapy] are most applicable to patients with moderate or more severe pain *who have not responded to nonopioid therapies*." R. Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10(2) J. Pain 113, 116 (Feb. 2009) (emphasis added).  Elsewhere, the article recommends that, before initiating opioid therapy, prescribers conduct "a thorough history and physical examination, including an assessment of psychosocial factors and family history" and a "comprehensive benefit-to-harm analysis," maintain a "continuing discussion with the patient regarding [chronic opioid therapy that] should include goals, expectations, potential risks, and alternatives," counsel patients about the "serious risks" of "abuse, addiction, [and] overdose," and "discuss a [chronic opioid therapy] management plan before initiating a course of treatment and on an ongoing basis while patients are on therapy." *Id.* at 115–17.

provided the other elements of a class-of-one claim are present. *E.g.*, *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010).

Here, Zogenix is not a member of the professions that the Boards regulate, the Boards have created no regulatory classification of which Zogenix is a member, and there is no clear standard against which departures could be assessed.[21]   Indeed, because the Boards' emergency regulations were promulgated in the midst of a declared public health crisis, they are a preeminent example of "discretionary [governmental] decisionmaking" immune from a class-of-one attack. *Engquist*, 553 U.S. at 603.[22]

Zogenix has also failed completely to allege or introduce a single fact that would demonstrate that Defendants harbor "personal hostility" toward Zogenix, *Tapalian v. Tusino*, 377 F.3d 1, 6 (1st Cir. 2004), or have undertaken a "malicious orchestrated campaign" with the intent of harming Zogenix, *Rubinovitz v. Rogato*, 60 F.3d 906, 912 (1st Cir. 1995), as required by binding First Circuit precedent to support a class-of-one claim. *See Buchanan v. Maine*, 469 F.3d at 158, 178 (1st Cir. 2006).[23]   This deficiency alone is fatal to Zogenix's claim.

Finally, Zogenix's own allegations and arguments undermine its claims that Zohydro is similarly situated to other opioids and that the emergency regulations lack rational basis.   The

---

[21] *Milnot v. Arkansas State Bd. of Health*, 388 F. Supp. 901 (D. Ark. 1975), on which Zogenix relies, is inapposite. The statute at issue regulated the plaintiff (a filled milk manufacturer) directly, expressly prohibiting both the sale and manufacture of filled milk.

[22] A recent Ninth Circuit decision, involving a class-of-one claim challenging discretionary adjustments to Arizona's execution protocol, illustrates this point.  *See Towery v. Brewer*, 672 F.3d 650, 660–61 (9th Cir. 2012) (per curiam). The claim was not permissible in that context, the court ruled, because, "under Arizona's statutory scheme," decisions were "relegated to the Director [of the Department of Corrections], with no State law requirement that there be uniformity." *Id.* at 660.   The decisions "'by their nature involve[d] discretionary decisionmaking,'" the court noted, and lacked any "pattern of generally exercising the discretion in a particular manner." *Id.* (quoting *Engquist*, 553 U.S. at 603).

[23] Zogenix's unfounded suggestion that Defendants have acted in "bad faith" by supposedly endeavoring to "sidestep" the Court's preliminary injunction order, Pltf's PI Mem., at 14, does not demonstrate personal hostility toward or a malicious desire to injure Zogenix.  The same is true of Zogenix's improper and inaccurate assertion of regulatory intent based on a single, mischaracterized statement by one individual at a BORIP meeting.

14

Department of Justice fact sheet that Zogenix cites specifically notes that "[h]ydrocodone is the most frequently prescribed opioid in the United States and is associated with more drug abuse and diversion than any other licit or illicit opioid." *See* http://goo.gl/J5fCQc; *see also* Shanahan Aff., ¶ 4 (Zohydro "is of greater concern than other [ER/LA] opioids that are not abuse-deterrent because hydrocodone opioids are the most commonly abused.  Therefore Zohydro is more likely to be abused than other ER/LA opioids.").  Because Zohydro is the only all-hydrocodone opioid, the only extended-release hydrocodone product, and the only hydrocodone product subject to Schedule II controls, *see* AC, ¶ 5, it is not "similarly situated in all relevant respects" to other extended-release, long-acting opioids.  *Barrington Cove Ltd. P'ship v. R.I. Housing & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001) (emphasis in original).  Put simply, those opioids are oranges to Zohydro's apple. *See id.* ("apples should be compared to apples").

In this circuit the "rational basis" standard for purposes of class-of-one claims is "exceptionally deferential," necessitating proof of a government action that is "wholly 'arbitrary or irrational.'" *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 104–05 (1st Cir. 2002) (quoting *Me. Cent. R.R. Co. v. Bhd. of Maint. Way Employees*, 813 F.2d 484, 492 (1st Cir. 1987)).[24]  Defendants' rational basis for promulgating the emergency regulations cannot seriously be questioned given the substantial risk of abuse associated with hydrocodone opioids and the special risks attendant to Zohydro's elevated dose of hydrocodone.  Defendants have acted reasonably and responsibly in an effort to protect public health and safety.

---

[24] *See also Jeneski v. City of Worcester*, 476 F.3d 14, 17 (1st Cir. 2007) ("The question is not what went on in the mind of the state actor but whether anyone, including the judge, can conceive of a rational reason for such a classification.").

### III.     **Zogenix has not demonstrated any injury sufficient to establish its standing to sue under Article III, let alone imminent harm.**

The "irreducible constitutional minimum" of standing requires an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," as well as a "causal connection between the injury and the conduct" of which the plaintiff complains. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Mere allegations of possible future injury are insufficient. *See Blum v. Holder*, 744 F.3d 790, 796 (1st Cir. 2014).[25]  Moreover, "when," as here, "the plaintiff is not [itself] the object of the government action or inaction [it] challenges, standing . . . is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation omitted).  In this situation, because the necessary element of causation "hinge[s] on the independent choices of the regulated third party, 'it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation.'" *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562).  To meet that burden, the plaintiff must introduce "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation." *Id.* at 941.

Zogenix's contentions of injury are based entirely on speculation about future events, presented in the form of conclusory, unsupported assertions by Zogenix's president about the purported likely response of Massachusetts prescribers and pharmacists to the emergency regulations.  Courts "reject as overly speculative [such] predictions of . . . future actions by third parties." *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 912 (D.C. Cir.

---

[25] The same is true in the preliminary injunction context.  *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

1989).  There is, in fact, not one iota of evidence before the Court that Massachusetts prescribers and pharmacists will decline to prescribe or dispense Zohydro when otherwise appropriate as a result of the emergency regulations.  There is, therefore, no evidence that Zogenix will lose Zohydro-related revenue, or lose any benefit associated with its research-and-development activities or other investments in Zohydro or the 3-year period of exclusivity for Zohydro sales due to Defendants' regulations.  All of the evidence is in fact to the contrary.

Nor has Zogenix offered any evidence tracing any purported reputational injury to the Boards' emergency regulations, as opposed to one or more of the multitude of well-publicized, critical comments and adverse actions taken by other governmental and private actors relative to Zohydro.  Defendants were far from the first public officials to express concerns and take action in response to Zohydro's extraordinary risk.  When the FDA considered Zohydro's application for premarket approval, the agency's expert advisory committee voted 11 to 2 (with one abstention) against approval. *See Summary Minutes of Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee*, at 6 (Dec. 7, 2012), http://goo.gl/cAZi44.  Only a bare majority even considered Zohydro effective for the management of chronic pain, and 9 of 14 members found the evidence insufficient that Zohydro is safe in the intended population. *Id.* at 5.  While the FDA subsequently granted premarket approval, it simultaneously indicated that it will "give serious consideration to assuring that any non-abuse formulations [like Zohydro] are removed from the market" as soon as an alternative, abuse-deterrent formulation is available. *See* Hagerty Aff., Ex. A, at 32.

FDA's October 2013 premarket approval of Zohydro, over the resounding objection of its own scientific advisors, met with prompt and widespread criticism.  In December 2013, 29 Attorneys General sent a letter urging the FDA to reconsider. *See* http://goo.gl/ZQQXS2.  On

March 13, 2014, a bipartisan group of congressmen introduced bills in the Senate and House of Representatives to revoke FDA's approval. *See* S. 2134, 113th Cong. (2014); H.R. 4241, 113th Cong. (2014).  And on April 4, 2014, the State of Vermont issued emergency regulations governing Zohydro prescription practices, *see* http://goo.gl/Lbm7Z4, that are nearly identical to those that BORIM subsequently adopted. *See* http://goo.gl/LfUINu.[26]

In the wake of Zohydro's FDA approval, private parties also announced their opposition. Blue Cross/Blue Shield of Massachusetts declined to provide insurance coverage for Zohydro prescriptions. *See* http://goo.gl/K13O4a.  New Hampshire physicians and pharmacists indicated that they will voluntarily refrain from prescribing and dispensing it until there is an abuse-deterrent version. *See* Sarah Palermo, *Zohydro ban unlikely in N.H., as doctors and pharmacists voluntarily postpone using it*, Concord Monitor, Apr. 20, 2014, http://goo.gl/suZ2Fx.[27]  And according to Zogenix's chief executive officer, unidentified companies have made "statements on pay-to-play acquisitions" and "information about Zohydro ER has been and continues to be reported by the media and echoed by several organized efforts." Transcript, Zogenix Earnings Call, May 8, 2014, ("Tr. EC"), at 3, 12.[28]

Perhaps of greatest significance, on March 12, 2014, Purdue Pharmaceutical announced that it would soon seek FDA approval for an abuse-deterrent hydrocodone-only extended-release

---

[26] On April 28, 2014, Pennsylvania legislators introduced a bill that would impose similar requirements for Zohydro prescriptions in that state, including a requirement that the prescriber document "that nothing else will effectively manage the severe pain." *See* http://goo.gl/h4GdEj.

[27] Many members of the Massachusetts medical community similarly perceive no need for Zohydro, as is exemplified by the Affidavit of Dr. Daniel P. Alford, an Associate Professor and Assistant Dean at the Boston University School of Medicine and a primary care physician at Boston Medical Center specializing in pain management. *See* Affidavit of Daniel P. Alford, MD, MPH, FACP, FASAM (Doc. #20), attached as Defts' Ex. G, ¶¶ 4-6 ("There are many options for controlling pain available to physicians," including extended-release opioid medications with abuse-deterrent properties, "making them safer than Zohydro ER.").  Alternatives also include extended-release opioid analgesics that do not contain acetaminophen. *See id.*, ¶ 5.  Other Massachusetts prescribers consider Zohydro a medication of last resort, due to its risks and the availability of safer alternatives. *See* Shanahan Aff., ¶ 6; Liebschutz Aff., ¶ 7.

[28] Transcript prepared by Seeking Alpha and available at www.SeekingAlpha.com.

analgesic, i.e., the very type of alternative to Zohydro that the FDA indicated from the outset might lead to Zohydro's removal from the market. *See* Brady Dennis, *Maker of OxyContin developing tamper-resistant hydrocodone drug*, Wash. Post., Mar. 12, 2014, http://goo.gl/JfI5aH. Purdue actually filed its application on April 30. A.P., *Purdue Pharma Submits NDA for Abuse-Deterring Pain Med*, Drug Discovery & Dev., Apr. 30, 2014, http://goo.gl/G1jrSu. Zogenix, on the other hand, does not expect to have an abuse-deterrent formulation approved by FDA until "the 2016 timeframe." Tr., EC, at 10. Numerous commentators have attributed a steep decline in Zogenix's stock to Purdue's early March announcement. *See, e.g.*, Dennis, *supra*, at 18  (3/12/14 Washington Post article reporting that Zogenix's stock price "fell more than 20 percent in the wake of [the] announcement"); A.P., *Abuse-Resistant Hydrocodone Could Sink Sales of New Drug*, N.Y. Times, Mar. 12, 2014, http://goo.gl/XT7nKh (same); *Purdue Pharma Submits NDA for Abuse-Deterring Pain Med*, *supra*, at 19 (Drug Discovery & Development magazine article noting that Purdue's announcement "touched off a steep decline in sales of Zogenix," that its shares had lost 18 cents, or 7%, as of midday trading on the day of Purdue's NDA filing, and that Zogenix stock was down 43% since the Purdue announcement).  And just this week, Zogenix's stock reportedly lost nearly 10% of its value after Zogenix announced certain upcoming SEC filings by company executives and "several insiders including [Zogenix's] Chief Executive Officer sold their holdings" in the company. *See* Josiah Liston, *5 Weakening Stocks*, Emerging Markets, June 5, 2014, http://goo.gl/zDgC4a.

Thus, before Defendants took any action, there was widespread and widely publicized opposition to Zohydro, resulting in numerous public and private responsive measures and a steep decline in the value of Zogenix's stock.  Zogenix offers no expert testimony linking any drop in its stock price or any other potential evidence of reputational harm to the Boards' emergency

regulations. Moreover, on May 8 Zogenix's executive vice president and chief commercial officer assured company investors that there had been no significant impact from these developments on Zohydro sales, but rather a "steady up-tick [of prescriptions by target prescribers] week over week" since the March launch and "very positive" overall response by physicians and patients. Tr. EC, at 5. He explained that Zohydro "is being well received by the prescribing community. Although there have been some instances where we've had physician feedback related to the media coverage, particularly in certain states, in most of the situations we've been able . . . to effectively address the concerns of these prescribers." *Id.* at 4–5.

Because Zogenix has failed to allege or demonstrate actual or imminent injury traceable to the violations it alleges, this court lacks jurisdiction under Article III and the case should be dismissed. It follows *a fortiori* that Zogenix has failed to demonstrate irreparable harm permitting issuance of a preliminary injunction.

## CONCLUSION

Zogenix has no likelihood of succeeding on its claims. Moreover, because Zogenix has failed to demonstrate any injury traceable to the emergency regulations, while the public will clearly be harmed if implementation of the regulations is enjoined, the balance of equities is solidly in Defendants' favor. For all of these reasons, the Court should deny Zogenix's motion for a preliminary injunction.

By their counsel,
MARTHA COAKLEY, ATTORNEY GENERAL

 /s/ Jo Ann Shotwell Kaplan
Jo Ann Shotwell Kaplan (BBO #459800)
Assistant Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2085; fax: (617) 727-5785
June 6, 2014        JoAnn.Kaplan@state.ma.us

<u>Certificate of Service</u>

The undersigned counsel hereby certifies, this 6th day of June, 2014, that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to any non-registered parties so indicated on the NEF.

/s/ Anne Sterman
Anne Sterman
Assistant Attorney General

21