**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSSACHUSETTS**

---

|  |  |
|---|---|
| ZOGENIX, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:14-cv-11689 |
| | ) |
| DEVAL PATRICK, in his official capacity as | ) |
| GOVERNOR OF MASSACHUSETTS, | ) |
| | ) |
| CHERYL BARTLETT, RN, in her official capacity | ) |
| as DEPARTMENT OF PUBLIC HEALTH | ) |
| COMMISSIONER, | ) |
| | ) |
| CANDACE LAPIDUS SLOANE, M.D., *et al.*, | ) |
| in their official capacities as members of the | ) |
| MASSACHUSETTS BOARD OF REGISTRATION | ) |
| IN MEDICINE, | ) |
| | ) |
| KAREN M. RYLE, MS, R.PH, *et al.*, | ) |
| in their official capacities as members of the | ) |
| MASSACHUSETTS BOARD OF | ) |
| REGISTRATION IN PHARMACY, and | ) |
| | ) |
| DIPU PATEL-JUNANKAR, PA-C, *et al.*, | ) |
| in their official capacities as members of the | ) |
| MASSACHUSETTS BOARD OF | ) |
| REGISTRATION OF PHYSICIAN ASSISTANTS, | ) |
| | ) |
| Defendants. | ) |

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

Although Defendants frame their brief as a motion to dismiss, they devote only a single boilerplate paragraph at the end of the brief to procedural issues (in this case, standing).  Because Defendants have provided no basis for their standing argument, they have waived it.  The rest of Defendants' brief is not a brief in support of a motion to dismiss; instead, it seeks to anticipate and respond to Zogenix's legal arguments regarding preemption and equal protection.  In doing so, Defendants focus mostly on the unobjectionable aspects of the new regulations, ignoring the critical ones that render the drug unable to be prescribed or dispensed in Massachusetts – principally, the requirement that physicians verify that "*other pain management treatments have failed,*" 243 Mass. Code Regs. 2.07(25)(d) (emphasis added), and the prohibition on anyone but the pharmacists themselves handling Zohydro™ ER, even for purposes of unpacking boxes, stocking supplies, or ringing up sales for a customer, 247 Mass. Code Regs. 8.05(3).  Taken together, these restrictions have the effect of prohibiting physicians from prescribing and pharmacists from stocking Zohydro™ ER, thus imposing an effective ban on the drug in Massachusetts.  This ban suffers from the same constitutional defects as the original ban enjoined by this Court.

## ARGUMENT

When evaluating a motion to dismiss under Rule 12(b)(6),[1] the court "take[s] the well-pleaded facts as they appear in the complaint, extending plaintiff every reasonable inference in his favor."  *Pihl v. Massachusetts Dep't of Educ.,* 9 F.3d 184, 187 (1st Cir. 1993).  Although the complaint must set forth a "plausible" claim, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[1]  To the extent that Defendants object to Plaintiff's standing under Rule 12(b)(1), the court similarly credits the plaintiff's well-pleaded factual allegations and draws all reasonable inferences relevant to subject matter jurisdiction in its favor.   *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

1

(2007), dismissal is appropriate only if "it appears to a certainty that the plaintiff would be unable to recover under any set of facts," *Roma Constr. Co. v. Russo,* 96 F.3d 566, 569 (1st Cir. 1996).  The court may look to public records, documents central to the plaintiff's claim, documents referenced in the complaint, and documents the authenticity of which are not disputed by the parties.  *Watterson v. Page*, 897 F.2d 1, 3-4 (1st Cir. 1993).

## I.     Defendants' Regulations Are Preempted By Federal Law.

As previously noted, the two most objectionable aspects of Defendants' new regulations are: (i) the BORIM, BORIP, and BOROPA requirement that physicians draft a Letter of Necessity "*verifying that other pain management treatments have failed,*" 243 Mass. Code Regs. 2.07(25)(d) (emphasis added); and (ii) the BORIP requirements that prohibit anyone but the pharmacist from handling Zohydro™ ER, even for purposes of unpacking boxes, stocking supplies, or ringing up sales with a customer, 247 Mass. Code Regs. 8.05(3).

The Letter of Necessity requirement seeks to impose a new indication for Zohydro™ ER that is different than the indication for which FDA approved the drug.  For that reason alone, it is preempted.  But in addition, by prohibiting prescription of the drug unless the physician has verified that "other pain management treatments have failed," the regulation requires physicians to cycle patients through several other suboptimal treatments and document their failure before prescribing Zohydro™ ER.  The burdens imposed by this "forced failure" requirement are so draconian that physicians are unlikely ever to prescribe the drug.  Heit Decl. ¶ 10; Bell Decl.

The new restrictions on pharmacists are even more problematic.  The BORIP regulations broadly ban all certified pharmacy technicians, pharmacy technicians, pharmacy technician

2

trainees, and pharmacy interns from handling Zohydro™ ER.  247 Mass. Code Regs. 8.05(3).[2]

In other words, a licensed pharmacist personally must unpack all deliveries of the drug, handle

stocking and restocking of the special locked cabinet purchased solely for handling of Zohydro™

ER (other locked cabinets typically are accessible to technicians and interns), fill every

prescription, place every filled prescription back in the special locked cabinet, ring up every sale

at the cash register, and hand every prescription directly to a customer.  It is not difficult to

predict the cumulative effect of this cascade of administrative burdens: pharmacies will not stock

the drug.  And lest there be any doubt about the effect of the new regulations, one need look no

further than the commentary by the Board at the BORIP meeting.  At the meeting, the Board

members made clear that the goal of the new regulations was to "deter people from going on this

drug."  Ex. A, Tr. 97:8-9.[3]  The confidential declaration of Roger Hawley (which was the subject

of Zogenix's recent motion to seal and will be filed under seal if permitted by the Court) makes

clear that the BORIP regulations have had the very effect intended by the Board.

    The government's scattershot responses to these straightforward contentions are

unavailing.  For example, Defendants state the obvious when they argue that the Commonwealth

---

[2] Zogenix's Second Amended Complaint also challenged the BORIP requirement that pharmacists supply a "written warning approved by the Board regarding the specific dangers of hydrocodone-only extended release medication that is not in abuse deterrent form," 247 Mass. Code Regs. 9.04(d), because no notice had been provided to pharmacists regarding what that warning should look like.  Subsequently, on May 21, 2014, BORIP issued a "Frequently Asked Questions" on the BORIP regulations stating the FDA Medication Guide for Zohdyro™ ER could constitute an approved written warning.  Ex. B.  The FDA medication guide does not comply with the letter of the BORIP requirements, as it does not address "the specific dangers of hydrocodone-only extended release medication that is not in abuse deterrent form" as purportedly required by the regulations.  Compare 247 Mass. Code Regs. 9.04(d) with Ex. C (Zohydro™ ER Medication Guide).  However, because federal requirements mandate that pharmacists dispense the FDA medication guide anyway, Zogenix does not seek to challenge any state requirement that they do so.
[3] Zogenix has available a complete audio recording of this meeting and is happy to furnish the audio file upon the Court's request.

is empowered to regulate physicians, pharmacists and physicians assistants.  Defs. Br. at 6-10.

Nobody has argued otherwise.  But the Commonwealth cannot use its general power to regulate

as a pretext for accomplishing an end that is preempted by federal law.  *See, e.g.*, *AT&T Mobility*

*LLC v. Concepcion*, 131 S. Ct. 1740, 1747-48 (2011) (state could not evade preemptive effect of

the FAA by characterizing its rule preventing class arbitrations as a general contract defense,

where it foreclosed in practice the Congressional goal of enforcing arbitration agreements in

order to streamline proceedings); *Wos v. E.M.A. ex rel. Johnson*, 133 S. Ct. 1391, 1398 (2013)

("Pre-emption is not a matter of semantics.  A State may not evade the pre-emptive force of

federal law by resorting to . . . description at odds with the statute's intended operation and

effect.").

Defendants also base much of their brief on the bald assertion that FDA has turned a

blind eye to the regulations at issue, and thus somehow has ratified them.  Defs. Br. at 8; *see also*

*id.* at 10, 11.  In sole support, Defendants cite to two sentences from Commissioner Hamburg's

April 29, 2014 statement regarding the efforts of Massachusetts and Vermont to regulate

Zohydro™ ER.  Those sentences refer to "certain steps" among those taken by Vermont and

Massachusetts, namely "screening for abuse risk" and "documenting medical need."  Ex. D at 1.

But the comments do not address the regulations challenged here: the statement was issued on

April 29, and the BORIP and BOROPA regulations were not issued until May 6 and 8,

respectively.  And with regard to the BORIM regulations, the Commissioner's comments make

no mention of the requirement that physicians "verify that other pain management treatments

have failed" before prescribing the drug—a requirement that does not appear in the Vermont regulations.[4]

The *rest* of the Commissioner's statement, which understandably goes un-quoted in the Commonwealth's brief, reflects a scathing criticism of both states' regulations.  It chastises them for focusing "on one drug alone," noting that the requirements "would not apply to the prescribing of any of the other opioids on the market that account for some 250 million prescriptions and 18 billion tablets each year" and risk "diverting attention from more comprehensive policy solutions that apply to all opioids."  Ex. D at 2.  In short, there simply is no basis for asserting that FDA has blessed the regulations at issue here; quite the contrary is true.

Turning to the two main arguments before the Court:

**A.   The New Regulations Constitute an Effective Ban on Zohydro™ ER.**

As argued in Zogenix's motion for preliminary injunction, Defendants' new regulations constitute a *de facto* ban that suffers from the same preemption problem as the original ban.  The administrative burdens on physicians, physician assistants, and pharmacists are simply too high.

Defendants characterize Zogenix as purportedly relying on a "crystal ball" to assert that physicians and pharmacists are "unlikely" to prescribe and dispense the drug.  Defs. Br. at 10, n. 10.  But it does not require a crystal ball to grasp the logical effect of Defendants' highly restrictive regulations; indeed, the government's very goal in enacting the new regulations –

---

[4]  Defendants suggest that Zogenix has conceded the constitutionality of the Vermont requirements merely because it has not *yet* filed a lawsuit challenging them.  Defs. Br. at 12, n. 11.  That plainly is not so.  In any event, the Vermont restrictions are quite different from those enacted in Massachusetts.  Most importantly, they do not require physicians to verify that "other pain management treatments have failed" or require that only pharmacists may handle the drug at all times.

5

which were designed to go into effect the same day the original ban was lifted by judicial action – was to "deter people from going on this drug." Ex. A, Tr. 97:8-9. Its stated purpose from the outset has been to force Zogenix to adopt an abuse-deterrent formulation of Zohydro™ ER that has not been approved by the FDA. In any event, at the risk of stating the obvious, Zogenix attaches hereto the following: (i) a declaration from Howard Heit, a prominent pain management physician and Assistant Professor at Georgetown Medical School, opining that the new regulations make Zohydro™ ER impossible to prescribe by requiring physicians to put their patients at potentially great risk through a "forced failure" of alternative medications; (ii) a declaration from economic expert Gregory Bell, a Ph.D./MBA who consults extensively in the pharmaceutical industry, opining that the new regulations impose such a severe financial and administrative burden on prescribers and pharmacists that they constitute an effective ban, because physicians are unlikely to prescribe the drug and pharmacists are unlikely to stock or dispense it; and (iii) a confidential declaration, which will be filed under seal, from Roger Hawley describing recent information from the field regarding the effect that the BORIP regulations actually have had in the market. Heit Decl. ¶ 10; Bell Decl.; Hawley Decl.

Defendants also assert that the new regulations merely "codif[y] pre-existing best medical practice." Defs. Br. at 11-12. But tellingly, nowhere in Defendants' lengthy recitation of "best practices" can there be found any requirement that physicians "verify that other pain management treatments have *failed*," 243 Mass. Code Regs. 2.07(25)(d); 249 Mass. Code Regs. 9.04(8). Nor is there any reference among those "best practices" to a prohibition on anyone but pharmacists coming into contact with the drug. 247 Mass. Code Regs. 8.05(3).

As to the requirement that physicians "verify that other pain management treatments have failed," Defendants argue that physicians need not actually prescribe other drugs before

6

prescribing Zohydro™ ER.  Defs. Br. at 12.  Rather, they suggest that a physician confronted

with a patient in chronic pain may "verify that other pain management treatments have failed" by

prescribing "no medications at all."  *Id.*  Certainly the phrase "other pain management

treatments" must have some meaning; choosing to do *nothing* cannot constitute a "pain

management *treatment*."  Nor would doing nothing comport with physicians' duties to their

patients, most of whom are in severe chronic pain (including end-of-life pain). [5]

Defendants also suggest that the requirement that physicians verify that "other pain

management treatments have failed" is in harmony with the FDA-approved indication for use

when "alternative treatment options are inadequate."  Defs. Br. at 12.  The requirement that other

treatments "have *failed*" quite obviously has a different meaning than the requirement that other

options be "inadequate."  If a patient has liver damage but otherwise is responsive to

hydrocodone, a physician knows off the bat that a product containing acetaminophen would be

"inadequate."  But she cannot "verify" that that another option "has *failed*" until she puts the

patient on that drug product, potentially causing grave harm and/or forcing the patient to endure

a substandard pain management treatment until its failure has been documented.  Defendants fail

to articulate any reasoned justification for the "forced failure" requirement's interference with

physician judgment respecting appropriate pain management therapy.

And the BORIP regulations are no better.  In essence, they require a licensed pharmacist

personally to unpack all deliveries of the drug, handle stocking and restocking of the special

locked cabinet purchased solely for handling of Zohydro™ ER, fill every prescription, place

---

[5] It is no answer to suggest that patients might try hypnotism, biofeedback, physical therapy, or
other non-medication treatment options; those treatments are not alternatives to medication in
patients who are being considered for opioid therapy suffering from chronic pain but rather
approaches that can be taken in conjunction with medication.

every filled prescription back in the special locked cabinet, ring up every sale at the cash register, and hand every prescription directly to a customer.  The confidential declaration of Roger Hawley, which will be filed under seal if permitted by the Court, makes clear that the BORIP regulations have had the actual effect intended by the Board and that the burden simply is too great for pharmacies to bear.

Defendants cite *Town of Amherst v. Omnipoint Commc'ns Enters., Inc.*, 173 F.3d 9, 16 (1st Cir. 1999), for the proposition that "it is improper" for a court to conclude that a state or local law "necessarily will be interpreted and applied so as to effectuate a ban."  Defs. Br. at 13. The case says nothing of the sort.  It was an adjudication case, not a rulemaking case, governing a municipality's denial of a special exception and variance in connection with the plaintiff's proposal to build antenna towers.  The court addressed whether the municipality's denial of the plaintiff's permit meant that *future alternative* proposals would be denied as well, and the court decided, unsurprisingly, that it would be premature to assume that they would.  That legal issue simply bears no relevance to this rulemaking case, where the government already has taken the action that poses the preemption problem.

In short, Defendants' efforts to justify under the guise of "reasonable regulation" their blatant evasion of this Court's April 15, 2014 Order must fail.

**B**. **Even if Not an Effective Ban, The New Regulations Nonetheless Are Preempted.**

**1.** ***The Regulations Conflict With FDA's Approved Indication Statement.***

Even if the new regulations do not constitute a *de facto* ban, they nonetheless are preempted.  The new restrictions require physicians to prepare a letter of necessity "verify[ing] that other pain management treatments *have failed,*" 243 Mass. Code Regs. 2.07(25)(d); 249 Mass. Code Regs. 9.04(8).  This runs afoul of FDA's approved indication statement for Zohydro,

8

which states: "Indicated for the management of pain severe enough to require daily, around-the-clock, long-term treatment and for which alternative treatment options are *inadequate*."  Ex. E at 29 (emphasis added).  By seeking to alter the circumstances in which Zohydro™ ER is indicated, the Commonwealth has undermined FDA's authority to approve drugs for specific indications supported by substantial evidence of safety and effectiveness.

Zohydro™ ER was approved based on a clinical trial performed on a patient population determined to need around-the clock opioid therapy and who were taking opioids for the four weeks prior to the trial at an equivalent daily dose of at least 45 mg of oral morphine.   Farr Aff., Dkt. 48, ¶ 9.  The trial conducted by Zogenix would not have justified its approval for patients for whom alternative therapies had *failed*, because all patients in the pivotal trial had been treated for four weeks on another opioid.  Moreover, as set forth in an FDA Industry Guidance, FDA would have required *two clinical trials* for approval of a drug with the indication imposed by Defendants, not the single trial supporting the proposed indication actually considered by FDA. Ex. F at 4-5.  A patient population in which previous opioid therapy has failed is far different from the Zohydro™ ER trial population.  Patients in whom alternative therapies have failed are likely to have responded differently to Zohydro™ ER, requiring a different study design to develop the data necessary to support NDA approval. *Id.*

In addition, one of the medically appropriate uses of Zohydro™ ER is its use, along with other opioid therapies, in the treatment of chronic pain on a "rotation" basis – meaning that the patient is prescribed different opioids for a short period of time in order to reduce the chances of acclimation or addiction.  Farr Aff., Dkt. 48, ¶ 5.  This acceptable usage also formed the basis of FDA approval, Ex. E at 31-32, and is inconsistent with the requirement that other therapies be shown to have "failed."  Indeed, the entire premise of opioid rotation is that prior therapies have

9

*not* failed but are instead effective and well-tolerated. *Id.* at 31.  By requiring prior therapies to fail *before* Zohydro™ ER may be prescribed, Massachusetts effectively bans its use in opioid rotation.  This is inconsistent with Congressional intent for the effect of FDA drug approvals and is unconstitutional. *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154-55 (1982) (federal regulations can preempt state law where a regulator's choice represents a "reasonable accommodation of conflicting policies that were committed to the agency's care by the statute").

Defendants attempt to distinguish *Geier* by arguing that under the facts of that case, preserving manufacturer choice "among different kinds of passive restraint devices was a significant objective" of the federal regulation at issue.  Defs. Br. at 15-16, citing *Williamson v. Mazda Motor of Am., Inc*., 131 S. Ct. 1131, 1136 (2011).  Defendants argue that in *Williamson*, the Court noted that the holding of *Geier* does not apply where the choice preserved by the federal regulation at issue was not a "significant regulatory objective." *Id.*  Surely Defendants do not suggest that maintaining an appropriate array of medicines sufficient to permit physicians to choose appropriate treatment is not a "significant objective" of FDA in approving drugs. *See* 21 U.S.C. § 393(b); 21 U.S.C. § 355(d); 21 C.F.R. § 314.125.  Defendants' argument is easily refuted by FDA's own proclamations. *See, e.g*., Ex. E at 31 ("Further limiting access to potential treatments is not the answer when new treatments are critically needed.  As with many other drug classes, one individual ER/LA opioid is not always effective and/or tolerated by any individual patient. Some patients find that only a single member of this class provides adequate pain relief and/or has a tolerable side effect profile.  Some patients are unable to achieve adequate pain relief from, or to tolerate any of the approved products.  The addition of an alternative within the class will be potentially beneficial to numerous patients who are currently

10

suffering from undertreated pain.").  In any event, unlike *Wyeth* and *Williamson*, the case

presented is not one in which the Commonwealth's regulations merely sit on top of FDA's

approved indications; rather, they seek to eviscerate them by imposing a new, different

indication for the drug.

### 2.  *The New Regulations Are Inconsistent with FDA's Decision Not to Require ADT.*

The government's end goal is not difficult to discern: it is trying to coerce Zogenix to

reformulate Zohydro™ ER with an abuse-deterrent formulation.  Thus, the new regulations

provide Zogenix with an escape hatch: it may avoid regulation under the new BORIM rules if it

reformulates Zohydro™ ER with an abuse-deterrent formulation.  243 Mass. Code Regs.

2.07(25).  But FDA already considered and rejected a requirement of abuse-deterrent technology

for Zohydro™ ER.   Farr Aff., Dkt. 48, ¶ 8.[6]   FDA carefully approved Zohydro™ ER, which

like many other opioids is in a non-abuse deterrent formulation, as part of the aggregate mix of

drug options intended to be approved for public use under the agency's expertise.   The

Commonwealth's efforts to induce Zogenix to reformulate Zohydro™ ER to include an abuse-

deterrent formulation are in direct conflict with FDA's determination to make those options

available.  The fact that the government has packaged its inducement in the form of "physician

regulation" and "pharmacist regulation" does not insulate the Commonwealth from preemption.

### II.  Defendants' Conduct Violates the Equal Protection Clause.

Defendants' regulations also violate the Equal Protection Clause by singling out

Zohydro™ ER for draconian restrictions not applicable to any other extended-release opioid

---

[6] Commissioner Hamburg has specifically commented that "the science of abuse-deterrence is
still in its infancy and has yet to be fully tested or proven in actual market or use conditions."
Ex. G at 3.  The technology also does nothing to prevent oral overdose, the most common form
of opioid analgesic abuse, and must be balanced against the needs of the estimated 100 million
Americans coping with chronic pain.  *Id.* at 1, 3.

products.  Defendants contend that Zogenix's claim fails as a matter of law, either because the

Massachusetts regulations are shielded by government discretion or because Zogenix has not

properly alleged its claim.  Defs. Br at 45, at 16, 18-20.  These allegations fail.

     ***First***, Defendants are wrong to contend that class-of-one claims are categorically barred

whenever they challenge state action involving discretion.  *See* Defs. Br. at 45, at 16-17.  This

should be evident from the structure of the Clause itself – if it is to have teeth at all, it must

operate to cabin unfettered state discretion to act in "arbitrary or irrational" ways.  *Sampson v.*

*Town of Salisbury*, 441 F. Supp. 2d 271, 280 (D. Mass. 2006).  In its foundational class-of-one

Equal Protection case, the Supreme Court explained that the Clause was designed to "secure

every person within the State's jurisdiction against intentional and arbitrary discrimination."

*Olech*, 528 U.S. at 565 (2000) (citations omitted).  There, the plaintiff's claim rested on a

municipal requirement that she cede a 33-foot easement in order to be connected to the water

supply, in contrast to the 15-foot easement demanded of other similarly situated property owners.

*Id.* at 565.  She validly stated a claim on the basis of this "irrational and wholly arbitrary"

determination.  *Id.*   So too here.

     Defendants make much – over the course of three pages of briefing – of a subsequent

Supreme Court case, *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591 (2008), which they

contend "significantly confined the availability of class-of-one claims" and "bars Zogenix's

class-of-one claim."  Defs. Br. at 16-17.  This is hardly the case.  Defendants are correct that

*Engquist* eliminated class-of-one claims in the *public employment context* in which the case

arose, and to which the Court expressly limited its holding.  *Engquist*, 553 U.S. at 591, 599

(finding specifically that the "class-of-one theory of equal protection does not apply in the public

employment context" and explaining that "government has significantly greater leeway in its

12

dealings with citizen employees than it does when it brings its sovereign power to bear on

citizens at large").  The Court recognized, and Zogenix does not dispute, that:

> There are *some* forms of state action . . . which by their nature involve
> discretionary decisionmaking based on a vast array of subjective,
> individualized assessments.  In such cases treating like individuals
> differently is an accepted consequence of the discretion granted to
> government officials.  This principle applies most clearly in the
> employment context . . . [u]nlike the context of arms-length regulation,
> such as in *Olech*, treating seemingly similarly situated individuals
> differently *in the employment context* is par for the course.

*Id.* at 592 (emphasis added).  It is not reasonable to suggest, as do Defendants, that *Engquist*

stands broadly for the principle that whenever "the government acts in the exercise of its

discretionary authority, class-of-one claims seeking to second-guess that exercise of discretion

are barred."  Defs. Br. at 17.[7]

Where *Engquist* does distinguish public employment cases from those involving the kind

of "arms-length regulation" susceptible to class-of-one claims, it observes that employment

decisions lack a "clear standard against which departures, even for a single plaintiff, could be

readily assessed."  For example, one can easily imagine that a public employer's decision to

terminate an employee based on "subjective, individualized" factors like job performance or

personal behavior would be incapable of judicial review based on deviation from any "readily

accessible" standard of employee treatment.  Again, this is no bar to Zogenix's claim, which

involves the type of "arms-length regulation" to which *Engquist* does not apply.  Here, the

---

[7]  In an even more striking incident of creative case analysis, Defendants cite to *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 904 (7th Cir. 2012) using a parenthetical that omits the following bolded text from the actual opinion, in order to reach a much broader purported holding: "*Engquist* 'tells us **public employment is just an** *example* **of the situations in which** the Constitution tolerates selective action, without requiring public officials to explain to a court's satisfaction why they exercised discretion in favor of one person and against another.'" Dkt. 17 n.15.  Defendants' accompanying citations to cases denying claims in fact-specific contexts such as police investigations and state executions are similarly unavailing.

Commonwealth's normal standard of regulation is clear: in the face of what it identifies as a class-wide "public health emergency around opioid abuse," Ex. H at 1, it has applied the BORIM, BORIP, and BOROPA regulations to *no other drug* besides Zohydro™ ER. Thus, Defendants' discriminatory regulations – singling out Zohydro™ ER for draconian restrictions not levied upon any other member of its drug class – constitute a striking departure from a clear standard of *non*-restriction that can be "readily assessed" by this Court.[8]

Defendants also assert that Zogenix's Equal Protection claim must fail because it has not alleged that Defendants targeted Zohydro™ ER for regulation based on "malicious or bad faith intent to injure" the company. Defs. Br. at 18. Defendants' contention misses the mark. They first suggest that a class-of-one claim lies only when plaintiffs allege malice or bad faith, citing for the proposition *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006).[9] Just a few months prior to *Buchanan*, however, this Court had observed that contrasting First Circuit cases were actually "unclear on the issue" of whether malice or bad faith intent to harm a plaintiff is required, and that the Supreme Court had explicitly avoided that very question in *Olech*. *Sampson*, 441 F. Supp. 2d at 279 (citations omitted). Even more significantly, and perhaps recognizing this ambiguity, multiple First Circuit cases examining class-of-one claims after

---

[8]  That these regulations were promulgated as emergency actions does not alter the analysis. Zogenix does not challenge Massachusetts' choice *to take* action regarding a public health emergency, *see Am. Grain Prods. Processing Inst. v. Dep't of Public Health*, 467 N.E.2d 455, 467 (1984), but rather its choice to do so *in a way* that treats Zohydro™ ER differently from similarly-situated drugs, without any rational basis.

[9]  *Buchanan* in turn directly cites a prior case, *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004), for its list of elements, including the malice or bad faith requirement. Tracing *Tapalian*'s elements reference back through three levels of citing references, one reaches *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980), which explicitly left open "the question whether an official who claims that his intent to injure was benign but which under any objective measure would not be found so may be held liable."

14

*Buchanan* declined to require malice or bad faith as an element.[10]  To the extent that neither the Supreme Court nor the First Circuit has consistently required plaintiffs to allege malice or bad faith in class-of-one claims, the resolution of Defendants' motion to dismiss would be a poor vehicle for imposing such a rule.

However, even if this Court *were* to require an allegation of malice in class-of-one claims, the government's conduct clearly meets that standard, and the facts supporting that malice are clearly spelled out in the Second Amended Complaint.  *See, e.g.,* Second Am. Compl., Dkt. 43, ¶¶ 1, 9, 12-14, 47, 54-56, 61, 105-6, 114.  As noted more fully therein, the new regulations come on the heels of this Court's April 15, 2014 Order finding the original ban unconstitutional.  Rather than accepting this Court's ruling, or seeking to appeal it, Defendants sought to dress their wolf up in sheep's clothing and pass it off as a "reasonable" regulation – targeted solely at one drug.  Lest there be any doubt about this, the transcript of the public meeting of the BORIP at which the emergency regulations were passed clearly indicates that the restrictions were created as part of an ongoing attempt to "deter people from going on this drug." *See* Ex. A, Tr. 97:8-9.  The Board also recognized that the Commonwealth's policies would make Zohydro™ ER a drug of "last resort if [patients] tried and failed on others, and the doctor has to prove that in his letter," *id.*, Tr. 68:17-20, even though the Board members conceded that the FDA indication for Zohydro™ ER was "*not* as a last resort," *id.*, Tr. 70:6-9.

---

[10]  *See SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 34, 35 n.4 (1st Cir. 2008) (listing first a set of claim elements not requiring bad faith and later characterizing "malicious or bad faith intent to injure a person" as an "impermissible consideration" for selective treatment or a reason for relaxing the degree of similarity required between the plaintiff and others similarly situated); *Cordi-Allen v. Conlon*, 494 F.3d 245, 250 n.3-4 (1st Cir. 2007) (finding that the Court did "not reach any question of whether, post-*Olech*, a plaintiff must demonstrate malice or bad faith" and suggesting instead that "the degree of similarity required may be relaxed somewhat" if the plaintiff has presented evidence of malice or bad faith).

\\DC - 040672/000004 - 5692446 v1

Lastly, Defendants challenge that Zogenix has not alleged that it is similarly situated "in all relevant aspects" to the other members of its drug class that have not been burdened by the Commonwealth's onerous regulations.  Defs. Br. at 19.  To begin with, the cases cited by Defendants do not require any such magic language, especially where the complaint does not suggest that there are differences between the plaintiff and other members of the purported class. *See, e.g., Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.,* 246 F.3d 1, 10 (1st Cir. 2001) (noting that ruling was based in part on the fact that the "complaint alleg[ed] additional facts arguably differentiating the plaintiff in important respects from fellow class members"); *Freeman v. Town of Hudson*, 714 F.3d 29, 39 (1st Cir. 2013) (focusing on alleged facts and not whether any particular language was used).  In any event, the Second Amended Complaint alleged, repeatedly, that Zohydro™ ER has been unfairly targeted with restrictions not applicable to other similarly-situated opioid products, and it went into extensive detail about how and why those other products were similarly-situated in all relevant respects, including in the eyes of FDA.  *See, e.g.,* Second Am. Compl., Dkt. 43, ¶¶ 34, 56, 57, 58, 59, 60 (describing similarities between Zohydro™ ER and other ER/LA opioids).

Rather than attacking the legal sufficiency of the Second Amended Complaint, Defendants appear to be arguing the merits of Zogenix's "similarly situated" claims.  Their arguments must fail.  First Circuit case law confirms that in evaluating the "similar situation" of parties for Equal Protection purposes, "[e]xact correlation is neither likely nor necessary, but the cases must be fair congeners . . . apples should be compared to apples."  *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989).  As noted above, the Commonwealth has proclaimed that it has taken action against a class-wide "public health emergency around opioid abuse."  Ex. H at 1.  It comes as some surprise, then, that Defendants have declined to take action

16

against all opioid products, or even all extended-release/long-acting opioid products.  Instead, the

BORIM, BORIP, and BOROPA restrictions apply *solely* against Zohydro™ ER.  Principled

regulation combatting a class-wide problem would not focus relentlessly on eliminating access to

one – and only one – product, either as a matter of Equal Protection or sound public policy

reasonably calculated to achieve the stated objective of curbing opioid abuse.  *See* Heit Decl.

¶ 15.

Defendants contend that their regulatory fixation on Zohydro™ ER is reasonable, relying

on excuses ever more distanced from sound medical science.  First, they raise the concern that

Zohydro™ ER, as an extended-release/long-acting medication, contains higher amounts of

hydrocodone per pill than other combination hydrocodone drugs.  Dkt. 45, at 2.  This, they say,

means that they can restrict Zohydro™ ER without worrying about regulating other

hydrocodones or extended-release drugs.  The concern in the opioid misuse context, however, is

not just dosage: it is *potency*, considering not just the amount of drug per pill but the strength of

the drug itself.  On a milligram-to-milligram basis, Zohydro™ ER is less potent than several

widely marketed opioids.[11]  Defendants later assert that the regulations are rationally drawn

simply because Zohydro™ ER is the first single-entity hydrocodone product, the first extended

release hydrocodone product, and the only hydrocodone product currently subject to Schedule II

controls.[12]  Dkt. 45, at 19.  But FDA has already made clear that the abuse potential for single

---

[11]     *See* FDA Approved Labeling for Zohydro ER, Table 1; FDA Provides Facts About
Zohydro, FDA.Gov, http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/
ucm395456.htm (explaining that it would be "misleading to say that Zohydro ER is stronger than
anything currently on the market," given the greater potency of other extended release, long-
acting opioids like morphine sulfate, hydromorphone, oxymorphone, and oxycodone).
[12]     Defendants have also suggested that Zohdyro™ ER is different because it is new to the
market, such that the emergency regulations would not disrupt existing patient plans as they
would if imposed on other opioid drugs.  This argument misses the point entirely, as the temporal

ingredient opioids simply does not differ from that of combination products.[13]  Indeed,

combination products, not single-entity products, are the most widely abused opioid drugs.[14]

Zohydro™ ER's unique acetaminophen-free, extended-release formulation – already

approved by FDA as safe and effective for nationwide pain treatment – does not give the

Commonwealth a free pass to regulate in an irrational and arbitrary manner.  Zohydro™ ER and

other opioid medications, particularly those with extended-release/long-acting formulations, are

"fair congeners" for purposes of misuse risk assessment.  This is why FDA has supported

"requirements for the *class-wide* E[xtended]R[elease]/L[ong]A[cting] opioid analgesics" and

expressed concern about "some misinformation circulating about Zohydro's safety and potency"

that "has caused diversion of attention from comprehensive policy solutions to focus on a single

drug."  Ex. G at 1-3.  Zohydro™ ER is situated similarly in all *relevant* aspects to the other

members of its drug class, *Cordi-Allen*, 494 F.3d at 250-51, and therefore must be "treated alike"

by the Commonwealth, *Pagan*, 448 F.3d at 34.  The Equal Protection Clause will not tolerate

Defendants' failure to do so.

### III.  Defendants Have Not Properly Challenged Zogenix's Standing – Nor Could They.

In one boilerplate paragraph at the close of their brief, Defendants argue that Zogenix has

failed to allege facts sufficient to demonstrate standing to sue.  Defs. Br. at 20.  Defendants do

not accompany this paragraph with any explanation or support.  This tactic deprives Zogenix of

---

situation of Zohydro™ ER's market launch has nothing to do with – and does nothing to
improve – the substantive manner in which Defendants have drawn their regulatory classes. In
any event, the regulations do not address any other new opioids that might come on the market
over the coming months; they single out one.

[13]      *See* Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination
Products from Schedule III to Schedule II, 79 Fed. Reg. 11,037, 11,041 (Feb. 27, 2014).

[14]      *See* Department of Justice (DOJ) Fact Sheet, Hydrocodone, *available at:*
http://www.justice.gov/dea/druginfo/drug_data_sheets/Hydrocodone.pdf.

any reasonable notice of the basis for Defendants' motion, and the standing argument should be

rejected for that reason alone.  *See U.S. v. Russo*, 540 F.2d 1152, 1155 (1st Cir. 1976)

("conclusory boilerplate motion" was properly dismissed where it "did not refer to any facts of

the case at hand").  It is no answer that Defendants intend to "explain in detail in opposing

Zogenix's motion for a preliminary injunction" why they believe that Zogenix lacks

standing.  Defs. Br. at 45, at 20.  Defendants have this all backwards.  Any jurisdictional

objections that Defendants wish to raise must be briefed as part of their motion to dismiss, *not*

their merits opposition to Zogenix's motion for preliminary injunction.  Defendants may not

simply lodge their Rule 12 motion support within other unrelated filings as they see fit.  *See*

*Zerbe v. Pinal*, Civil No. 05-dc-021-JD, 2006 WL 1451545 * 1 n.1 (D.P.R. May 23, 2006)

(requiring parties to file proper motions setting forth the relief sought with "reasons justifying

that relief," and declining to resolve claims contained in other documents including objections);

District of Massachusetts Local Rule 7.1(b)(1) (2012) (requiring moving parties to file a

memorandum of "reasons, including citation of supporting authorities, why the motion should be

granted" with each motion filing).  That Defendants have attempted to hide the ball on their

standing argument, especially when the Court's briefing schedule does not permit reply filings,

speaks volumes.

  To the extent that Zogenix can guess at the basis for Defendant's standing argument,

Defendants will not prevail.  Zogenix faces and has pleaded concrete "injury in fact," *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992), in the form of substantial lost sales, grave

reputational harm, and practical diminution of its federally-guaranteed exclusivity period.  This

Court's injunctive relief would redress Zogenix's injuries, which are "fairly traceable" – by

which we mean directly traceable – to Defendants' actions.  *Id.* at 560-61.  That Defendants'

19

regulations apply to third party prescribers and pharmacists is no bar to suit, because the clear coercive effect of the regulations is that those parties' "choices have been or will be made in such a manner as to produce causation." *Id.* at 562

## CONCLUSION

For the foregoing reasons, Zogenix respectfully requests that the Court deny Defendants' motion to dismiss and issue a preliminary injunction enjoining Defendants from implementing or enforcing the latest restrictions on Zohydro™ ER, including but not limited to the BORIM, BORIP, and BOROPA regulations, pending adjudication on the merits of this dispute.

Dated: June 6, 2014                    Respectfully Submitted,

                                       /s/  Steven P. Hollman

                                       Kenneth J. Parsigian (BBO # 550770)
                                       Steven J. Pacini (BBO # 676132)
                                       LATHAM & WATKINS LLP
                                       John Hancock Tower, 20th Floor
                                       200 Clarendon Street
                                       Boston, MA 02116
                                       Tel:  (617) 948-6000
                                       Fax:  (617) 948-6001
                                       kenneth.parsigian@lw.com
                                       steven.pacini@lw.com

                                       HOGAN LOVELLS US LLP
                                       Steven P. Hollman (*pro hac vice*)
                                       Susan M. Cook (*pro hac vice*)
                                       555 Thirteenth Street, N.W.
                                       Washington, D.C. 20004
                                       (202) 637-5672 (Telephone)
                                       (202) 637-5910 (Fax)
                                       steven.hollman@hoganlovells.com
                                       susan.cook@hoganlovells.com

                                       *Attorneys for Plaintiff Zogenix, Inc.*

20

### CERTIFICATE OF SERVICE

I certify that this document was filed through the ECF system on the date set forth above and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Steven P. Hollman

21