**Defendants' Exhibit I**

# Massachusetts Department of Public Health



## Findings of the Opioid Task Force and Department of Public Health Recommendations on Priorities for Investments in Prevention, Intervention, Treatment and Recovery

June 10, 2014

**Executive Summary**

In response to the growing opioid addiction epidemic in Massachusetts, and across the nation, Governor Patrick declared a public health emergency on March 27, 2014.  The Governor directed the Department of Public Health (DPH) to take several actions to combat overdoses, stop the opioid epidemic from getting worse, help those already addicted to recover, and map a long-term solution to ending widespread opioid abuse in the Commonwealth.  Per the Governor's directive, DPH utilized the Executive Committee of the Interagency Council on Substance Abuse and Prevention to create the Opioid Task Force (Task Force).  This Task Force was charged with providing recommendations to strengthen the Commonwealth's opioid abuse prevention and treatment systems to reduce overdose events, prevent opioid misuse and addiction, increase the numbers of persons seeking treatment, and support persons recovering from addiction in our communities.

This report summarizes the findings of the Task Force and provides recommendations for strengthening our Commonwealth's ability to respond to the opioid crisis with a focus on prevention, intervention, treatment and recovery.  These recommendations include, but are not limited to, the expansion of treatment beds; the formation of a centralized navigation system for patients, families, and first responders to locate treatment services; a public-facing dashboard that would help facilitate consumer choice of services; additional opioid prevention coalitions for support and education; more stringent safeguards for those opioids which are most frequently abused and misused; a meeting of New England governors to develop a regional response to the opioid epidemic; and the expansion of the use of injectable naltrexone for persons re-entering the community from correctional facilities.

Since the convening of this Task Force, the Massachusetts Legislature has also taken actions to address the opioid epidemic in Massachusetts. The recommendations included in this report complement the Legislature's proposals, and DPH looks forward to continuing to work closely with the Legislature on the important issue of opioid misuse, abuse and overdose.

Despite having one of the strongest treatment systems in the country as measured by the robust continuum of care offered and the presence of dedicated addiction treatment providers, there are still opportunities for improvement.  DPH believes that with the policy recommendations made here, particularly with an emphasis on safe opioid prescribing, the Department will be able to help those struggling with addiction, their loved ones and communities.

**Introduction**

Massachusetts is experiencing an opioid addiction epidemic.  From 2000 to 2012 the number of unintentional fatal opioid overdoses in Massachusetts increased by 90 percent.[1]  In 2012, 668 Massachusetts residents died from unintentional opioid overdoses, a 10 percent increase over the previous year.[2]  The Massachusetts State Police reported that in jurisdictions in which they respond to homicides at least 140 people died of suspected heroin overdoses between November 2013 and March 2014.  Various communities in the Commonwealth have reported previously unseen spikes in both fatal and non-fatal opioid overdose in recent months.  The Department of Public Health (DPH) Bureau of Substance Abuse Services (BSAS) data shows that in FY13 nearly half of all persons receiving treatment in the publicly funded system reported opioids as their primary or secondary drug of choice.  In addition, approximately 40 percent of persons served in FY13 in the BSAS system were between the ages of 13 and 29.

Massachusetts is not alone in struggling with the devastating consequences of opioid misuse, abuse and addiction.  In 2013, the U.S. Department of Health and Human Services deemed prescription-opioid overdose deaths an epidemic.[3]  In the United States, deaths from

---

[1] Fatal Opioid-related Overdoses Among MA Residents, 2000-2013. Massachusetts Department of Public Health, March 2013. Available at: http://www.mass.gov/eohhs/docs/dph/substance-abuse/opioid/fatal-opioid-overdoses-2000-2013.docx. Accessed on June 5, 2014.

[2] Fatal Opioid-related Overdoses Among MA Residents, 2000-2013. Massachusetts Department of Public Health, March 2013. Available at: http://www.mass.gov/eohhs/docs/dph/substance-abuse/opioid/fatal-opioid-overdoses-2000-2013.docx. Accessed on June 5, 2014.

[3] Addressing prescription drug abuse in the United States: current activities and future opportunities. U. S. Department of Health and Human Services, 2013. Available at: http://www.cdc.gov/homeandrecreationalsafety/overdose/hhs_rx_abuse.html. Accessed on: June 9, 2014.

prescription opioid overdose quadrupled between 1999 and 2010.[4]  People who are abusing opioids are also at high risk for, among other things, liver disease, Hepatitis C, and HIV infection.[5]  Opioid addicted individuals live approximately 15 years less than people who do not have the disease.[6]  Opioid addiction is a chronic disease, which like other chronic illnesses, cannot be cured but can be effectively treated and managed.[7]

On March 27, 2014, in response to the crisis of opioid abuse in the Commonwealth and after meeting individuals and families impacted by it, Governor Patrick declared a public health emergency and, among other actions, committed an additional $20 million in state funding to increase treatment and recovery services and directed the Commissioner of the Department of Public Health to establish an Opioid Task Force (Task Force) within the Interagency Council on Substance Abuse and Prevention (Council).  The Task Force was charged with providing recommendations to reduce overdose events, prevent opioid misuse and addiction, increase the numbers of persons seeking addiction treatment, support persons recovering from addiction in our communities, and map a long term solution to address opioid abuse in the Commonwealth.

This report contains a description of the Task Force's methodology, an overview of substance abuse services offered by the Commonwealth, findings from the Task Force's deliberations, and actions recommended by DPH in response to the Task Force's work and findings.

## Task Force Methodology

In addition to the Executive Committee of the Council, the membership of the Task Force included those struggling with addiction and their families, providers, insurers, first responders, public safety officials, local

---

[4] Jones CM, Mack KA, Paulozzi LJ. Pharmaceutical overdose deaths, United States, 2010.  JAMA 2013; 209:657-659.

[5] Moore K and Dusheiko G. Opiate Abuse and Viral Replication in Hepatitis C. American Journal of Pathology November 2005;167(5):1189-1191.

[6] Smyth B, Fan J, Hser Y, Life Expectancy and Productivity Loss Among Narcotics Addicts Thirty-Three Years After Index Treatment. Journal of Addictive Diseases 2006; 25(4): 37-47.

[7] Kritz S, Chu M, John-Hull C, Madray C, Louie B, and Brown LS Jr., Opioid dependence as a chronic disease: the interrelationships between length of stay, methadone dose and age on treatment outcome at an urban opioid treatment program. J Addiction Dis. 2009, 28(1):53-6.

government representatives, the judiciary and legislators.  A complete list of participants can be found in Appendix III.  The mission of the Task Force was to develop recommendations to improve on the Commonwealth's current efforts to (1) prevent opioid abuse, addiction and overdose; (2) educate the public about opioid addiction and treatment options; (3) facilitate access to treatment though improved care coordination; (4) expand the current treatment system; (5) ensure access to the full continuum of treatment services by all insurers; (6) divert non-violent criminal offenders with substance use disorders to appropriate treatment; (7) assist persons with addictive disorders re-entering the community from correctional facilities to maintain opioid abstinence; and (8) expand community based recovery supports.

Given the urgency of the opioid epidemic and taking into consideration the 60-day time frame in which to consider and develop recommendations, the Task Force formed focus groups (Appendix V) to maximize stakeholder input and to allow for a comprehensive overview of the current system.  A total of 19 focus groups and/or interviews were held with stakeholders from across the Commonwealth, including persons who were actively using opioids, persons in recovery, parents, prevention coalitions, law enforcement, members of the judiciary, state agency representatives, schools and colleges, behavioral health providers, pharmacists, hospitals, emergency room physicians, physicians specializing in addiction medicine, first responders and insurers.  As previously noted, approximately 40 percent of persons served in FY13 in the BSAS system were between the ages of 13 and 29, so particular attention was given to this age group when discussing priorities.

The Task Force met as a committee of the whole three times.  During the first meeting, the Task Force members discussed the opioid problem and its charge, agreed upon the focus group approach, and brainstormed potential investments.  During the second meeting, members reviewed and commented on early findings and proposed recommendations from the initial focus groups, which can be found in Appendix IV.  During the final meeting, the Task Force members reviewed a series of focus group recommendations and provided feedback to DPH on those

recommendations.  Finally, DPH reviewed and prioritized those recommendations based on their ability to have a positive impact on the public health emergency in the short and long term.

**Overview of Massachusetts Substance Abuse Services**

Massachusetts has one of the strongest substance abuse treatment systems in the country.[8]  The Bureau of Substance Abuse Services (BSAS) is the single state authority on substance abuse and provides a robust system that provides services across the full continuum of care. The BSAS is charged with licensing addiction treatment programs as defined in 105 CMR 164.012, licensing addiction counselors as defined in 105 CMR 168.000, and funding a continuum of prevention, intervention, treatment and recovery support services.  The BSAS also sets policy in this area and serves as the payer of last resort for persons seeking treatment services who are either uninsured or underinsured.  The types of services are summarized below.

Prevention

The BSAS prevention efforts include funding community based primary prevention campaigns across the state aimed at preventing the misuse and abuse of, and addiction to, alcohol and other drugs.  Other BSAS prevention efforts include the development of print materials and media campaigns to educate various stakeholders about the consequences of underage drinking and the misuse of alcohol and other drugs, the dissemination of evidence based prevention practices and the expansion of education about addictive disorders in various training programs for health professionals, including physicians and allied health professionals.

---

[8] See, for example, treatment rates as documented in the National Survey of Substance Abuse Treatment Services (N-SSATS), 2011. Population: U.S. Census Bureau, Population Estimates, State population dataset - SCPRC-EST2009-18+POP-RES. From: The Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Available at: http://www.samhsa.gov/data/DASIS/2k11nssats/NSSATS2011Tbl6.33.htm. Accessed on: June 5, 2014.

Intervention

The BSAS intervention efforts include providing funding to groups that support and advocate for individuals and families dealing with addictive disorders such as the Massachusetts Organization for Addiction Recovery (MOAR) and Learn to Cope.  The Massachusetts Overdose Education and Naloxone Distribution program is a model for the nation in terms of how to widely distribute naloxone (sometimes referred to as Narcan), a lifesaving medication that can reverse opioid overdose, to persons likely to witness an opioid overdose.

Treatment

The BSAS provides a full continuum of licensed treatment services in inpatient, residential and outpatient treatment settings.  In FY13 there were approximately 40,000 enrollments to the BSAS-funded acute treatment services (ATS) or detoxification programs.  The primary purpose of these programs is to medically treat withdrawal symptoms in persons dependent upon opioids, alcohol or other drugs.  Specialized services are available to those under 18 through Youth Stabilization Programs.  Detoxification services are paid for by commercial insurers, MassHealth and other public payers, and the BSAS.  Typically, individuals remain in detox programs for 4-6 days.  Best practice dictates that persons in these programs should continue in "step-down" treatment services in order to maximize their potential for continued abstinence from drugs of abuse.  Focus groups that included active consumers, consumers in recovery and family members all emphasized this point.

There are a number of step-down services available, including Clinical Stabilization Service (CSS) programs which provide a range of services, including nursing, intensive education and counseling on the nature of addiction and its consequences, relapse prevention and aftercare planning for individuals beginning to engage in recovery.  The usual length of inpatient stay in a CSS program is 10-14 days.  These programs are paid for by MassHealth, the BSAS and some commercial insurers.  Transitional Support Service (TSS) programs are another example of a short term

residential "step-down" service.  The expected length of stay in these programs is up to 30 days.  TSS services provide intensive care management services to prepare individuals for long-term residential rehabilitation or a return to the community.  TSS services are solely funded with the BSAS dollars.

Residential rehabilitation treatment programs feature a planned program of substance abuse treatment within a 24-hour residential setting located in the community.  These residential treatment programs serve individuals in the early stages of addiction recovery, where safe and stable living environments are essential to recovery.  Residential rehabilitation facilities primarily serve adults, but there are some facilities that focus on youth or families.  Individuals and families typically receive treatment in residential settings for 6-12 months while youth programs are generally 3 months in duration.  Like TSS, residential rehabilitation is only funded by the BSAS.

Outpatient substance abuse treatment is also available across the state.  Paid for to varying extents by commercial insurers, MassHealth and other public payers, and the BSAS, services may include individual, group and family counseling, intensive day treatment and educational services.  A subset of outpatient programs focus on providing services to individuals dually diagnosed with substance abuse and mental health conditions, persons who have been convicted of driving under the influence of substances and/or adolescents.

Many opioid addicted people utilize outpatient medication assisted treatment (MAT) services.  Opioid Treatment Programs (OTP) provide methadone dosing services in combination with an array of other services including counseling, drug screening and case management services.  Buprenorphine, sometimes known as suboxone, is another example of MAT.  Buprenorphine is available to patients in physician offices.  This arrangement is called Office Based Opioid Treatment (OBOT).  In order to prescribe buprenorphine, a physician must obtain a waiver from the Drug Enforcement Agency.  Physicians are limited to providing OBOT to 30 individuals in the first year of receiving a waiver and up to 100 individuals thereafter.  In 2012, injectable naltrexone, known as Vivitrol, was approved

for the treatment of opioid dependence.  This medication can be prescribed by any qualified health professional, including mid-level practitioners, and is given in the form of an injection on a monthly basis in the prescriber's office.  All of these medications are FDA approved for the treatment of opioid dependence and are shown to be effective in the scientific literature. Methadone treatment is primarily paid for by MassHealth and the BSAS, while buprenorphine and injectable naltrexone are paid for by MassHealth and the majority of commercial insurers.

Some persons suffering from opioid addiction do not see a need for treatment.  When these persons pose a danger to themselves or others by virtue of their addictive behaviors, they may be involuntarily committed to treatment.  Under Massachusetts General Law Chapter 123, Section 35 (Section 35), "any police officer, physician, spouse, blood relative, guardian or court official" can petition the court to commit a "person who he has reason to believe is an alcoholic or substance abuser" if that abuse "substantially injures his health or substantially interferes with his social or economic functioning, or… he has lost the power of self-control over the use of such controlled substances."  After reviewing the evidence to determine if the person is an immediate risk to himself or others, a judge may commit a person to treatment for up to 90 days.  There are specific treatment programs that focus on serving individuals who are committed to treatment through Section 35.

Recovery is an ongoing process.  Today, the BSAS funds 7 Recovery Support Centers (RSC) across the state staffed primarily by peer members in recovery.  RSCs offer a drug-free environment and a variety of activities including classes, leisure activities and support group meetings.  The BSAS also supports Recovery High Schools which provide a structured school environment for high-school aged youth in recovery to maintain their recovery and complete their education.  Case management services are provided to youth and adults in their homes to support their continued abstinence from substances in the community.

## **Task Force Findings with DPH Recommended Actions**

Below are the findings of the Task Force and DPH recommended actions in the areas of prevention, intervention, treatment, and recovery.  The list of recommended investments in order of priority can also be found in Appendix I and additional policy and regulatory recommendations in Appendix II.

When considering infrastructure investments, especially the addition of inpatient and residential treatment services, the current proposed expansion in the number of treatment beds was taken into account.  For example, the Governor's FY15 budget already includes the addition of a new detoxification and clinical stabilization service and both the House and the Senate supported the addition of these 64 beds in their respective budget proposals.  Furthermore, as of April 2014, DPH completed an expansion of 80 transitional support services beds and 200 long term residential beds for single adults.  Additionally, the Governor's FY15 budget includes the addition of long term residential services under the trial court expansion budget, another initiative supported by the legislature.  The Governor's current budget also calls for the expansion of 8 specialty courts to divert non-violent offenders.

## **PREVENTION**

**Finding:  There is a need for increased education for youth and families about the dangers of drug use.**

Task Force members emphasized the importance of ongoing education for children and parents about the dangers of drug use, the appropriate use of prescription pain medications and their potential addictive qualities.  Focus groups also discussed the potential of leveraging community coalitions.

Prevention programs designed and tested to reduce risk and increase awareness can help people of various ages develop and apply the skills necessary to stop problem behaviors before, and after, they begin.  Research has demonstrated that research-based drug abuse prevention programs are cost-effective.  Each dollar invested in prevention saves up to

7 dollars in areas such as substance abuse treatment and criminal justice system costs, not to mention their wider impact on the trajectory of young lives and their families.[9]

Recommended Actions

- The Governor should convene a meeting of New England governors to discuss a collective response to the opioid epidemic impacting the region;

- Develop a statewide evidence-based public service campaign on the prevention of addictive disorders targeted at youth and parents;

- Add up to five new Opioid Overdose Prevention Coalitions in high need areas.

**Finding: There is a need for increased education for prescribers to ensure safe and effective pain management**

The diagnosis and treatment of pain is integral to the practice of medicine, and inappropriate treatment of pain, including both over-treatment and under-treatment, is an important problem.  Providers must balance the legitimate needs of patients with pain against the dangers to the public of opioids circulating through communities.  Prescribers reported that they would like enhanced education about the potential addictiveness of prescription pain medications, how to identify at risk individuals, how to identify potential opioid abuse, and how to effectively taper people off of prescription pain medications without leading to addiction.

Recommended Action

- Practitioners are already required by medical boards to complete training on pain management to renew their licenses.  This training could be further enhanced, particularly around safe prescribing

---

[9] National Institute on Drug Abuse. Topics in Brief: Drug Abuse Prevention. Revised March 2007. Available at: http://www.drugabuse.gov/publications/topics-in-brief/drug-abuse-prevention. Accessed on: June 5, 2014.

practices and managing of medications to decrease the risk of addiction.

## INTERVENTION

**Finding:  Opportunities exist to improve safe prescribing and dispensing of controlled substances.**

Deaths from prescription opioid overdoses quadrupled from 1999 to 2010 and far exceed the combined toll of cocaine and heroin overdoses.[10]  At the same time, prescription opioid pain medications serve an important and legitimate role in the treatment of pain.  Safe prescribing and dispensing practices are needed to decrease the risk of misuse and abuse while allowing for the legitimate use of these important medications.   Focus groups discussed the role of pharmacists in providing education to consumers at the time of dispensing, as well as potentially engaging with prescribers.  Focus groups also discussed the utility and limitations of the Prescription Monitoring Program, and its role in preventing prescription drug misuse and abuse.

Recommended Actions

- Review and develop regulations to promote the safe prescribing and dispensing of controlled substances, including the funding of necessary infrastructure to support these activities;

- For those opioids which are most frequently abused and misused, DPH recommends that the DPH Drug Control Program propose regulations mandating all prescribers to utilize the PMP each time they issue a prescription for Schedule II or III drugs that have been determined by DPH to be commonly misused or abused and designated as a drug that needs additional safeguards;

---

[10] Jones CM, Mack KA, Paulozzi LJ. Pharmaceutical overdose deaths, United States, 2010. JAMA 2013;309:657-659.

- Task the various boards of registration, within and beyond DPH,  with consideration of regulations to minimize diversion and misuse while ensuring safe prescribing and patient access to medication;

- Consider additional safe prescribing recommendations to be issued by the Joint Policy Working Group.

## TREATMENT

**Finding:  There is a need for centralized treatment resources.**

Task Force members discussed the challenges to accessing services in a timely manner, noting the importance of getting treatment within the window of opportunity when an individual is ready to accept it.  Well-accepted models recognize that treatment needs to be matched to the patient's acceptance of it for the treatment to be most successful.  Across the focus groups, there was not a clear understanding of how to access the treatment network in Massachusetts.  Focus group participants described the burden of having to call multiple programs on an ongoing basis to find available services.

Recommended Actions

- Develop a central navigation system for adult services that can be accessed through an 800 number.  The system would maintain a real time inventory of available substance abuse services across the continuum of care.  Central navigation could be utilized to identify appropriate resources by consumers and their families, first responders, schools, and providers.  When contacted, intake staff would work, if appropriate, with the caller to place the person needing services into the best available setting;

- Establish pilot regional walk-in centers that could coordinate with central navigation as needed.  These centers could provide assessment, liaison with central intake to place the person in the best

treatment setting, daily clinically run group sessions, and emergency one-on-one counseling;

- Develop and implement a public facing dashboard to facilitate consumer choice by providing quality assessments and other information about treatment options.

**Finding:  Individuals and families report challenges in accessing services beyond simply knowing where they are.**

Treatment is necessary to provide patients relief from physical withdrawal symptoms and to place patients on the road to recovery.  Task Force members heard from several individuals struggling with addiction and their families who described difficulty in accessing treatment services.  BSAS notes that approximately 40 percent of persons served in FY13 in the BSAS system were between the ages of 13 and 29, making this an important population to consider.  In addition, 20 percent of 16 to 24 year olds served in the BSAS system in FY13 had children under six, highlighting the need for services for families with children.

Recommended Actions

- Add treatment programs with an emphasis on:

  - Community-based treatment programs for youth and young adults to provide home-based counseling services;

  - Residential treatment programs for populations in need, including adolescents and transitional age youth, families, single adults with children, Hispanics, and residents in currently geographically underserved areas such as Franklin County; and

  - Clinical Stabilization Services program for step down services.

- Add funding to allow community health centers to increase capacity to provide medication assisted treatment including injectable naltrexone to people in the community.

## Finding:  Providers and consumers express concerns about barriers to access

Even when treatment is available, individuals and families may still have trouble accessing that treatment.  For example, providers and consumers that participated in our focus group expressed the belief that insurers are too restrictive in authorizing certain care.  Other issues that potentially affect access include housing issues and physician reluctance to receive authority to prescribe buprenorphine due to real and/or perceived burdensome regulatory requirements.  Stigma is also an important barrier to treatment.  All of these factors can prevent individuals from obtaining the treatment they need as the first step to recovery.

<u>Recommended Actions</u>

- DPH and the Division of Insurance, in consultation with the Health Policy Commission, should conduct a comprehensive review of medical necessity criteria and utilization review guidelines for opioid abuse and addiction treatment developed by carriers and consult with clinical experts to develop minimum criteria for opioid abuse and addiction treatment services that will be considered medically necessary for all plans;

- The Interagency Council on Substance Abuse and Prevention should expand its review of substance abuse issues to review interagency regulatory and operational barriers to treatment, such as loss of foster care placement, long wait periods for insurance coverage, lack of drug-free shelters, and physician reluctance to receive authority to prescribe buprenorphine due to real and/or perceived burdensome regulatory requirements.

## Finding: Correctional facilities are an important site of care for opioid addiction.

Task Force members noted the impact of opioid addiction on incarcerated individuals.  Jails and prisons offer treatment for addiction on a voluntary

basis; however, in some facilities, individuals receive incentives to participate in treatment programs.  Whether or not individuals have received treatment for their substance use while incarcerated, it is important to provide individuals support once they complete their sentences.  Otherwise, without that support, they may relapse, and this relapse could cause them to engage in behaviors that potentially result in re-incarceration.

Recommended Actions

- Enhance the DOC's and Sheriff Offices' continuum of care by increasing the availability of treatment for offenders at designated DOC facilities.  Specifically, DOC recommends implementing a basic substance abuse education/motivation enhancement program targeting offenders with substance abuse issues, and a graduate maintenance and aftercare program for offenders who have completed the residential substance abuse treatment program.  Currently, the DOC provides substance abuse treatment for inmates who are nearing release, as research has indicated that offenders receive the maximum benefits of treatment prior to release when they are focused on reentering the community;

- Support the expansion of the use of injectable naltrexone for persons re-entering the community from correctional facilities by providing funding for supportive case management services to ensure participants comply with their post-release treatment plan and assist them in navigating access to other critical services.

## **RECOVERY**

**Finding:  There is a need for peer support in the recovery process.**

Research has shown that recovery is facilitated by social support.  Peer recovery support services are designed and delivered by people who have experienced both substance use disorder and recovery.  These services help people become and stay engaged in the recovery process and reduce

the likelihood of relapse.  Because they are designed and delivered by peers who have been successful in the recovery process, they embody a powerful message of hope, as well as a wealth of experiential knowledge. The services can effectively extend the reach of treatment beyond the clinical setting into the everyday environment of those seeking to achieve or sustain recovery.  Focus group participants emphasized that opioid addiction is a chronic disease and recovery is an ongoing process that requires ongoing supports.  In addition, they emphasized the need to provide support services not just during normal business hours but on nights and weekends to provide safe, drug-free activities to support the recovery process.

Recommended Actions

- Develop a peer to peer support network by encouraging the hiring of recovering peers to speak with at-risk youth and other special high risk populations, participate in a speakers bureau, and meet with individuals at critical transition points such as in emergency rooms, time of arrest or when returning to the community.

**Finding:  There is a need for expanded recovery services across the state.**

There are currently 7 Recovery Support Centers across the Commonwealth that operate 12 hours per day.  People in recovery highlighted the value of these services and their desire to have increased access to them.  Both the focus groups and Task Force recognized that there is a need for expanded recovery support services focused on creating healthy communities that assist individuals maintain abstinence from drugs and alcohol after formal treatment has completed.

Recommended Actions

- Augment the capacity of Recovery Support Centers by expanding the hours of currently existing centers to include nights and weekends and by adding new Recovery Support Centers;

- Add a Recovery High School in Worcester area;

- Add Learn to Cope chapters across the Commonwealth;

- DPH also recommends developing and implementing a voluntary accreditation program for Alcohol Drug-Free Living housing, also known as sober homes.  These homes can provide affordable housing and are an important part of the continuum of recovery support in the community.

## Conclusion

These recommendations are important steps towards addressing the Commonwealth's public health emergency.  DPH appreciates the leadership of Governor Patrick and the commitment and hard work of Task Force members who contributed their time, ideas, and expertise to help the Commonwealth address the opioid epidemic.

Since the convening of the Task Force, the Massachusetts Legislature has taken steps to address the opioid epidemic in Massachusetts. The recommendations included in this report complement the Legislature's proposals and DPH looks forward to continuing to work closely with the Legislature on the important issue of opioid misuse, abuse, and overdose.

Despite having one of the strongest treatment systems in the country as measured by the robust continuum of care offered and the presence of dedicated addiction treatment providers, we still have opportunities for improvement.  DPH believes that with Governor Patrick's leadership and the policy recommendations made here, particularly with an emphasis on safe opioid prescribing, we will be able to help those struggling with addiction, their loved ones and impacted communities.

Appendix I: DPH Recommended Investments in Priority Order

| Recommendation | Funding Estimate | Annualized | Pending Legislative Action |
|---|---|---|---|
| Develop a central navigation system that could be accessed through an 800 number.  The system would build upon existing information lines, other central navigation systems and be used by consumers, families, first responders, health care professionals and behavioral health providers to access information about treatment options including current availability. | $1,450,000 | Yes | Proposed Senate budget includes language and funding for a central navigation system |
| Pilot regional centers that provide assessment, drop-in counseling and referral to treatment on demand leveraging existing treatment organizations. | $1,800,000 | Yes | Senate budget proposes $10M Trust Fund to expand services. |
| Develop Prescription Monitoring Program infrastructure to support safe opioid prescribing practices and new regulations related to the Public Health Emergency and accelerated enrollment of prescribers. | $1,500,000 | Yes | SB2142 provides DPH additional authorities to require PMP registration and consultations, as well as places limitations on the prescribing physician.  In the budget, House and Senate proposed $3.7M for roll-out of full, mandatory use of the PMP by prescribers. |
| DPH and the DOI, in consultation with the Health Policy Commission to conduct a comprehensive review of medical necessity criteria and utilization review guidelines for opiate abuse and addiction treatment developed by carriers pursuant to sections 12 and 16 of chapter 1760.  The agencies to consult with clinical experts to develop minimum criteria for opiate abuse and addiction treatment services that will be considered medically necessary for all plans. | $250,000 | No | SB2142 directs the Center for Health Information and Analysis (CHIA) to review accessibility of substance abuse treatment and the adequacy of coverage; while the Health Policy Commission is to determine standards for evidence-based substance abuse treatment and to create a certification process for providers. |
| Enhance the DOC's continuum of care by increasing the availability of treatment for offenders at designated DOC facilities. | $2,000,000 | Yes | |

| Recommendation | Funding Estimate | Annualized | Pending Legislative Action |
|---|---|---|---|
| Support the expansion of the use of injectable naltrexone for persons re-entering the community from correctional facilities. | $1,000,000 | Yes | |
| Add funding to allow community health centers to increase capacity to provide medication assisted treatment including injectable naltrexone to people in the community. | $300,000 | Yes | |
| Develop a statewide evidence-based public service campaign on the prevention of addictive disorders targeted at youth and parents. | $1,000,000 | No | SB2142 requires distribution of educational information on family support services to families, upon admission to the program.  The Senate final budget proposes funding for a public education campaign. |
| Develop/implement voluntary accreditation for Alcohol and Drug-Free living homes. | $500,000 | Yes, for at least 3 years | Senate and House proposed budgets include language and funding for voluntary accreditation for Alcohol and Drug-Free living homes. |
| Add five community based treatment programs for youth and young adults to provide home based counseling services using both evidence based treatment models. | $1,000,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add two adolescent residential treatment programs for 13-17 year olds. | $855,125 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add one residential treatment programs for 16-21 year olds. | $660,985 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add one residential treatment program for 18-25 year olds. | $660,985 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add one family residential treatment program. | $820,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add two adult residential treatment programs prioritizing Hispanics and single adults with children. | $1,100,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add one detoxification program in Franklin County. | $550,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add one Clinical Stabilization Services Program. | $350,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add five Opioid Overdose Prevention Coalitions in high need areas. | $500,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |

| Recommendation | Funding Estimate | Annualized | Pending Legislative Action |
|---|---|---|---|
| Develop peer to peer support networks to meet with persons at critical transition points, such as in emergency rooms, at times of arrest, at times of program transition. | $500,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Expand the hours of currently existing Recovery Support Centers to cover nights and weekends. | $350,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add three new Recovery Support Centers. | $1,050,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add another Recovery High School in the Worcester area. | $500,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add Learn to Cope Chapters across the state by adding program staff. | $300,000 | Yes | As noted above, the Senate budget proposes a $10M trust fund to expand services. |
| Add a public facing dashboard to facilitate consumer choice and transparency, includes development of IT and data structures. | $1,000,000 | No | Senate budget recommends a public facing dashboard. |
| **TOTAL** | $19,997,095 | | |

Appendix II: Additional DPH Recommendations

| DPH Policy and Regulatory Recommendations |
|---|
| DPH Drug Control Program will be proposing regulatory amendments to the PMP requiring all prescribers to utilize the PMP each time they issue a prescription for a Schedule II or III drug which has been determined by the Department to be commonly misused or abused and which has been designated as a drug that needs additional safeguards. |
| DPH suggests that the various boards of registration, within and beyond DPH, be tasked with consideration of regulations to minimize diversion and misuse while ensuring safe prescribing and patient access to medication |
| DPH recommends consideration of additional safe prescribing recommendations to be issued by the Joint Policy Working Group. |

## Appendix III: Task Force Members

| Member | Affiliation |
|---|---|
| Dr. Thomas Amoroso | Medical Director, Tufts Health Plan |
| Cheryl Bartlett | Commissioner, Department of Public Health |
| Kim Bishop-Stevens | Coordinator, Substance Abuse Services, Department of Children and Families |
| Dr. Troy Brennan | Medical Director, CVS |
| Andrea Cabral | Secretary, Executive Office of Public Safety |
| Paula Carey | Chief Justice of the Trial Court |
| Paul Doherty | Parent, Learn to Cope |
| Ed Dolan | Commissioner of Probation |
| Chuck Farris | President and CEO, Spectrum Health Services |
| Peter Forbes | Commissioner, Department of Youth Services |
| Marcia Fowler | Commissioner, Department of Mental Health |
| Maryann Frangules | Executive Director, MA Coalition for Addiction Services |
| Dr. Barbara Herbert | Medical Director, St. Elizabeth's Comprehensive Addiction Program, Steward Health Care System |
| Tom Hoye | Mayor, Taunton |
| Hilary Jacobs | Director, Bureau of Substance Abuse Services, DPH |
| Paul Jeffrey | Pharmacy Director, MassHealth |
| Theodore Joubert | Chief, Fire Chiefs Association |
| Katie Joyce | Vice President for Policy and Domestic & International Government, Mass Life Sciences |
| Paul Kusiak | Parent |
| William Luzier | Executive Director, Interagency Council on Substance Abuse Services and Prevention |
| John McGahan | President, Gavin Foundation |
| Richard McKeon | Major, Division of Investigative Services |
| Rosemary Minehan | Judge, Plymouth District Court |
| Christopher Mitchell | Director of Program Services, DOC |
| Joseph Murphy | Commissioner, Massachusetts Division of Insurance |

| Member | Affiliation |
|---|---|
| Coleman Nee | Secretary, Department of Veterans' Services |
| Heidi Nelson | CEO, Duffy Health Center |
| Lora Pellegrini | President & CEO, Massachusetts Association of Health Plans |
| Dr. Debra Pinals | Assistant Commissioner, Forensic Mental Health Services, Department of Mental Health |
| John Polanowicz | Secretary, Executive Office of Health and Human Services |
| Domenic Sarno | Mayor, Springfield |
| David Seltz | Executive Director, Health Policy Commission |
| Luis Spencer | Commissioner, Department of Corrections |
| Martin Walsh | Mayor, Boston |
| Steven Walsh | Executive Director, Massachusetts Council of Community Hospitals |
| Steven Tolman | President, AFL-CIO |

<u>Appendix IV</u>: Focus Group Feedback

Proposed Priorities and Funding Recommendations
(from Focus Groups with Task Force feedback included)
May 21, 2014

| Focus Group Recommendations | Funding Estimate |
|---|---|
| **DATA** | |
| Develop and implement a public facing dashboard to facilitate consumer choice and improved performance management. | $1,000,000<br><br>Includes development of IT infrastructure |
| Increase capacity to allow for ongoing data analytics of service delivery system, including the supply and demand for services, program effectiveness, utilization patterns, provider service profiles, including results of injectable naltrexone (vivitrol) services | |
| **POLICY/REGULATORY ACTION** | |
| Develop and implement an accreditation program for Alcohol Drug-free Living housing, also known as sober homes.  In developing program, be cognizant of sober homes as an important piece of the affordable housing. | $500,000 |

| Focus Group Recommendations | Funding Estimate |
|---|---|
| Recommend initiatives to enhance the capabilities of clinicians to identify and treat patients with substance abuse issues or who are at risk for developing substance abuse issues.  Such initiatives could include:<br><br>• Enhancing the content of required CME course to include more on opiate addiction, including paths to addiction involving prescription drugs, and  best practices on prescribing buprenorphine<br>• Requiring all providers to complete the training by a specified date, and not wait until the time of license renewal.<br>• Require Massachusetts medical schools and residency programs, nursing schools, and physician assistant training programs to increase training of physicians on pain management, including non-pharmaceutical management of pain, the use of pain medication and addiction medicine, training in SBIRT, screening pregnant women, safely weaning patients from pain medication, how to provide patient education and reduction in stigma<br><br>Following training, provide support to providers of addiction services that are targeted at removing barriers to patient's receiving needed care. | Some funds may be needed to provide post training support |
| Review and develop regulations to promote the safe prescribing and dispensing of controlled substances. | N/A |
| Develop DOI and DPH regulations that require insurers to increase the medical management of opiate prescriptions by insurers (quantity limits, prior authorization, etc.), create physician prescription profiles, and use profiling information in making re-credentialing decisions. | N/A |
| Direct MassHealth and DPH to develop a pilot payment reform initiative based on an episodes of care model | $100,000 to develop the pilot<br><br>(additional money needed to fund the pilot) |

| Focus Group Recommendations | Funding Estimate |
|---|---|
| DPH and the DOI, in consultation with the Health Policy Commission to conduct a comprehensive review of medical necessity criteria and utilization review guidelines for opiate abuse and addiction treatment developed by carriers pursuant to sections 12 and 16 of chapter 1760.  The agencies to consult with clinical experts to develop minimum criteria for opiate abuse and addiction treatment services that will be considered medically necessary for all plans.<br><br>DPH and DOI, in consultation with public and private payers to address barriers to accessing medication-assisted treatment. | $250,000 |
| Provide PMP data downloads to insurers to enable them to obtain a complete prescribing profile of patients and physicians.<br><br>Provide access to PMP data by health plan physicians and pharmacists to enable insurers to review patient-specific prescription histories. | $200,000 |
| Hold a series of facilitated stakeholder forums to review and discuss evidence based research regarding most effective treatment approaches.  Aim to develop a shared understanding of best treatment and care management practices and how persons seeking care can have that care covered by a combination of insurance and BSAS-funded services.<br><br>Participants would include providers, insurers, state officials, first responders, consumers and family members.  The sessions would be professional facilitated to assure that all parties are heard and the consensus goals are achieved. | $10,000 per session (recommend up to 10 sessions) |
| Develop statewide strategy for safely disposing of needles by providing locked needle disposal boxes in public areas throughout the state | N/A |
| Consider adoption of the Model Drug Dealer Act which allows family members to bring a civil lawsuit against a dealer if he/she sells drugs that lead to a fatal overdose. | N/A |

| Focus Group Recommendations | Funding Estimate |
|---|---|
| Charge Interagency Task Force on Substance Abuse and Prevention to review interagency regulatory and operational barriers to treatment.  Examples of potential areas of review include:<br><br>• Loss of foster care placement for a child who seeks residential treatment;<br>• Long wait periods for insurance coverage;<br>• Lack of drug-free shelters;<br>• Physician reluctance to receive authority to prescribe buprenorphine due to real and/or perceived burdensome regulatory requirements. | N/A |
| **PREVENTION** | |
| Develop a sustained, state-wide, evidence-based public service campaign to educate youth and parents about dangers of addiction.  In addition, the campaign may provide information on Massachusetts' Good Samaritan Law. Involve public figures who are role models for youth. | $1,000,000 |
| Develop peer-to-peer support network by hiring recovering peers to:<br><br>• Speak with at-risk youth and other special high risk populations<br>• Participate in a speakers' bureau<br>• Meet with individuals at critical transition points, such as in emergency rooms, at time of arrest, or when returning to the community | $400,000 |
| Add five new Opioid Prevention coalitions in high need cities. | $100,000 per coalition |
| **INTERVENTION** | |

| Focus Group Recommendations | Funding Estimate |
|---|---|
| Develop a central navigation system for adult services that can be accessed through an 800 number.  The system would maintain a real time inventory of available substance abuse services across the continuum of care.  Central navigation could be utilized to identify appropriate resources by consumers and their families, first responders, schools, and providers.  When contacted, intake staff would work, if appropriate, with the caller to place the person needing services in the best available setting.  In addition, intake staff could direct uninsured individuals to assistance in applying for MassHealth benefits.  The central navigation system should include resources available from both public and private payers and should be designed to gain efficiencies by building on existing resource programs. | $1,450,000 |
| Pilot regional walk in centers that provide:<br><br>• Assessment<br>• Liaison with central intake to place person in best treatment setting<br>• Daily open clinically run group sessions<br>• Emergency 1 on 1 counseling<br><br>The walk in centers would also coordinate with Central Navigation as needed.  Where possible, leverage existing organizations to pilot walk-in center model. | $600,000 per site cost |
| Establish a state-wide, community-based care management service that supports consumers and families receiving services:<br><br>• At times of transitions of care from one type of service provide to another (e.g., initial entry into the system, from detox to CSS, to TSS to residential programs, from jails/prisons to community)<br>• When the person is living and receiving services in the community<br><br>Care management services would be provided by both clinical care managers and peer navigators, working collaboratively on shared caseloads.  The Care Management program should be designed to gain efficiencies by building on existing programs offered by other state agencies and insurers. | $10,000,000 (estimated based on cost of providing to Section 35 clients - $1M for 5,000 clients; assuming would interact with 50,000 clients) |

| Focus Group Recommendations | Funding Estimate |
|---|---|
| To increase early identification, develop and implement a widespread education and training program to allow nurses and other professionals to identify high risk individuals at as many interaction points as possible  (e.g., schools, courts, MH clinics, CBHI providers).  The training should include both information on how to identify potential opioid abuse and information on where and how to refer individuals and their families for assistance and/or treatment services. | $25,000 per regional training |
| Work with colleges to develop capacity to identify and treat at risk college students | $150,000 |
| Share funding with cities and towns on a regional basis to fund at least one substance abuse counselor in each District Attorney's office to work with courts, first responders, and community and school organizations. | $40,000 per site |
| Expand the number of Drug Courts throughout the Commonwealth | $350,000 per court |
| Provide education, training and resource materials to First Responders to allow for them to provide hands on assistance in directing individuals to treatment, as appropriate. | TBD |
| **TREATMENT** | |
| Fund injectable naltrexone (Vivitrol), which reduces opioid cravings, for incarcerated people (in prisons and jails) who are returning citizens and work with public and private payers to reduce barriers to benefit coverage for medication-assisted treatments.<br><br>Provide transition of care services to assure that returning citizens are linked up to appropriate services and MassHealth care management support services to assure on-going treatment and patient engagement. | $147,000 per site |
| Establish Opiate Treatment Programs in Correctional Facilities (e.g., jails and prisons) | $75,000 per site |

| Focus Group Recommendations | Funding Estimate |
|---|---|
| Enhance the DOC's continuum of care and improve post release linkages to community based services through the implementation of the following initiatives:<br><br>• Improve the identification of offenders with substance abuse issues by adding a substance abuse specific assessment instrument at the Department's reception centers<br><br>• Increase the availability of treatment for offenders with substance abuse issues by adding basic substance abuse education and motivational enhancement programs at designated DOC institutions.<br><br>• Enhance the residential substance abuse treatment program by adding a graduate maintenance, aftercare and post release mentoring component<br><br>• Increase salaries of substance abuse treatment staff to maximize the recruitment and retention of the most competent staff | $2,000,000 |
| Selectively add residential beds for particularly vulnerable populations who are underserved, including women, single parents with children and Hispanics, and 18-25 year olds. | $504,000 per contract for adults<br><br>$735,000 per contract for transitional age youth and young adults |
| Work with MassHealth and commercial insurers to increase capacity for outpatient services including, for example:<br><br>• Intensive Outpatient Programs<br>• Group visits at walk-in centers<br>• Family-based programs<br>• Youth programs, which will allow for diversion from DYS | N/A |
| Add medication-assisted treatment service sites, including expanding treatment at CHCs, to the extent possible under the law. | $100,000 per OBOT or injectable naltrexone;<br><br>$300,000 per Methadone site |
| Add one detoxification program in Franklin County | $550,000 |
| Add one CSS program, location to be determined | $350,000 |

| Focus Group Recommendations | Funding Estimate |
|---|---|
| Provide technical assistance to pharmacies to encourage them to stock and dispense Naloxone | N/A |
| Provide technical assistance and training to assure availability of Naloxone through first responders.  Provide funding to assist first responders in replacing Naloxone supply. | (TBD) |
| **RECOVERY SUPPORTS** | |
| Expand the number of recovery support centers (RSC) and expand access to RSC on nights and weekends. | $350,00 per new site (assuming expanded hours)<br><br>$50,000 for current sites to expand hours |
| Provide drug free housing and programing 24/7 | TBD |
| Add an additional recovery high school in Worcester County. | $500,000 per high school |
| Add support groups, such as Learn to Cope, in areas of state with need and no existing program. | $300,000 |

## <u>Appendix V</u>- Focus Group Meetings

| Focus Groups | |
|---|---|
| **Organization** | **Meeting Dates** |
| Active Consumers | May 14 (10:00AM) at Project AHOPE |
| Consumers in Recovery | April 17 (11:00AM) MOAR meeting (Lawrence)<br><br>May 7 (10:00AM) at StepRox (Roxbury) |
| Family Members (Learn to Cope) | May 8 (7:00PM), Quincy |
| Health Insurers | April 23 (10:00AM) Attended meeting at MAHP<br>April 25 (1:00PM)  Attended BCBSMA meeting |
| Colleges | April 24 (1:00PM) Conducted call with Diane Fedorchak from UMASS Amherst |
| Mass Medical Society/Addictive Physicians | May 12 (6:00PM) at MMS offices in Waltham |
| ER doctors | April 24 (10:00AM) Call held with ER doctors from Sturdy Hospital |
| MA Hospital Association | April 30 Call held with MHA staff |
| Pharmacists | April 23 (1:00PM) Meeting held |
| BH providers | April 28 (12:30PM) Meeting held at Framingham Public Library |
| Judiciary | April 28 (10:00AM) Phone meeting held with Judges Carey and Minehan |
| Law Enforcement – Police/Fire | April 25 (10:00AM) Meeting held with firefighters in North Attleboro.<br><br>May 12 Meeting held with police chiefs in Norwood |
| Interagency Workgroup on Youth  (Jen Tracey) | May 14 (1:00PM) |
| Prevention Coalitions | May 12 |
| Full Interagency Council | April 16 (9:45AM) |
| BSAS Consumer Advisory Council | April 16 (5:30PM) |