**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSSACHUSETTS**

|  |  |  |
|---|---|---|
| ZOGENIX, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:14-cv-11689 |
| | ) | |
| DEVAL PATRICK, in his official capacity as | ) | |
| GOVERNOR OF THE COMMONWEALTH OF | ) | **DEMAND FOR JURY TRIAL** |
| MASSACHUSETTS, | ) | |
| | ) | |
| and | ) | (Leave to file granted 9/12/14 |
| | ) | |
| CHERYL BARTLETT, RN, | ) | |
| in her official capacity as | ) | |
| DEPARTMENT OF PUBLIC HEALTH | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CANDACE LAPIDUS SLOANE, M.D., | ) | |
| KATHLEEN SULLIVAN MEYER, ESQ., | ) | |
| MARIANNE E. FELICE, M.D., | ) | |
| ROBIN RICHMAN, M.D., | ) | |
| PAUL R. DeRENSIS, ESQ., | ) | |
| MICHAEL E. HENRY, M.D., in their official | ) | |
| capacities as members of the MASSACHUSETTS | ) | |
| BOARD OF REGISTRATION IN MEDICINE, | ) | |
| 200 Harvard Mill Square, Suite 330, Wakefield, | ) | |
| Massachusetts, 01880, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KAREN M. RYLE, MS, R.PH, | ) | |
| PATRICK M. GANNON, R.PH, MS, FABC, | ) | |
| EDMUND TAGLIERI, MSM, R.PH, NHA, | ) | |
| JAMES T. DEVITA, R.PH, | ) | |
| JANE F. FRANKE, RN, | ) | |
| ANTHONY PERRONE, MD, MBA, R.PH, | ) | |
| RICHARD TINSLEY, MBA, ME.D, | ) | |
| JOANNE M. TRIFONE, R.PH, | ) | |
| ANITA YOUNG, ED.D, R.PH, in their official | ) | |
| capacities as members of the MASSACHUSETTS | ) | |

BOARD OF REGISTRATION IN PHARMACY,          )
239 Causeway Street, 5th Floor, Suite 500, Boston,   )
Massachusetts, 02114,                               )
                                                    )
and                                                 )
                                                    )
DIPU PATEL-JUNANKAR, PA-C,                          )
MIGUEL VALDEZ, PA-C,                                )
EDWARD GLINSKI, MD,                                 )
RICHARD BAUM, MD,                                   )
NICOLE MEREGIAN, PA-C,                              )
LAURA HILF, RN, MS,                                 )
SHANNON SHERIDAN-GELDART, PA-C,                     )
JESSICA BRITNELL, PA-C, in their official           )
Capacities as members of the MASSACHUSETTS          )
BOARD OF REGISTRATION OF PHYSICIAN                  )
ASSISTANTS, 239 Causeway Street, 5th Floor,         )
Suite 500, Boston, Massachusetts, 02114,            )
                                                    )
                        Defendants.                 )
_____)

## VERIFIED THIRD AMENDED COMPLAINT

Plaintiff Zogenix, Inc. ("Zogenix"), by its undersigned counsel, hereby brings this

Verified Third Amended Complaint against Defendants Deval Patrick, solely in his official

capacity as Governor of the Commonwealth of Massachusetts ("Governor Patrick"), Cheryl

Bartlett, RN, solely in her official capacity as Commissioner of the Department of Public Health

("Commissioner Bartlett"), and the members of the Massachusetts Board of Registration in

Medicine (the "BORIM"), Massachusetts Board of Registration in Pharmacy ("BORIP"), and

Massachusetts Board of Registration of Physician Assistants ("BOROPA"), solely in their

official capacities, and states and alleges the following:

1.      This is an action seeking temporary, preliminary and permanent injunctive relief, a

declaratory judgment, and other appropriate relief to set aside as unconstitutional the recent

2

actions of the Governor, Commissioner, BORIM, BORIP, and BOROPA relating to Plaintiff's drug Zohydro® ER, including:

(i) First, explicitly banning the prescribing, ordering, dispensing, and administration of a pain medication specifically approved as safe and effective by the federal Food and Drug Administration ("FDA") for marketing and sale in the United States;

(ii) Then, after this Court enjoined Defendants from enforcing their explicit ban, abandoning the explicit ban in favor of draconian "emergency" requirements imposed upon any effort to prescribe or dispense the drug, which effectively created another ban of the drug;

(iii) Then, on the eve of (and even after) this Court's decision to enjoin some of those "emergency" regulations, issuing final regulations that continue unfairly to single out Zohydro® ER and to impose an undue burden on pharmacists' willingness to stock the drug;

(iv) Throughout, singling out a particular extended release opioid product and treating it differently from all other opioids having similar qualities by imposing excessive restrictions on prescriptions and dispensation of the drug – even in instances where it is appropriate for the treatment of severe chronic pain patients;

(v) And finally, taking all of the foregoing actions with the purpose and intention of forcing Zogenix to offer Zohydro® ER in an abuse-deterrent formulation, despite the fact that the current formulation was approved as safe and effective by FDA and that FDA explicitly considered and rejected the abuse-deterrent formulation that Defendants seek to force Zogenix to make available.

2.     Defendants' hysterical predictions about Zohydro® ER were unwarranted.  Indeed, now that the drug has been on the market everywhere except Massachusetts for several months,

the data is in, and it is clear that the level of abuse of Zohydro® ER is exceptionally low – in complete contrast to the uninformed predictions previously made by Defendants regarding abuse potential.  There simply is no basis, then, for imposing restrictions upon Zohydro® ER that are not applied to other Schedule II opioids, let alone for doing so with the purpose of seeking to undermine patients' access to this FDA-approved drug.

3.      Zogenix's product, Zohydro® ER (Hydrocodone Bitartrate Extended-Release Capsules), was approved by FDA on October 25, 2013 for the management of pain severe enough to require daily around-the-clock, long term opioid treatment and for which alternative treatment options are inadequate.

4.      The active ingredient in Zohydro® ER, hydrocodone, has been available in FDA-approved products since 1943 and is the same active ingredient found in a number of immediate-release hydrocodone combination analgesic products already on the market.  Products containing hydrocodone in combination with acetaminophen are some of the most commonly prescribed opioid analgesics currently available in Massachusetts and elsewhere for the treatment of chronic pain.

5.      Hydrocodone is a type of opioid; there are many others, including morphine, codeine, methadone, oxycodone, hydromorphone, tapentadol, and fentanyl.   All of these opioids are available in extended release/long acting formulations.

6.       Zohydro® ER is the first single-entity hydrocodone product available on the market, the first extended release hydrocodone product, and the only hydrocodone product subject to schedule II controls under the Controlled Substances Act and the Massachusetts Controlled Substances Act – the most restrictive schedule available for an FDA-approved

product. Many other opioid products that contain active ingredients other than hydrocodone – such as morphine, methadone, hydromorphone, oxycodone, oxymorphone, tapentadol, and fentanyl – are subject to state and federal schedule II controls as well.

7.      Notwithstanding that FDA already has determined Zohydro® ER to be safe and effective – and approved it for marketing and sale in the United States – Governor Patrick, acting through various public health agencies, recently issued a series of unconstitutional orders and regulations that apply to Zohydro® ER only and not to any of the other opioid products.

8.      The first emergency order, dated March 27, 2014, empowered Commissioner Bartlett to issue an order prohibiting the prescribing, ordering, dispensing, or administration of hydrocodone-only extended release drug products, a category that only includes Zohydro® ER. Ex. A. The single substance ban was designed to be lifted only when Commissioner Bartlett "ha[d] determined that adequate measures are in place to safeguard against the potential for diversion, overdose, and abuse…." *Id.* at 2.

9.      In response to the original ban, Zogenix filed this action on April 7, 2014, alleging that the ban violated the United States Constitution. (D.E. 1). On that same date, Zogenix also filed a motion for a temporary restraining order and/or preliminary injunction. (D.E. 3-5.) After briefing by both sides and two hearings before the Court, on April 15, 2014, this Court issued an order concluding that Defendants' actions likely were preempted by federal law and declaring that Zogenix was entitled to a preliminary injunction. (D.E. 26.) The Court stayed the order for one week, until April 22, 2014. During that time, Plaintiff's counsel reached out to legal representatives in the Governor's Office and Defendants' litigation counsel to inquire whether Defendants intended to appeal the April 15, 2014 Order. Although Defendants' counsel

indicated that the Governor was unlikely to appeal, they did not reveal during those discussions that the Governor was preparing to implement alternative measures in an effort to sidestep this Court's April 15, 2014 Order and to accomplish the Governor's federally preempted purpose of banning Zohydro® ER in Massachusetts unless and until Zogenix would agree to make it available only in an abuse deterrent formulation.

10.     The very day that the Court's stay expired, Governor Patrick issued a press release (without any advance notice to or consultation with Zogenix or its counsel), stating that he had directed Commissioner Bartlett to issue a new emergency order requiring doctors to "utilize the Prescription Monitoring Program (PMP) prior to prescribing a hydrocodone-only extended release medication that is not in an abuse deterrent formulation," which Defendants acknowledged only applied to Zohydro® ER.  Ex. B at 1-2.  Defendants then proceeded to enact various emergency regulations applicable only to hydrocodone-only extended release medications that are not in an abuse-deterrent form (*i.e.,* Zohydro® ER, and only Zohydro® ER). These new emergency regulations: (i) required physicians and physicians assistants, before prescribing Zohydro® ER, to supply a letter of medical necessity verifying that "other pain management treatments have failed"; and (ii) prohibited certified pharmacy technicians, pharmacy technicians, and pharmacy interns from handling Zohydro® ER.

11.     In response to the emergency regulations, Zogenix filed a motion for a preliminary injunction on May 23, 2014, alleging that the emergency regulations violated the United States Constitution.  (D.E. 47.)  After briefing by both sides and a hearing before the Court, this Court issued an Order on July 8, 2014 concluding that Defendants' actions likely were preempted by federal law and declaring that Zogenix once again was entitled to injunctive relief.  (D.E. 66.)

Specifically, the Court enjoined the operation of Defendants' regulations at 243 CMR 2.07(25) and 263 CMR 5.07(12)(d), requiring a Letter of Medical Necessity confirming that "other pain management treatments have failed."  Although the Court found the record insufficiently developed to grant an injunction against the BORIP regulations, it invited Zogenix to make a more detailed submission on this point.  *Id.* at 10-11.

12.     Immediately prior to the issuance of the Court's decision, Defendants once again amended their regulatory scheme.  In a series of regulations issued on or about July 3, 2014, the BORIM, BORIP, and BOROPA regulations were amended to require, *inter alia*, that a prescriber find that "other pain management treatments are *inadequate*."  The BORIP regulations regarding personnel handling of Zohydro® ER also were amended: although certified pharmacy technicians, pharmacy technicians, and pharmacy technician trainees may not handle Zohydro® ER, pharmacy interns under the direct supervision of registered pharmacists may handle Zohydro® ER.  247 CMR 8.05(3).

13.     Taken together, these requirements continue to impose draconian restrictions on pharmacists' abilities to stock or dispense Zohydro® ER that are intended to accomplish the Governor's preempted purpose and, particularly viewed in the context of defendants' prior actions, amount to an effective ban of the drug in Massachusetts.  The collective final regulations also are inconsistent with the federal regulatory scheme governing the approval of prescription drugs.

14.     For example, the announced actions have applied and continue to apply only to any hydrocodone-only extended release medication (*i.e.,* to Zohydro® ER) "that is not in an abuse deterrent formulation," and Defendants clearly continue to have as their ultimate objective

7

the intention to coerce Zogenix into creating an abuse-deterrent formulation of Zohydro® ER. Yet FDA specifically considered and rejected the requirement of an abuse deterrent formulation when it granted approval for Zohydro® ER.  Ex. C at 27-29.  Dr. Margaret A. Hamburg, Commissioner of Food and Drugs, specifically noted in regard to this determination that "the science of abuse-deterrence is still in its infancy and has yet to be fully tested or proven in actual market or use conditions" and that "abuse deterrent formulations do not prevent someone from taking more pills orally – the most common form of opioid analgesic abuse."  Ex. D at 3.  Dr. Hamburg also stressed the importance of balancing potential abuse with "the very real medical needs of the estimated 100 million Americans living with severe chronic pain or coping with pain at the end of life, which is also a major public health problem in this country."  *Id.* at 1.  In addition to acknowledging the importance of balancing these two complex sets of needs and "apply[ing] sound science as we move forward to achieve this balance," Dr. Hamburg noted the importance of devising "comprehensive policy solutions," such as "requirements for the class-wide E[xtended]R[elease]/L[ong]A[cting] opioid analgesics", and she expressed concern regarding "some misinformation circulating about Zohydro's safety and potency" that "has caused diversion of attention from comprehensive policy solutions to focus on a single drug." *Id.* at 1-3.

15.    In spite of these considerations, the Commonwealth, in ordering oppressive regulations designed to interfere with the medical judgment of physicians and dispensation responsibilities of pharmacists, is attempting to override the reasoned decision by FDA to approve Zohydro® ER for the treatment of severe chronic pain and taking upon itself the responsibility for regulating the safety and effectiveness  of drugs already approved by FDA as

safe and effective, including dictating a formulation for such drugs that is acceptable to the Commonwealth regardless of whether that formulation requirement conflicts with FDA's specific formulation determination.

16.     In addition, by effectuating the new restrictions on the prescribing and dispensing of Zohydro® ER, the Commonwealth is eschewing any comprehensive approach to the health emergency it identifies.  It has taken no such action against any similar opioid drugs currently being misused and abused within the state, and even though more than 30 other extended release/long-acting opioid-based drug products approved for the same use as Zohydro® ER contain larger quantities of the active opioid drug than the highest strength of Zohydro® ER. Instead, the Commonwealth is intentionally singling out one drug to be treated differently from other extended-release/long-acting opioid medications, without any rational basis.  These actions violate the United States Constitution.

## PARTIES

17.     Plaintiff Zogenix, Inc. is a Delaware corporation with its principal place of business at 12400 High Bluff Drive, Suite 650, San Diego, California, 92130.  Zogenix holds an approved New Drug Application, No. 202880, for Zohydro® ER.

18.     Defendant Deval Patrick is the Governor of the Commonwealth of Massachusetts. Governor Patrick maintains an office at the Massachusetts State House, Office of the Governor, Room 105, Boston, Massachusetts, 02133.

19.     Defendant Cheryl Bartlett is the Commissioner of the Massachusetts Department of Public Health.  Upon information and belief, Commissioner Bartlett maintains an office at the

Massachusetts Department of Public Health, 250 Washington Street, Boston, Massachusetts, 02108.

20.     Defendants Candace Lapidus Sloane, Kathleen Sullivan Meyer, Marianne E. Felice, Robin Richman, Paul R. DeRensis, and Michael E. Henry are members of the Massachusetts Board of Registration in Medicine.  The BORIM is a department of the Massachusetts Department of Health and Human Services and maintains an office at 200 Harvard Mill Square, Suite 330, Wakefield, Massachusetts, 01880.

21.     Defendants Karen M. Ryle, Patrick M. Gannon, Edmund Taglieri, James T. DeVita, Jane F. Franke, Anthony Perrone, Richard Tinsley, Joanne M. Trifone, and Anita Young are members of the Massachusetts Board of Registration in Pharmacy.  The BORIP is a department of the Massachusetts Department of Health and Human Services and maintains an office at 239 Causeway Street, 5th Floor, Suite 500, Boston, MA 02114.

22.     Defendants Dipu Patel-Junankar, Miguel Valdez, Edward Glinski, Richard Baum, Nicole Meregian, Laura Hilf, Shannon Sheridan-Geldart, and Jessica Britnell are members of the Massachusetts Board of Registration of Physician Assistants.  The BOROPA is a department of the Massachusetts Department of Health and Human Services and maintains an office at 239 Causeway Street, 5th Floor, Suite 500, Boston, MA 02114.

## JURISDICTION AND VENUE

23.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331 in that this is a civil action arising under the laws of the United States; and 28 U.S.C. §§ 2201-2202 in that there exists between Zogenix and the Defendants an actual, justiciable controversy as to which Zogenix requires a declaration of its rights by this Court as well as temporary, preliminary

and permanent injunctive relief to prohibit the Defendants from violating federal laws and regulations and abridging its rights protected under the U.S. Constitution.

24.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because this is a civil action in which the Defendants maintain their offices and conduct business in this judicial district.  Moreover, a substantial part of the events giving rise to the claims herein occurred within this judicial district.

25.     Zogenix has standing to bring the present lawsuit because Defendants' actions have caused Zogenix actual injury, which is redressable through the specific relief requested herein.  As a pharmaceutical company manufacturing and selling pain medication through interstate commerce pursuant to its approval by the FDA, Zogenix's operations also fall within the zone of interests to be protected by the Contract, Equal Protection, and dormant Commerce Clauses of the U.S. Constitution, as well as general federal preemption principles.

26.     This case is ripe for adjudication.  As further discussed below, the Governor's actions and enforcement of defendants' orders and regulations has resulted and will continue to result in an immediate and concrete invasion of Zogenix's legally protected interests under federal law.

## NATURE OF THE CASE

**1.  Statutory Process for FDA Approval of Drugs:**

27.     Congress has vested FDA with responsibility for reviewing and approving all new prescription drugs sold in the United States.  To that end, the Food, Drug, and Cosmetic Act ("FDCA") requires all new prescription drugs to obtain FDA approval under a new drug application ("NDA") before they can enter the marketplace.  21 U.S.C. § 355(a), (b).

28.     Prior to receiving FDA approval, brand name or "pioneer" drug manufacturers must demonstrate the safety and effectiveness of their products.  *See* 21 U.S.C. § 355(b).  Drug manufacturers can accomplish this in several different ways: (i) they can submit full reports of safety and effectiveness, *id.* § 355(b)(1); (ii) they can submit full reports of safety and effectiveness where at least some of the information required for approval comes from studies not conducted by or for the applicant, *id.* § 355(b)(2); or (iii) they can submit information establishing that the proposed product is identical in specified characteristics to a previously approved product, *id.* § 355(j).

29.     An NDA applicant is required to submit extensive clinical evidence that the drug product is safe and effective; a list of the components of the drug; a statement of the drug's composition; a description of the manufacturing, processing, and packaging of the drug; samples of the drug as necessary; patent information on any patent that it claims will protect the drug product or its uses; and proposed labeling for the drug.  21 U.S.C. § 355(b)(1).  To establish safety and effectiveness, an NDA must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." 21 U.S.C. § 355(b)(1)(A).

30.     Upon receipt of an NDA, FDA is charged with performing a thorough analysis of the drug's safety and effectiveness—a process that requires the agency to carefully balance the benefits and risks to patients.  21 U.S.C. §§ 355(c), (d).  FDA will approve an NDA only when all necessary data are submitted or referenced to establish the product's safety and effectiveness. *Id*.  And FDA will refuse to approve an NDA if it finds that the application and the data

presented to support the application do not establish the safety and effectiveness of the product.

21 U.S.C. § 355(d); 21 C.F.R. § 314.125.

  31.  All drugs have some ability to cause adverse effects.  Thus, FDA's safety

assessment of a drug is determined by:

> whether its benefits outweigh its risks.  This benefit-risk
> assessment is the basis of FDA's regulatory decisions in the pre-
> market and post-market review process.  It takes into account the
> extensive evidence of safety and effectiveness submitted by a
> sponsor in [an NDA], as well as many other factors affecting the
> benefit-risk assessment, including the nature and severity of the
> condition the drug is intended to treat or prevent, the benefits and
> risks of other available therapies for the condition, and any risk
> management tools that might be necessary to ensure that the
> benefits of the drug outweigh its risks.  This assessment involves
> both quantitative analyses and a subjective qualitative weighing of
> the evidence.  Structured Approach to Benefit-Risk Assessment in
> Drug Regulatory Decision-Making, PDUFA V Plan (FY 2013-
> 2017), Draft of February 2013 at 1, *available at*
> http://patientnetwork.fda.gov/sites/default/files/fda_benefit-
> risk_draft_plan_final_for_posting.pdf.

  32.  At the time of initial approval of an NDA, FDA also may require a risk evaluation

and mitigation strategy ("REMS") for the drug if it is determined to be necessary to ensure that

the benefits of a drug outweigh the drug's risks.  21 U.S.C.  § 355-1.  A REMS for an NDA

product must include a timetable for submission of assessments of the REMS.  21 U.S.C. § 355-

1(d).  In addition, FDA may require that a REMS include any or all of the other REMS elements

set out in the FDCA if specific criteria are met. 21 U.S.C.  § 355-1(e), (f).   Such additional

elements may include elements to assure safe use ("ETASU").  FDA may require a REMS with

ETASU if the drug has been shown to be effective but is associated with a serious adverse drug

experience and can only be approved if such elements are required as part of a strategy to

mitigate a specific serious risk listed in the labeling of the drug.  21 U.S.C.  § 355-1(f)(1). The

FDCA specifically provides that the serious risks that can be considered in requiring a REMS include adverse events occurring from an overdose of the drug, whether accidental or intentional, and adverse events occurring from abuse of the drug.  21 U.S.C. 355-1(b).

33.     ETASU can include a requirement that healthcare providers who prescribe the drug have particular training or experience; pharmacies, practitioners, or health care settings that dispense the drug are specially certified; the drug be dispensed to patients only in certain healthcare settings; the drug be dispensed to patients with evidence or other documentation of safe use conditions; each patient using the drug be subject to certain monitoring; and each patient using the drug be enrolled in a registry.  21 U.S.C.  § 355-1(f).  Before imposing the ETASU, FDA must ensure that the ETASU are commensurate with the specific risks listed in the drug's labeling and not unduly burdensome on patient access to the drug, taking into consideration patients with serious or life-threatening diseases or conditions and patients who have difficulty accessing healthcare.  In addition, such ETASU must conform with elements to assure safe use for other drugs with similar, serious risks and be designed to be compatible with established distribution, procurement, and dispensing systems for drugs so as to minimize the burden on the healthcare delivery system.  21 U.S.C.  § 355-1(f)(2).

**2.   Zohydro® ER**

34.     Zogenix submitted an NDA for its drug Zohydro® ER on May 1, 2012 under Section 505(b)(2) of the FDCA.  21 U.S.C. § 355(b)(2); Ex. E at 1.  Zohydro® ER was developed for patients with severe chronic pain on immediate-release hydrocodone products who would benefit from an extended release product and in whom prescribers determined it appropriate to continue with the same opioid active ingredient while removing the potential for

14

liver toxicity associated with acetaminophen.  The pivotal clinical trial in the NDA was an adequate and well controlled clinical study in patients currently taking and tolerating an opioid medication before entering the study.  There was no requirement that patients enrolled in the study be shown to have been failing on their opioid therapy.  Ex. F at 27-29.  After eighteen months of careful scrutiny, FDA approved Zohydro® ER on October 25, 2013 for the management of pain severe enough to require daily, around-the clock, long-term opioid treatment for which alternative treatment options are inadequate; the same indication required of other FDA approved extended release opioids.  Ex. E at 1.

35.     Unlike all other hydrocodone products on the market used for chronic pain, Zohydro® ER does not contain acetaminophen, thereby avoiding the potential for acetaminophen toxicity in patients for whom Zohydro® ER is indicated.  The use of products containing acetaminophen in high doses over long periods of time has the potential to cause liver injury, acute liver failure, or even death.  Acetaminophen overdose is a leading cause of acute liver failure in the United States, with 63 percent of unintentional acetaminophen overdoses attributed to the use of opioid-acetaminophen combination products.  *See* Ex. G at 1.  The availability of an acetaminophen-free formulation of extended release hydrocodone is an important therapeutic option for certain chronic pain patients.

36.     Zohydro® ER, however, is not the only extended-release/long-acting opioid product on the market.  Currently, there are more than 30 extended-release/long-acting opioid products marketed in the US, including MS Contin, Opana ER, Duragesic, Exalgo, and OxyContin.  These medications, which contain active ingredients that can include morphine, oxymorphone, fentanyl, hydromorphone and oxycodone, are subject to Schedule II controls that

carefully dictate how physicians prescribe the drugs and how they are tracked.  Physicians may choose to prescribe different extended-release/long-acting opioids to patients based on how well the particular patient responds to the underlying active chemical, *i.e.*, hydrocodone, fentanyl, and oxycodone. [1]

37.     Thus, Zohydro® ER provides an important treatment option for patients on immediate release hydrocodone who need an extended-release product; for patients who are at risk for hepatic injury from acetaminophen; and for patients on other extended-release opioids in which another option for opioid rotation is of value.

38.     The announced actions apply only to hydrocodone-only extended release medication "that is not in an abuse deterrent formulation."  During the approval process for Zohydro® ER, FDA considered requiring abuse-deterrent technologies for the drug but ultimately concluded that the overall risk-benefit balance of Zohydro® ER was sufficient to support approval of the NDA without an abuse-deterrent formulation.  FDA outlined its reasoning in its Summary Approval.  Ex. C at 30-33.  Among other factors, FDA emphasized the medical benefits of an acetaminophen-free hydrocodone to treat chronic pain patients, noting that a patient being treated with a combination hydrocodone product would be able to switch to

---

[1]     The Drug Enforcement Administration (DEA), in consultation with the Department of Health and Human Services (HHS), recently proposed to reschedule all hydrocodone combination products from Schedule III to Schedule II because they share the same potential for abuse as a single-agent hydrocodone formulation, such as Zohydro® ER.  Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products from Schedule III to Schedule II, 79 Fed. Reg. 11037 (Feb. 27, 2014).  Federal regulators thus have determined that drug products that combine hydrocodone with other active pharmaceutical ingredients neither mitigate nor diminish their potential for abuse.  Accordingly, it appears that Defendants did not rely on any principled or evidence-based justification for distinguishing Zogenix's single-agent hydrocodone formulation from hydrocodone combination products, in terms of the potential for abuse.

Zohydro® ER  and reduce the number of doses per day and maintain a consistent blood level,

"which is widely believed to be provide better long-term pain control and to reduce the 'rush'

associated with high blood levels that appear to be sought after by opioid abusers." *Id.* at 33.  In

addition, for patients who have responded well to hydrocodone products but now need a higher

dose due to tolerance or increased pain arising from their underlying condition, Zohydro® ER

would permit prescribers to titrate those patients to an appropriate dose of hydrocodone without

the development of acetaminophen toxicities associated with the hydrocodone combination

products.  *Id.*  FDA also stated that the technology used to produce abuse-deterrent opioid

formulations "is still in the nascent stages." *Id.*  Further, FDA has concluded that it is not "in the

interest of public health at this time to require all opioid products or all [extended release/long-

acting] opioid products" to feature the abuse deterrent formulation. *See* Ex. H at 3.  In addition

to abuse-deterrent formulations' known ineffectiveness at affecting the most common form of

abuse by swallowing whole pills, FDA noted that "the availability of opioid formulations that are

not abuseable, that are not potentially addictive, and that do not have the potential to cause

respiratory depression and death in overdose is not likely in the near future."  Ex. C at 33.

        39.     FDA instead determined that there were effective measures in place to protect

patients while still making Zohydro® ER available for patients in need:  The labeling of the

product includes prominent warnings about abuse, a boxed warning about the known serious

risks of addiction, abuse, and misuse, and statements urging prescribers to assess each patient's

risk before prescribing the drug and to monitor patients regularly for the development of

addiction, abuse, and misuse.  And Zohydro® ER – unlike all other  hydrocodone products – is

included in the Extended Release/Long-Acting Opioid Analgesics REMS designed to reduce

serious adverse outcomes resulting from inappropriate prescribing, misuse, and abuse. FDA concluded that these measures combined were sufficient to support approval of the product. Ex. C at 31.

40. FDA's judgment in this regard has proven correct. Although the drug has been on the market everywhere except Massachusetts for six months, there is no evidence of widespread abuse of Zohydro® ER in areas where it has been prescribed.

## 3. Zogenix's Contracts

41. Zogenix maintains contracts with wholesalers who supply, and retailers who operate, Massachusetts pharmacies. In fact, pursuant to these contracts, several pharmacies stocked Zohydro® ER prior to the Governor's original ban.

42. Zogenix also contracts with Inflexxion, a Massachusetts company that developed cutting-edge abuse tracking methods in conjunction with the federal National Institutes of Health ("NIH").

## 4. The Governor's First Declaration of a Public Health Emergency and the Original Ban

43. Without warning to or discussion with Zogenix regarding the safety and effectiveness of Zohydro® ER, on March 27, 2014, Governor Patrick issued a press release (the "Ban Press Release") announcing that the Governor had declared a public health emergency in Massachusetts and that the Governor had directed the Department of Public Health ("DPH") to take several action steps aimed at combatting opioid overdoses. *See* Ex. I. The Ban Press Release announced that the declared public health emergency provided "emergency powers" to Commissioner Bartlett to, among other actions: "[i]mmediately prohibit the prescribing and dispensing of any hydrocodone-only formulation (commonly known as Zohydro) until

determined that adequate measures are in place to safeguard against the potential for diversion,

overdose, and misuse." *Id.* at 1-2.

44.     The same day, the Governor issued a one-page Declaration of Emergency under

M.G.L. chapter 17, section 2A, citing general concerns about opioid addiction and concluding

that "an emergency exists which is detrimental to the public health" in Massachusetts. Ex. A at 2.

45.     Also on March 27, 2014, the Commissioner and Public Health Council ("PHC")

approved an emergency order (the "Ban Order") providing: "No registered individual

practitioner shall prescribe or order, and no one shall dispense or administer any hydrocodone

bitartrate product in hydrocodone-only extended-release formulation until the Commissioner has

determined that adequate measures are in place to safeguard against the potential for diversion,

overdose and abuse." Ex. J.  There is exactly one "hydrocodone bitartrate product in

hydrocodone-only extended-release formulation": Zohydro® ER.

46.     The Commissioner and DPH explained the Ban Order in a March 27, 2014

memorandum as follows: "This order will protect against overdose and abuse of hydrocodone-

only extended-release formulation [sic], and provides the means for the Commissioner to lift the

prohibition when there are adequate safety measures, such as an abuse-deterrent formulation,

which will then allow for the prescribing of hydrocodone-only products to patients with severe

pain without running as great a risk that the medication will be diverted or abuse [sic]." Ex. J.

47.     This memorandum came as a surprise to Zogenix; it was never consulted before

the memorandum issued.  And the memorandum doubtless came as a surprise to FDA.  As

previously noted, during the course of the approval process for Zohydro® ER, FDA expressly

considered whether abuse-deterrent technology should be required for the drug, and it concluded

that the benefits of the formulation outweighed any attendant risks.  Ex. C at 30-33.  Thus, in

banning Zohydro® ER pending its implementation of abuse-deterrent technology, and in

determining that the drug is not safe in its current formulation, the Commonwealth placed itself

squarely in opposition to the FDA's expert determination and in conflict with federal law.  But it

did so without any indication that it developed or considered the same factual record surrounding

Zohydro® ER that was presented to the FDA in connection with the agency's determination.

Prohibiting the sale of Zohydro® ER in Massachusetts also is inconsistent with the

Commonwealth's obligations under the drug rebate Medicaid statute.  42 U.S.C. § 1396r-8.

48.     Defendants' ban would have had an impact on patients beyond the borders of

Massachusetts.  On March 31, 2014, the director of the Prescription Monitoring and Drug

Control division of the DPH issued a Circular Letter to all providers who were Massachusetts

Controlled Substance Registrants that informed the providers of the emergency declaration and

order and supplied sample "Q&As" that might arise from the Defendants' actions.  Ex. K at 2.

One question asked whether a Massachusetts provider could still prescribe hydrocodone-only

extended release drugs, *i.e.*, Zohydro, to residents of other states.  *Id.*  The response stated, "No.

The order states that no provider registered in Massachusetts shall prescribe any hydrocodone

bitartrate product in hydrocodone-only extended-release formulation in Massachusetts."  *Id.*

**5.  Zogenix's Complaint and the Court's First Preliminary Injunction Order**

49.     In response to the Governor's and the Commissioner's actions to ban the

prescribing and dispensing of Zohydro® ER, on April 7, 2014, Zogenix filed a complaint in this

case alleging that the ban was preempted by federal law and violated the Contracts and dormant

Commerce Clauses of the U.S. Constitution.  After briefing by both sides and two hearings

before the Court, on April 15, 2014, this Court issued an order concluding that the Defendants'

actions were preempted by federal law and that Zogenix was entitled to a preliminary injunction.

(D.E. 26.)  The final sentence of the order stated that the injunction was "stayed until April 22,

2014."  (*Id.* at 5.)

50.     Within days of the Court's issuance of the preliminary injunction order, counsel

for Zogenix reached out to legal counsel on the Governor's staff, in order to provide them with

facts about Zohydro® ER that would better help Defendants understand why the medication

provides an important treatment option not currently available to severe chronic pain patients

while presenting risks no greater than those of other opioids already on the market.  In addition,

counsel for Zogenix asked to discuss ways to conclude the case, given the Governor's public

statements indicating that he did not anticipate Defendants would appeal the Court's preliminary

injunction order.  At no time did employees of Defendants or their counsel indicate that they

planned to undertake additional actions targeted specifically at Zohydro® ER in its current

formulation.

### 6.  Defendants' Additional Emergency Restrictions on Prescribing Zohydro

51.     On the same day that the stay of the Court's preliminary injunction order was

lifted, and without prior discussion with or warning to Zogenix or its counsel, the Governor

directed Commissioner Bartlett to issue a new emergency order (the "PMP Order") requiring

prescribers to "utilize the Prescription Monitoring Program (PMP) prior to prescribing a

hydrocodone-only extended release medication that is not in an abuse deterrent formulation,"

which Defendants acknowledged only applied to Zohydro® ER.  Ex. B at 1-2.  Under the PMP

Order, prescribers must use the PMP to evaluate a patient's prescription history prior to each

instance of issuing a prescription of Zohydro® ER.  Ex. L at 1.  According to a Circular Letter

sent to all Massachusetts Controlled Substance Registration Participants on April 24, 2014,

because prescriptions for Schedule II medication (such as Zohydro® ER) can be written for no

more than a 30-day supply, the PMP Order "will require the prescriber to check the patient's

PMP record, at a minimum, every 30 days while he or she is being prescribed the medication."

*Id.*  The April 24 Circular Letter also notes that Commissioner Bartlett issued the PMP Order

pursuant to the March 27, 2014 PHC vote that resulted in the original ban.  *Id.*

52.     On the same day, the BORIM, through its members, promulgated emergency

regulations requiring licensees, prior to prescribing Zohydro® ER, to undertake four distinct

measures. The emergency regulation, then found at 243 CMR 2.07(25), stated that prior to

prescribing "a hydrocodone-only extended release medication that is not in an abuse deterrent

form" (a description that precisely matches Zohydro® ER in its current, FDA-approved

formulation and applies to no other drug), the licensee must:

> (a) Thoroughly assess the patient, including an evaluation of the
> patient's risk factors, substance abuse history, presenting
> condition(s), current medication(s) and a check of the online
> Prescription Monitoring Program;
>
> (b) Discuss the risks and benefits of the medication with the
> patient;
>
> (c) Enter into a Pain Management Treatment Agreement with the
> patient that shall appropriately address drug screening, pill counts,
> safe storage and disposal and other requirements based on the
> patient's diagnoses, treatment plan, and risk assessment;
>
> (d) Supply a Letter of Medical Necessity as required by the Board
> of Registration in Pharmacy that includes the patient's diagnoses
> and treatment plan, verifies that other pain management treatments
> have failed, indicates that a risk assessment was performed and
> that the licensee and the patient have entered into a Pain
> Management Treatment Agreement; and

(e) Document 243 CMR 2.07(25)(a)-(d) in the patient's medical record.

53.     According to the Commonwealth's own records, as included in DPH's April 24, 2014 Circular Letter to prescribers, the BORIM emergency regulations applied to approximately 95% of the prescribers of controlled substances in Massachusetts.  Ex. L at 2.

54.     On May 6, 2014, the BORIP promulgated two additional emergency regulations similarly restricting the ability of pharmacists to prescribe Zohydro®.  The first, codified at 247 CMR 8.05(3), provided that no "certified pharmacy technician, pharmacy technician, pharmacy technician trainee, or pharmacy intern" could handle Zohydro® ER.

55.     The second BORIP regulation, codified at 247 CMR 9.04(8), provided that a pharmacist may not dispense Zohydro® ER unless:

   (a) The drug is stored in a "securely locked and substantially constructed cabinet at all times while on pharmacy premises,"

   (b) The drug is prescribed in a container with a child proof safety cap, or a locked box;

   (c) The prescriber has supplied a Letter of Medical Necessity that complies with 243 CMR 2.07(25), including, *inter alia*, a verification that "other pain management treatments have failed," and the pharmacist keeps the Letter of Medical Necessity in a readily retrievable manner;

   (d) Each prescription is accompanied by a "written warning approved by the Board regarding the specific dangers of [Zohydro® ER]";

   (e) The pharmacist provides counseling that includes a review of the written warning supplied under 247 CMR 9.04(8)(c), including but not limited to:

      1. The name and description of the medication;
      2. The dosage form, dosage, route of administration and duration of drug therapy;
      3. Special instructions and precautions for preparation, administration, and use by the patient;

4. Common adverse or severe side effects of interactions and therapeutic contraindications;
5. Techniques for self-monitoring drug therapy;
6. Proper storage;
7. Prescription refill information; and
8. Action to be taken in the event of a missed dose;

(f) The pharmacist checks the patient's history via the online PMP.

56. On May 8, 2014, the BOROPA promulgated emergency rules similarly restricting the ability of physician assistants to prescribe Zohydro® ER. Codified at 263 CMR 5.07(12), the rules matched those for physicians under the BORIM rules; prior to prescribing Zohydro® ER, a physician assistant must:

(a) Thoroughly assess the patient, including an evaluation of the patient's risk factors, substance abuse history, presenting condition(s), current medication(s) and a check of the online Prescription Monitoring Program;

(b) Discuss the risks and benefits of the medication with the patient;

(c) Enter into a Pain Management Treatment Agreement with the patient that shall appropriately address drug screening, pill counts, safe storage and disposal and other requirements based on the patient's diagnoses, treatment plan, and risk assessment;

(d) Supply a Letter of Medical Necessity as required by the Board of Registration in Pharmacy that includes the patient's diagnoses and treatment plan, verifies that other pain management treatments have failed, indicates that a risk assessment was performed and that the licensee and the patient have entered into a Pain Management Treatment Agreement; and

(e) Document 263 CMR 5.07(12)(a)-(d) in the patient's medical record.

24

**7.  The Court's Second Preliminary Injunction and Defendants' Final Regulations:**

57.     In response to Defendants' emergency regulations, Zogenix filed for preliminary injunctive relief on May 23, 2014, alleging that the emergency regulations violated the United States Constitution.  (D.E. 47.)  After briefing by both sides and a hearing before the Court, on July 8, 2014, this Court issued an order concluding that Defendants' actions again likely were preempted by federal law and declaring that Zogenix was once again entitled to injunctive relief. (D.E. 66.)  Specifically, the Court enjoined the operation of Defendants' emergency regulations at 243 CMR 2.07(25) and 263 CMR 5.07(12)(d), requiring a Letter of Medical Necessity confirming that "other pain management treatments have failed."  Although the Court found the record insufficiently developed to grant an injunction against the BORIP regulations, it invited Zogenix to renew its objections in the future upon a more detailed submission.  (D.E. at 10-11).

58.     Just prior to the issuance of the Court's decision, Defendants had promulgated final regulations intended to supersede their emergency regulations.  In a series of final regulations issued on or about July 3, 2014, the BORIM, BORIP, and BOROPA regulations were amended to require, *inter alia*, not that a prescriber find that alternative treatments "have failed," but that "other pain management treatments are *inadequate*." *See also* ¶¶ 52, 56, 57, *supra* (setting forth additional text of regulations).  The BORIP regulations regarding personnel handling of Zohydro® ER also were amended: although certified pharmacy technicians, pharmacy technicians, and pharmacy technician trainees still may not handle Zohydro® ER, pharmacy interns under the direct supervision of registered pharmacists now may handle Zohydro® ER.  247 CMR 8.05(3).

59.     The BORIM and BOROPA regulations indicate that their purpose is "to enhance the public health and welfare by promoting optimum therapeutic outcomes, avoiding patient injury and eliminating medication errors."  While Defendants are correct that, in broad terms, regulation of physicians, pharmacists, and physician's assistants invoke state power, those powers must not be exercised in a manner that interferes with FDA's authority to approve drugs as safe and effective.  Where, as here, the purpose and effect of the restrictions is to prevent the dispensation of an FDA-approved medication, they are preempted.  Moreover, the regulations cannot violate the Equal Protection Clause by improperly burdening Zogenix and its drug, Zohydro® ER, as a "class of one" targeted for crushing regulations not applied to the multitude of other opioid medications that remain available in Massachusetts.

60.     Defendants' regulations single out Zohydro® ER for unique restrictions.  There can be no question that this disparate treatment was intended.  Ex. B (in which the Governor's office recognizes in a press release that Defendants' "several new actions to restrict the availability of hydrocodone-only extended-release medication that is not in abuse-deterrent form (commonly known as Zohydro) . . . come on the same day [April 22, 2014] as the state's previous ban on all prescribing and dispensing of Zohydro ends").

61.     This intentional and disparate regulatory treatment clearly burdens Zohydro® ER more than other similarly situated drugs within the same class of medications.  In one way, Zohydro® ER is different from other hydrocodone products: it is free of acetaminophen, making it an appropriate treatment for patients with liver toxicity concerns.  But in terms of the misuse concerns cited by the state to justify its regulations, Zohydro® ER matches its class – which is comprised not only of hydrocodone products but also other opioids, many of which are, like

26

Zohydro® ER, extended release and therefore have relatively high amounts of opioids in each tablet.  Indeed, the amount of hydrocodone in each Zohydro® ER capsule is on a par with other long acting, extended release (ER/LA) opioid drug products.

62. FDA has explained that the abuse potential for hydrocodone combination products simply does not differ from the abuse potential for single ingredient opioids—*all* opioid products pose a risk of abuse, misuse, or addiction.  *See* Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products from Schedule III to Schedule II, 79 Fed. Reg. 11,037, 11,041 (Feb. 27, 2014).  In fact, Department of Justice studies have shown that combination products, not single ingredient opioids, currently are the most widely abused opioid products.  *See* Department of Justice (DOJ) Fact Sheet, Hydrocodone, *available at:* http://www.justice.gov/dea/druginfo/drug_data_sheets/Hydrocodone.pdf.  And in terms of potency, Zohydro® ER is less potent, on a milligram-to-milligram basis, than several other widely marketed opioid drugs.  *See also* FDA Approved Labeling for Zohydro ER, Table 1; FDA Provides Facts About Zohydro, FDA.Gov, http://www.fda.gov/Drugs/DrugSafety/ InformationbyDrugClass/ucm395456.htm (explaining that it would be "misleading to say that Zohydro ER is stronger than anything currently on the market," given the greater potency of other extended release, long-acting opioids like morphine sulfate, hydromorphone, oxymorphone, and oxycodone).[2]  With respect to this class of drugs, Defendants have refused to regulate similarly medications that, under any reasonable medical analysis, must be compared "apples to apples."

---

[2] FDA Commissioner Dr. Margaret A. Hamburg recently agreed: "[i]t's been said that Zohydro is super-potent.  That surprises me because the highest dosage unit of Zohydro extended-release is lower than the highest dosage unit of all the other available extended-release products on a milligram basis."  Ex. M at 3.

63.     The PMP Order and the BORIM, BORIP, and BOROPA regulations apply only to
Zohydro® ER, despite the fact that there is no rational basis for claiming that Zohydro® ER has
any more risk of misuse or abuse than any other extended-release/long-acting opioid medication
on the market.  First, Zohydro® ER is not the only opioid available without an abuse deterrent
formulation; in fact, there is only one opioid medication currently on the market that contains an
abuse deterrent formulation, OxyContin.  As FDA Commissioner Margaret Hamburg has stated,
requiring opioids to contain an abuse deterrent formulation "puts too much faith in the current
state of technology.  I wish we were there but we are not.  It remains a hope more than a reality
but there is promise . . . ."  Ex. D at 3.  Indeed, "the science of abuse-deterrence is still in its
infancy and has yet to be fully tested or proven in actual market or use conditions.  There are
even limits to the abuse-deterrence of OxyContin, the only opioid with a claim on its label that
the drug has abuse-deterrent properties."  *Id.*

64.     FDA Commissioner Hamburg also noted that Zohydro® ER "is in the same class
of [extended-release] and [long-acting] opioids as OxyContin and Opana ER – sharing similar
risks of abuse with others in its class."  *Id.*  This is why Zohydro® ER "has the same strict
labeling and requirements for post market studies, training programs for prescribers, and a
Medication Guide for patients," as other Schedule II extended-release/ long-acting opioids in the
class.  *Id.*  Thus, Zohydro® ER is properly viewed in the context of these Schedule II extended-
release/long-acting opioids, and not – as Defendants have compared it – to hydrocodone
combination products, which are Schedule III drugs.

65.     Because Zohydro® ER poses no additional risks beyond the risks found to exist
with all Schedule II extended-release/long-acting opioids in its class and because the new BORIP

restrictions limit pharmacists' abilities to dispense Zohydro® ER, there is no rational basis for imposing the new restrictions.

66.     In practice, the BORIP regulations, particularly when viewed in the context of defendants' prior actions described above, constitute a de facto ban on Zohydro® ER in its current formulation, apparently with the intent to accomplish the same result as the original ban on the prescription and dispensation of the drug in Massachusetts.

67.     Collectively, the BORIM, BORIP, and BOROPA regulations require physicians, pharmacists, and physician assistants to jump through numerous and onerous regulatory hoops in order to prescribe and dispense Zohydro® ER in its current, FDA-approved formulation.  None of the requirements applies if a physician or physician assistant chooses to prescribe an opioid other than Zohydro® ER in its current formulation.  In particular, pharmacists must isolate Zohydro® in locked storage while it is on the premises, even after the prescription has been filled, dispense it in child-proof or locked containers, provide extensive patient counseling, and check the status of the patient in the PMP.  While many of these restrictions are good practice, these restrictions are not imposed on other extended-release, long-acting opioid medications in Zohydro® ER's drug class.

68.     Even worse, the BORIP regulations tightly limit the members of pharmacy staffs that may handle Zohydro® ER in its current formulation.  Under 247 CMR 8.05(3), although "pharmacy interns" now may handle Zohydro®, no "certified pharmacy technician, pharmacy technician, or pharmacy technician trainee" may handle Zohydro® ER.

69.     The BORIP rules, particularly those barring certified pharmacy technicians from handling Zohydro® ER, likely will bar pharmacies from stocking Zohydro® ER at all.

Pharmacies are unlikely to accept the high risk that certified pharmacy technicians may, even inadvertently, come into contact with the drug while on the premises, in violation of 247 CMR 8.05(3).  Moreover, few pharmacies' staffing structures would allow them to stock Zohydro® consistent with the BORIP rules in the first place.  There is a very palpable difference between a "pharmacy intern" and a "certified pharmacy technician."  Certified pharmacy technicians must merely be 18 years old, certified by a Board-approved certifying body, and registered with the Board of Pharmacy.  247 CMR 8.04.  In contrast, pharmacy interns must (i) currently be enrolled in an approved school of pharmacy (*i.e.,* be candidates for their Doctorate of Pharmacy), (ii) have completed two years of education in the approved school of pharmacy in which the candidate is currently enrolled, and (iii) submit appropriate information regarding the internship and a certified statement from the school of pharmacy in advance to the Board.  247 CMR 8.01. In addition, in order for a pharmacist to hire a pharmacy intern, the pharmacist must be a registered pharmacy preceptor educator – qualified through actual practice and approved by BORIP to supervise and train pharmacy interns.  247 CMR 8.01(2).  A registered pharmacy preceptor may not supervise more than two pharmacy interns at one time.  247 CMR 8.01(13). Due to such existing administrative burdens, only a minority of Massachusetts pharmacies accept pharmacy interns, and those that do still continue to rely heavily upon certified pharmacy technicians to handle and process Schedule II drugs.

70.     In practice, the BORIP final rules has prevented and will continue to prevent pharmacies from stocking and dispensing  Zohydro® ER in Massachusetts.

**8. Resulting Injury to Zogenix and Massachusetts Patients:**

71.     Defendants' actions have caused and will continue to cause real and irreparable harm for patients in Massachusetts with chronic pain.  Zohydro® ER addresses a specific set of patient needs.  It fills a noticeable and important gap for chronic pain patients - an acetaminophen-free, extended-release hydrocodone product suitable for round-the-clock pain treatment. While there are other opioid products on the market, some patients are unable to achieve adequate pain relief from, or unable to tolerate, other active ingredients in FDA-approved opioid products or FDA approved hydrocodone combination products. This therapy also provides an additional tool for the common practice of opioid rotation in patients with chronic pain.  Zohydro® ER provides an important option for patients while also being the most comprehensively regulated hydrocodone product on the market.

72.     Without adequate access to Zohydro® ER, hydrocodone patients in Massachusetts will either have to remain on immediate release therapy, with a 4-6 hour dosing interval, or be converted to a different drug substance if they require around the clock care or face risks from the ubiquitous presence of acetaminophen in the immediate-release combination products.  Patients also may be subjected to ineffective and potentially risky pain treatments while physicians undertake to comply with the Commonwealth's new requirement that they prove that alternative pain treatments have "failed" before prescribing Zohydro® ER.

73.     Responsive to Massachusetts' concerns related to opioid misuse, and as discussed above, fully 63 percent of unintentional acetaminophen overdoses can be attributed to the use of opioid combination pain medicines.  Ex. G at 1.  Each year, about 50,000 to 60,000 patients are admitted to emergency rooms for acetaminophen poisoning, and on average more than 500 die

each year of acetaminophen related liver toxicity.  *Id.* at 5.  Depriving Massachusetts patients of adequate access to Zohydro® ER will not alleviate the hydrocodone safety problems in the state and will compromise public knowledge of the unique contribution that the product has made to preventing acetaminophen poisoning.

74.   In addition, Defendants' conduct, unless enjoined, will continue to cause irreversible harm to the reputation and goodwill of Zohydro® ER and Zogenix and will irreparably disrupt the launch of this product.  The Commonwealth's actions are likely to cause physicians, pharmacists, and patients – both in Massachusetts and across the country - wrongly to believe that Zohydro® ER is not safe and effective.

75.   The longer that physicians and pharmacists associate Zohydro® ER with unacceptable risks of opioid abuse, the more the reputation of the drug itself and Zogenix at large will be compromised.  These effects are already being seen, even beyond Massachusetts, as physicians, patients and regulators have been carefully watching the Governor's personal campaign against Zohydro® ER.  More information on the harm resulting from Defendants' conduct will be provided following entry of a protective order.

76.   Health care providers may also have to turn to competing hydrocone-based products, regardless of health risks to patients who will benefit from the unique formulation of Zohydro® ER, because the ability of pharmacies to dispense the drug, consistent with the BORIP final regulations, is effectively nil.  This conversion would further lower Zogenix's standing in the market and reduce its overall market share.

77.    Zogenix also stands to suffer substantial lost sales in Massachusetts as a result of Defendants' actions.  It has projected millions of dollars in sales for Zohydro® ER in Massachusetts in the coming years.

78.    Zogenix has invested over $75 million on the research and development of Zohydro® ER since 2007.   Zohydro® ER is one of Zogenix's only two FDA-approved and marketed products.  Wall Street analyst and company projections had expected  Zohydro® ER to become Zogenix's leading product in terms of revenue by 2015 and the overwhelming majority of Zogenix' product revenue in 2016 and beyond.  But after Governor Patrick's announcement, the average stock price for Zogenix dropped significantly, resulting in lost market capitalization in the hundreds of millions of dollars.

79.    Zogenix also has lost – and is continuing to lose – valuable months out of its federally-mandated three-year exclusivity as a pioneer drug manufacturer due to the Commonwealth's ongoing conduct.

## CLAIMS FOR RELIEF

### Count I
### (United States Constitution: Preemption)

80.    Zogenix realleges, reasserts, and incorporates by reference herein each of the allegations contained in the foregoing paragraphs of the Complaint as though set forth fully herein.

81.    The Supremacy Clause of the United States Constitution provides that federal laws made under the authority of the United States shall be the "supreme law of the land," the laws of any state to the contrary notwithstanding.  U.S. CONST. art. VI, § 2.

82.     The Supremacy Clause mandates that federal law preempts any state regulation that poses an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

83.     Under the Food, Drug, and Cosmetic Act ("FDCA"), Congress has delegated to the U.S. Food and Drug Administration ("FDA") the authority to protect and promote the public health by approving for public use "safe and effective" drugs.  The FDA has approved Zohydro® ER as a safe and effective drug.

84.     The Commonwealth's original ban broadly prohibits the prescription, ordering, dispensation, or administration of any hydrocodone bitartrate product in hydrocodone-only, extended-release formulation, until the Department of Public Health Commissioner has determined that "adequate measures" are in place to safeguard against overdose or abuse. Zohydro® ER is the only drug on the market in Massachusetts meeting the definition of a hydrocodone bitartrate product in hydrocodone-only, extended-release formulation.

85.     The more recent restrictions imposed by the Commonwealth, both in the forms of its emergency and final regulations, constitute an effective ban on Zohydro® ER.  This is true in part because they are motivated by an improper purpose: to coerce Zogenix to change the formulation of Zohydro® ER to an abuse-deterrent one.  The regulations also are unconstitutional because they make it so difficult to dispense Zohydro® ER that pharmacists are unlikely to do so.   Under 247 CMR 8.05(3), no "certified pharmacy technician, pharmacy technician, or pharmacy technician trainee" may handle Zohydro® ER.  This rule will likely bar pharmacies from stocking Zohydro® ER at all, given the high risk that prohibited staff members may, even inadvertently, come into contact with the drug while on the pharmacy premises.  This

problem is compounded by the requirement that the drug be kept in a locked cabinet at all times, even after the prescription is filled.  247 CMR 9.04(8).  Mandating these destructive workflow processes in every pharmacy – and only for Zohydro® ER, unlike all other Schedule II opioids – builds an intentional and insurmountable barrier to medication access for patients.  Many pharmacies have been unable to stock the drug in the first place under the BORIP regulation's tight personnel handling requirements.  More information about this issue will be provided following entry of a protective order.

86.     Pharmacy interns may now handle Zohydro® ER under the final rules, 247 CMR 8.05(3), but most pharmacies do not hire pharmacy interns; and even for those pharmacies that do hire pharmacy interns, certified pharmacy technicians are still needed to handle Schedule II prescriptions. Because Massachusetts' pharmacy staffing infrastructures are fundamentally incompatible with a rule that allows only pharmacists and pharmacy interns to handle Zohydro® ER, the BORIP final regulations continue to serve as an effective ban on the dispensation of Zohydro® ER in Massachusetts.

87.     During the BORIP meeting at which the BORIP emergency regulations were approved, Board members specifically noted that the intent and goal of the regulations was to make it as difficult as possible to prescribe and dispense Zohydro® ER in Massachusetts.

88.     The BORIM, BORIP, and BOROPA emergency and final regulations single out Zohydro® ER, the only hydrocodone bitartrate product in hydrocodone-only, extended-release formulation, as the sole subject of sweeping new requirements imposed upon doctors and pharmacists wishing to make  Zohydro® ER available to patients.

89.     Taken as a whole, the original ban and BORIM, BORIP, and BOROPA regulations, both emergency and final, represent an impermissible effort by Massachusetts to establish its own drug approval policy and directly regulate the availability of drugs within the state.  They conflict with the FDA's mandate under the FDCA, disregard federal policies, undermine the FDA's comprehensive regulatory scheme for nationally-effective drug approvals, and otherwise impede the accomplishment and execution of the full purposes and objectives of federal law.

90.     The original ban and BORIM, BORIP, and BOROPA regulations, both emergency and final, also specifically undermine the FDA's assessment that Zohydro® ER is a safe and effective product that may be distributed in all fifty states.  In so doing, they impede the FDA's Congressional mandate to approve a range of safe treatments to promote the public health.

91.     Plaintiff has no adequate remedy at law for the violation of the Supremacy Clause.

92.     The original ban and BORIM, BORIP, and BOROPA regulations, both emergency and final, will cause substantial, imminent, and irreparable injury to Plaintiff, unless they are vacated and Defendants are enjoined from enforcing them.

## Count II
### (United States Constitution:  Equal Protection Clause)

93.     Zogenix realleges, reasserts, and incorporates by reference herein each of the allegations contained in the foregoing paragraphs of the Complaint, as though set forth fully herein.

94.     The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

95.     Governor Patrick and Commissioner Bartlett's orders, as well as the emergency and final BORIM, BORIP, and BOROPA restrictions on prescribing and dispensing Zohydro® ER, intentionally single out one extended-release/long acting opioid medication to be treated differently than all other similarly situated extended-release/long acting opioid medications on the market.  Further, by doing so, they upset the comprehensive, class-wide policy solutions devised by FDA to apply to all extended release/long acting opioids.

96.     During the BORIP meeting at which the BORIP emergency regulations were approved, Board members specifically noted that the intent and goal of the regulations was to make it as difficult as possible to prescribe and dispense  Zohydro® ER in Massachusetts.  Ex. N, Tr. 97:8-9.  This statement plainly reflects bad faith and an intent to harm Zogenix.

97.     Defendants have exercised the state's regulatory power in promulgating the arms-length emergency and final regulations codified at 243 CMR 2.07(25), 247 CMR 8.05(3), 9.04(8), and 263 CMR 5.07(12).  In so doing, Defendants have repeatedly, intentionally, and arbitrarily subjected Zohydro® ER to more and harsher regulations than other Schedule II drugs of the same class, which present no less danger of misuse and abuse than Zohydro® ER.

98.     There is no rational basis for the difference in treatment of Zohydro® ER. Because Zohydro® ER poses no additional risks beyond the risks found to exist with all Schedule II extended-release/long-lasting opioids in its class and because the new restrictions

limit the ability of prescribers and pharmacists to prescribe and dispense only Zohydro® ER, there is no rational basis for imposing the new restrictions.

## Count III
## (United States Constitution:  Contract Clause)

99.     Zogenix realleges, reasserts, and incorporates by reference herein each of the allegations contained in the foregoing paragraphs of the Complaint, as though set forth fully herein.

100.     The Contract Clause of the United States Constitution provides that no state shall pass any law "impairing the obligation of contracts."  U.S. CONST. art. I, § 10, cl. 1.

101.     The original ban broadly prohibited any prescription, ordering, dispensation, or administration of Zohydro® ER in Massachusetts.  The subsequent emergency and final regulations put in place to restrict prescribing and dispensing Zohydro® ER in Massachusetts make it difficult for physicians to prescribe – and for pharmacists to dispense – the medication for needy patients.  Under the new regulations, it is highly unlikely in particular that any pharmacies will choose to dispense Zohydro® ER.  In effect, the BORIM, BORIP, and BOROPA emergency regulations are a de facto ban on the stocking and dispensation of the drug.

102.     Zogenix has valid contracts with wholesalers who supply Zohydro® ER to Massachusetts pharmacies.  These wholesalers already have stocked products at retail locations within the state.  Because the BORIP final regulations will make it impossible for pharmacies to retain these stocked supplies or dispense the drug consistent with staffing obligations, these contracts between Zogenix and its wholesalers are now substantially impaired.  The ban and agency regulations also will impair Zogenix's ability to receive payment under its contract terms.

Sales are likely to be so low as to negate the purpose of the contracts: to supply retail locations with the medication.

103.     Zogenix also has valid contracts with Inflexxion, a company retained to track abuse patterns for Zohydro® ER within Massachusetts.  Defendants' actions irretrievably frustrate the purpose of the agreement and impair Zogenix's ability to receive the services for which it bargained.

104.     For the reasons set forth herein, Defendants' actions do not reflect a significant and legitimate public purpose.  The state has not appropriately explained the contours of a public emergency necessitating the drastic steps it has taken.  Furthermore, its actions single out Zohydro® ER while ignoring both the unique advantages of  Zohydro® ER to specific patients and the dangers of other hydrocodone products and opioid products.

105.     For the reasons set forth herein, Defendants' actions are not based upon reasonable conditions and are not of a character appropriate to the state's stated public purpose.  The ban is *ultra vires* and could never be adequately tailored, to the extent that Massachusetts lacked authority to ban Zohydro® ER in the first place.  Moreover, it is too grossly under- and over-inclusive to reflect any level of tailoring, on its own terms.  In addition, the new restrictions on prescribing Zohydro® ER single out one medication without any rational connection to the Commonwealth's stated purpose of addressing opioid abuse in general.

106.     Plaintiff has no adequate remedy at law for the violation of the Contracts Clause.

107.     Defendants' actions will cause substantial, imminent, and irreparable injury to Plaintiff, unless the orders are vacated and Defendants are enjoined from enforcing the ban and the new restrictions.

### Count IV
### (United States Constitution:  Commerce Clause)

108.     Zogenix realleges, reasserts, and incorporates by reference herein each of the allegations contained in the foregoing paragraphs of the Complaint, as though set forth fully herein.

109.     The Commerce Clause of the U.S. Constitution prevents a state from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between the states.

110.     Prescription drug regulation is an arena that is inherently national in nature, in that the FDA has long set uniform standards for drug regulation across all states.

111.     The original ban and the new restrictions on Zohydro® ER, including the BORIM, BORIP, and BOROPA restrictions on prescribing and dispensing Zohydro® ER, impose significant burdens on interstate commerce because they interfere with the FDA's national and uniform system of regulation.  If Massachusetts (and other states) are allowed to make determinations as to what drug formulations are appropriately safe and effective, the result will be a patchwork of state-specific regulation governing how prescription drugs are designed and formulated that would effectively eviscerate the mission of the FDA and create 50 different (and potentially conflicting) sets of rules for deciding what constitutes safe and effective pharmaceuticals.

112.   The original ban and the new restrictions on Zohydro® ER, including the BORIM, BORIP, and BOROPA restrictions on prescribing Zohydro® ER, also impose significant burdens on interstate commerce because they harm patients living in Massachusetts, as well as patients residing outside of Massachusetts who see health care providers in the state. Because under the original ban health care providers are prohibited from prescribing or dispending Zohydro® ER to any patients (regardless of their state of residence), patients across several states will not be able to access Zohydro® ER, thus impacting commerce beyond the borders of the state.  Similarly, under the emergency and final BORIM, BORIP, and BOROPA restrictions, patients being treated by Massachusetts physicians will have to jump through extremely burdensome hoops in order to obtain FDA-approved medication.  The BORIP final regulations in particular will prevent pharmacists from dispensing Zohydro® ER, and thus impact commerce beyond the borders of the state.

113.   The burden imposed on interstate commerce by the ban is clearly excessive in relation to the putative local benefits touted by Defendants.  The draconian restrictions on Zohydro® ER in the form of the emergency and final regulations also rise to the level of a de facto ban and constitute excessive state action.  By contrast, the putative local benefits of limiting opioid abuse are both hypothetical and minimal, given that they only apply to the one drug that has not yet contributed to the very problem that Massachusetts is seeking to address. Because the new restrictions only target Zohydro® ER, they will not have any meaningful impact on the purported goal of addressing opioid abuse in general.

114.   Zogenix has no adequate remedy at law for the violation of the Commerce Clause.

41

115.    Defendants' actions will cause substantial, imminent, and irreparable injury to Zogenix unless the orders are vacated and Defendants are enjoined from enforcing them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.  A declaration pursuant to 28 U.S.C. § 2201 that the Governor's and Commissioner's conduct in effectuating a ban on the prescription, ordering, dispensing, and administration of Zohydro® ER violates the United States Constitution;

B.  Temporary, preliminary, and permanent injunctive relief and/or a final order enjoining the Defendants from implementing or enforcing the new regulations, the Declaration of Emergency, the Commissioner's Ban Order or any other action banning or severely restricting the prescription, ordering, dispensing, and administration of  Zohydro® ER.  In the alternative, temporary, preliminary, and permanent injunctive relief and/or a final order vacating the new regulations, the Governor's Declaration of Emergency, the Commissioner's Order, and any other conduct undertaken by or at the direction of Defendants relating to the Commonwealth's effort ban Zohydro® ER;

C.      A declaration pursuant to 28 U.S.C. § 2201 that the Governor's, Commissioner's, and BORIM, BORIP, and BOROPA members' conduct in imposing the foregoing restrictions on the prescribing and dispensing of  Zohydro® ER violates the United States Constitution;

D.      Temporary, preliminary, and permanent injunctive relief and/or a final order enjoining the Defendants from implementing or enforcing their administrative and regulatory restrictions on Zohydro® ER, including but not limited to the Declaration of Emergency, the Commissioner's PMP Order, and/or the BORIM, BORIP, and BOROPA emergency and final

42

regulations.  In the alternative, temporary, preliminary, and permanent injunctive relief and/or a

final order vacating the Governor's Declaration of Emergency, the Commissioner's PMP Order,

and the BORIM, BORIP, and BOROPA emergency and final regulations and any other conduct

undertaken by or at the direction of Defendants relating to the Commonwealth's effort restrict

access to Zohydro® ER;

     E.   An order awarding plaintiff's costs, expenses and attorneys fees; and/or

     F.   Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury of any and all issues triable of right before a jury.

Dated: September 9, 2014                 Respectfully Submitted,

                                           ZOGENIX, INC.,

                                           By Its Attorneys

                                         /s/  Steven P. Hollman

                                         Kenneth J. Parsigian (BBO # 550770)
                                         Steven J. Pacini (BBO # 676132)
                                         LATHAM & WATKINS LLP
                                         John Hancock Tower, 20th Floor
                                         200 Clarendon Street
                                         Boston, MA 02116
                                         Tel:  (617) 948-6000
                                         Fax:  (617) 948-6001
                                         kenneth.parsigian@lw.com
                                         steven.pacini@lw.com

                                         Steven P. Hollman (*pro hac vice*)
                                         Susan M. Cook (*pro hac vice*)
                                         HOGAN LOVELLS US LLP
                                         555 Thirteenth Street, N.W.
                                         Washington, D.C. 20004
                                         (202) 637-5672 (Telephone)
                                         (202) 637-5910 (Fax)

steven.hollman@hoganlovells.com
susan.cook@hoganlovells.com

*Attorneys for Plaintiff Zogenix, Inc.*

## VERIFICATION OF THIRD AMENDED COMPLAINT

I, the undersigned, having read the allegations of the foregoing Verified Third Amended Complaint, hereby certify based upon my personal knowledge and under penalty of perjury that the factual allegations asserted in the Verified Third Amended Complaint are true and correct, and that matters asserted upon information and belief are believed to be true and correct.

Executed this 9th day of September, 2014.

Stephen J. Farr. Ph.D.
President, Zogenix, Inc.

**<u>CERTIFICATE OF SERVICE</u>**

I certify that this document was filed through the ECF system as an attachment to Plaintiff's Motion for Leave to File Third Amended Complaint, and then re-filed as a stand-alone document on September 15, 2014, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ Steven P. Hollman</u>