UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZOGENIX, INC.,<br><br>                          Plaintiff,<br><br>v.<br><br>DEVAL PATRICK, in his official capacity as the GOVERNOR OF MASSACHUSETTS,<br><br>CHERYL BARTLETT, RN, in her official capacity as DEPARTMENT OF PUBLIC HEALTH COMMISSIONER,<br><br>CANDACE LAPIDUS SLOANE, M.D., et al., in their official capacities as members of the MASSACHUSETTS BOARD OF REGISTRATION IN MEDICINE,<br><br>KAREN M. RYLE, MS, R.PH, et al., in their official capacities as members of the MASSACHUSETTS BOARD OF REGISTRATION IN PHARMACY, and<br><br>DIPU PATEL-JUNANKAR, PA-C, et al., in their official capacities as members of the MASSACHUSETTS BOARD OF REGISTRATION OF PHYSICIAN ASSISTANTS,<br><br>                          Defendants. | CIVIL ACTION<br>No. 1:14-cv-11689-RWZ |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S VERIFIED THIRD AMENDED COMPLAINT

Jo Ann Shotwell Kaplan (BBO #459800)
Eric Gold (BBO #660393)
Anne McLaughlin (BBO #666081)
Julia Kobick (BBO #680194)
Assistant Attorneys General
One Ashburton Place, 20th Floor
Boston, MA 02108

With its Verified Third Amended Complaint ("complaint" or "TAC"), plaintiff Zogenix, Inc. challenges final regulations of the Massachusetts Board of Registration in Medicine ("BORIM"), Board of Registration in Pharmacy ("BORIP"), and Board of Registration of Physician Assistants ("BOROPA") (together, the "Boards").[1]  The Boards' regulations set forth reasonable steps for prescribers and pharmacists to follow when prescribing and dispensing Zogenix's new opioid analgesic, Zohydro ER ("Zohydro"), in Massachusetts.  The regulations preserve the availability of Zohydro for qualified patients, while seeking to prevent diversion and abuse of this new potent and non-abuse-deterrent opioid.

In their final form the Boards' regulations are highly responsive to concerns previously expressed by the Court and by Zogenix, both in prior stages of this litigation and in comments filed during public rulemaking proceedings.  Yet, despite having obtained, except in one minor respect, the very changes to the Board's prior emergency regulations that it had requested, Zogenix has filed an amended complaint that reads as though nothing has changed since this litigation began.  Thus, Zogenix attempts to challenge the constitutionality of State actions dating back to March of this year, including actions since rescinded or superseded, continuing to assert class-of-one equal protection, Contracts Clause, dormant Commerce Clause, and obstacle preemption claims.  For the reasons discussed herein, Zogenix's claims should be dismissed in their entirety pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

## BACKGROUND

Zohydro "is the first single-entity hydrocodone product available on the market [and] the first extended release hydrocodone product[.]" TAC ¶ 6.  All other hydrocodone-containing products "are combination products with limited amounts of hydrocodone." U.S. Food and Drug Administration ("FDA") Center for Drug Evaluation and Research, *Background Materials: Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee*, at 33 (Dec. 7,

---

[1] Zogenix complains as well about a long-rescinded former emergency order of the Commissioner of the Department of Public Health ("DPH") conditionally banning Zohydro prescriptions and former emergency regulations promulgated by the Boards.  As is discussed herein, those challenges are moot.

2012, http://goo.gl/yZIYJw,  ("FDA Background Materials").[2]  In fact, Zohydro contains up to five times more hydrocodone than the highest dose of hydrocodone in any other analgesic currently on the market. *See* FDA, *Electronic Orange Book* (Aug. 2014), http://goo.gl/RZpZsq (search by active ingredient for "hydrocodone").  Because of this higher dosage, and because Zohydro is not abuse-deterrent, TAC ¶ 14, the FDA's Controlled Substances Staff "expect[s] that Zohydro ER . . . will be associated with higher levels of abuse than the hydrocodone combination products." FDA Background Materials, at 35.  Moreover, products containing hydrocodone are "associated with more drug abuse and diversion than any other licit or illicit opioid." *See* U.S. Department of Justice ("DOJ") Fact Sheet, Hydrocodone, http://goo.gl/J5fCQc. For this reason and others, some members of the FDA's own scientific advisory committee, which voted 11 to 2 against Zohydro's approval, concluded that Zohydro would, if approved for entry to the market, "most likely be abused more than other previously approved Schedule II extended-release opioids."[3]

Since March of this year, the defendants have taken various measures in response to the extraordinary risk posed by Zohydro's entry to the market, including emergency orders, emergency regulations, and final regulations.  Defendants did not appeal this Court's preliminary injunction against the DPH Commissioner's March 2014 emergency order conditionally banning Zohydro prescriptions.  Instead, the Boards issued emergency regulations in April 2014 restricting prescriber and pharmacy practices in an effort to prevent or minimize Zohydro's diversion and abuse. TAC ¶ 10.[4]  In July 2014, following public hearings and comment, and

---

[2] In addition to Zogenix's complaint, Defendants rely herein on public records susceptible to judicial notice.  *See Giragosian v. Ryan,* 547 F.3d 59, 65 (1st Cir. 2008) (court may consider public records in resolving motion to dismiss).

[3] *Summary Minutes of Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee*, at 6 (Dec. 7, 2012), http://goo.gl/cAZi44.  As one committee member put it, "this will be the choice drug for diversion and extracting hydrocodone.  So that's what makes it different." Anesthetic & Analgesic Drug Products Advisory Committee, Meeting Transcript, at 347 (Dec. 7, 2012), http://goo.gl/w7FbQA.

[4] On April 24, 2014, the DPH Commissioner also issued an emergency order requiring Massachusetts practitioners holding a Controlled Substances Registration to consult the state's online Prescription Monitoring Program, designed to reveal activities indicative of medication abuse, before prescribing Zohydro. *See* TAC ¶ 51, Exh. L. Because that same requirement appears in BORIM and BOROPA's regulations, arguments herein relative to the

input from Zogenix during both the regulatory process and in this litigation, the Boards revised the emergency regulations and promulgated new final regulations. TAC ¶ 12.[5]   Only the final regulations remain in effect.

The BORIM and BOROPA final regulations require prescribers, before prescribing Zohydro, to:

(a)     Thoroughly assess the patient, including an evaluation of the patient's risk factors, substance abuse history, presenting condition(s), current medication(s), a determination that other pain management treatments are inadequate, and a check of the patient's data through the online Prescription Monitoring Program;

(b)     Discuss the risks and benefits of the medication with the patient;

(c)     Enter into a Pain Management Treatment Agreement with the patient that shall appropriately address drug screening, pill counts, safe storage and disposal and other requirements based on the patient's diagnoses, treatment plan, and risk assessment unless a Pain Management Treatment Agreement is not clinically indicated due to the severity of the patient's medical condition;

(d)     Supply a Letter of Medical Necessity as required by the Board of Registration in Pharmacy pursuant to 247 CMR 9.04(8)(c); and

(e)     Document [the foregoing] in the patient's medical record.

243 CMR 2.07(25) (BORIM's regulation); 263 CMR 5.07(12) (BOROPA's regulation).

The BORIP final regulations require pharmacists to store Zohydro in a securely locked cabinet, dispense it with a child-proof safety cap or within a locked box, check the patient's history using the online Prescription Monitoring Program ("PMP"), confirm that the prescriber has supplied a Letter of Medical Necessity, provide patients a written warning about the drug's dangers, and provide counseling. 247 CMR 9.04(8).   The regulations also prohibit certified pharmacy technicians (the only pharmacy technicians able to handle any Schedule II drugs, pursuant to pre-existing regulations, *see* 247 CMR 8.05(2)) from handling Zohydro. 247 CMR 8.05(3).

---

final regulations apply as well to the Commissioner's order, which shall be subsumed within references to BORIM and BOROPA's "final regulations."

[5] BORIM's filing with the Massachusetts Secretary of State, which shows its final regulations codified at 243 CMR 2.07(25), is attached as Exhibit A.   BOROPA's final regulations, codified at 263 CMR 5.07(12), are attached as Exhibit B.   BORIP's final regulations, codified at 247 CMR 8.05(3) and 9.04(8), are attached as Exhibits C and D.

**ARGUMENT**

I.   **The Court Lacks Jurisdiction Over Zogenix's Challenges to a Rescinded Emergency Order and Expired Emergency Regulations.**

Among the most glaring defects of Zogenix's Third Amended Complaint are its continued complaints about State actions that expired or were rescinded months ago. Inexplicably, Zogenix continues to ask this Court to issue declaratory and injunctive relief with respect to DPH's March 2014 conditional ban on Zohydro and the Boards' April 2014 emergency regulations. TAC at 42–43.  But as Zogenix well knows, the conditional ban was rescinded in May 2014,[6] and the Boards' emergency regulations were superseded by final regulations in July 2014. TAC ¶ 12.

It is black-letter law that claims challenging "government regulatory schemes which have expired or been effectively repealed" are moot. *Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013); *see also New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 18 (1st Cir. 2002) (when the plaintiff "seeks only injunctive and declaratory relief, not damages[,] . . . it would be pointless either to enjoin the enforcement of a regulation that is no longer in effect or to declare its constitutional status"); *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) (challenge to regulations rendered moot by promulgation of new, revised regulations).  Where a "new system is now in place," an "old set of rules . . . cannot be evaluated as if nothing has changed." *Nat'l Mining* Ass'n, 251 F.3d at 1011.  The March 2014 emergency order and former emergency regulations no longer exist and cannot, as a matter of law, impair Zogenix's contracts, burden the interstate market in prescription drugs, impermissibly single Zogenix out for differential treatment, or stand as an obstacle to accomplishing the objectives of federal law.

Zogenix's continued remonstrations about these moot controversies belie the weakness of its claims with respect to the only remaining live controversy—namely, the constitutionality of

---

[6] *See* DPH, *Rescission of Order Prohibiting the Prescribing, Ordering, Dispensing and Administration of Any Hydrocodone Bitartrate Product in Hydrocodone-Only Extended-Release Formulation*, May 14, 2014, http://goo.gl/V54bqO.

the Boards' final regulations.  But in any event, federal courts "'are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong.'" *Am. Civil Liberties Union of Mass.*, 705 F.3d at 53 (quoting *Spencer v. Kemna*, 523 U.S. 1, 18 (1998)).  Indeed, mootness deprives a federal court of Article III jurisdiction, *see Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 70 (1983); *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 537 (1978), and Zogenix's complaint must therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) to the extent it seeks relief relative to the rescinded emergency order and/or the superseded emergency regulations.[7]  As a result, Defendants will address their remaining arguments exclusively to the final regulations.

## II.    Zogenix Has Not Alleged a Viable Class-of-One Equal Protection Claim.

Count II of Zogenix's complaint asserts that the Boards' final regulations violate the Equal Protection Clause by allegedly singling out Zohydro from other opioid medications without a rational basis. TAC ¶¶ 93–98.  The Court has already agreed that this "argument is misplaced." Mem. of Dec. Granting in Part and Denying in Part Motion for Preliminary Injunction, Doc. # 66, ("July 8 Dec.") at 4–5 n. 3.  As the Court has recognized, class-of-one claims "involve legislative or regulatory classifications in which there is a clear standard against which departures, even for a single plaintiff, [can] be readily assessed." *Id.* at 4 n. 3 (internal quotation omitted).  Thus, in this Court's words, "[t]he Supreme Court has held that forms of state action which involve 'discretionary decisionmaking based on a vast array of subjective, individualized assessments' are ill-suited for class-of-one Equal Protection claims." *Id.* (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603 (2008)).  Applying this Supreme Court precedent, the Court held that Zogenix, as of the last phase of this litigation, had "not established that a class-of-one Equal Protection claim is an appropriate cause of action." *Id.* at 4–5 n. 3.

---

[7] Zogenix's claims have never entitled it to injunctive relief against the Governor's declaration of a public health emergency and that aspect of the complaint must also be dismissed.  Zogenix has not so much as attempted to allege any authority for judicial relief relative to a gubernatorial declaration of a state of emergency, and none exists.  Nor is Zogenix affected in any way by such a declaration, without more.

Zogenix's newest complaint does not remedy the fundamental defects with its class-of-one claim, nor could it.  Indeed, Zogenix's claim does not satisfy the threshold prerequisite to a viable class-of-one claim—the "legislative or regulatory classification" requirement, previously acknowledged by the Court, *id.* at 4 n. 3—because Zogenix is not subject to the regulations it contests.  Class-of-one claims, like other equal protection claims, are founded on the principle that "legislative or regulatory classifications [must] apply without respect to persons, . . . [i.e., that] the Fourteenth Amendment requires that all persons subjected to … legislation shall be treated alike, under like circumstances and conditions, both in the *privileges conferred* and in the *liabilities imposed*." *Engquist,* 553 U.S. at 602 (internal quotations omitted and emphasis added).  The goal is to ensure that, unless there is a rational reason for differential treatment, "all *persons subject to legislation or regulation* are indeed being treated alike, under like circumstances and conditions." *Id.* (internal quotations omitted and emphasis added).

Here, the Boards have regulated the actions of healthcare professionals (specifically, physicians, pharmacists, and physician assistants), not pharmaceutical companies.  Zogenix therefore asks the Court to apply the protections of the Equal Protection Clause to State regulation of classes to which Zogenix does not belong—i.e., to regulations that Zogenix is not subject to and that impose no duty or liability on it.  Because the Boards have not regulated Zogenix or any other pharmaceutical companies at all, however, the Court could not possibly evaluate whether the Boards have irrationally regulated Zogenix differently than other similarly situated parties (whether defined as manufacturers of opioid medications generally, of extended-release/long-acting ("ER/LA") opioids, of hydrocodone-containing opioids, of Schedule II opioids, or of some subset of one of these categories).[8]  Defendants have located no case from

---

[8] Zogenix's complaint variously treats the alleged class of similarly situated parties in all of these ways, with the sole exception of manufacturers of hydrocodone-containing opioid analgesics. *See, e.g.*, TAC ¶¶  7, 59, and 61 (opioid medications), 1(iv) (subset of all opioids consisting of "opioids having similar qualities"), 2 (Schedule II opioids), 16 and 63 (ER/LA opioids), 64 (undefined subset of Schedule II ER/LA opioids), 95 (undefined subset of ER/LA opioids), 97 (undefined subset of Schedule II drugs).  Zogenix wants to avoid comparison with the manufacturers of other hydrocodone opioid analgesics because they are the most commonly abused of such medications, *see* DOJ Fact Sheet, Hydrocodone, http://goo.gl/J5fCQc.  Moreover, Zohydro is decidedly dissimilar to the other medications in this class, containing up to five times more hydrocodone than the highest dose of

any jurisdiction permitting class-of-one regulatory challenges by other than the regulated parties. Simply put, there is no legal basis for Zogenix's novel application of the class-of-one theory.

Moreover, like its prior complaints, Zogenix's operative complaint fails to "explain how the challenged regulations were compelled by legislative classification rather than a discretionary assessment of Zohydro's risks." July 8 Dec. at 4 n. 3. *Engquist* makes clear that class-of-one claims may only be asserted when "legislative or regulatory classifications" create "a clear standard against which departures, even for a single plaintiff, [can] be readily assessed." 553 U.S. at 602. Thus, class-of-one claims may not be used to challenge actions committed to an agency's discretion. *Id.* at 603. In those circumstances, "the rule that people should be 'treated alike, under like circumstances and conditions, is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id.* (quoting *Hayes v. Missouri*, 120 U.S. 68, 71-72 (1887)).

Two post-*Engquist* cases illustrate this point. In *Analytical Diagnostic Labs, Inc. v. Kusel*, the Second Circuit held that a class-of-one claim challenging a state agency's delay in renewing the plaintiff's permit to operate a laboratory was cognizable because, under New York law, the agency did "not possess unfettered discretion in deciding whether to revoke, suspend or otherwise limit an existing license." 626 F.3d 135, 142 (2d Cir. 2010). The case involved a legislative classification (laboratories subject to the agency's licensing authority) and a clear standard against which departures could be assessed (the agency's typical practice in revoking licenses). On the other hand, in *Towery v. Brewer*, the Ninth Circuit held that a class-of-one claim challenging an agency's adjustments to Arizona's execution protocol was not cognizable because decisions were "relegated to the Director [of the Department of Corrections], with no State law requirement that there be uniformity." 672 F.3d 650, 660 (9th Cir. 2012) (per curiam). The decisions therefore "'by their nature involve[d] discretionary decisionmaking'" and lacked

---

hydrocodone in the other products. *See* FDA, *Electronic Orange Book* (Aug. 2014), http://goo.gl/RZpZsq (search by active ingredient for "hydrocodone").

any "pattern of generally exercising the discretion in a particular manner." *Id.* (quoting *Engquist*, 553 U.S. at 603).[9]

Here, even if the Boards' final regulations (or some prior legislative action) had created a regulated class to which Zogenix belongs, there is no clear standard against which departures could be assessed. To the contrary, the Boards have broad, discretionary authority to promulgate such regulations as they "dee[m] necessary" given changing public health concerns.[10] As this Court has recognized, the Boards' regulations were therefore the product of "a discretionary assessment of Zohydro's risks," and cannot, under *Engquist*, be second-guessed via a class-of-one equal protection claim. July 8 Dec. at 4 n. 3.

Indeed, government actions taken amidst a declared public health emergency, like the Boards' final regulations here, are a preeminent example of government regulation not subject to class-of-one attack. Public-health crises inherently involve novel circumstances that must be tackled quickly and decisively. When the government confronts such an emergency—as when it must contain disease outbreaks, protect drinking water after storms, or combat sudden spikes in prescription opioid abuse—its actions cannot be "readily assessed" against a clear standard precisely because there *is* no baseline standard that applies in those situations. *Engquist*, 553 U.S. at 602. The regulatory status quo ante, whatever it was, preceded the state of emergency and therefore cannot provide a standard for the discretionary exercise of government authority to address new, emergency conditions.

---

[9] Other courts of appeals also understand *Engquist* to foreclose class-of-one claims alleging disparate treatment in officials' exercise of discretionary authority. *See, e.g., Novotny v. Tripp County*, 664 F.3d 1173, 1179 (8th Cir. 2011) (enforcement of weed ordinance); *Srail v. Village of Lisle*, 588 F.3d 940, 944–45 (7th Cir. 2009) (decision not to extend water services); *Flowers v. City of Minneapolis*, 558 F.3d 794, 799–800 (8th Cir. 2009) (police investigative decisions). *See also Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 904 (7th Cir. 2012) (en banc) (aff'g by an equally divided court) (Easterbrook, C.J., concurring in the judgment) (*Engquist* "tells us that . . . the Constitution tolerates selective action, without requiring public officials to explain to a court's satisfaction why they exercised discretion in favor of one person and against another.").

[10] *See* Mass. G.L. c. 13, § 10 (BORIM "shall adopt, amend, and rescind such rules and regulations as it deems necessary to carry out the provisions of this chapter."); Mass. G.L. c. 112, § 9F (BOROPA "shall adopt, amend and rescind such rules and regulations, not inconsistent with other provisions of the General Laws, as it deems necessary to carry out the provisions of this chapter."); Mass. G.L. c. 112, § 42A (BORIP "may make such rules and regulations as it deems necessary to enable it to properly enforce the provisions of law relating to the retail drug business and pharmacy, and regarding any other matter within its jurisdiction.").

In addition to alleging membership in a regulatory class subject to a clear standard, a class-of-one claim must allege "with reasonable particularity" that the plaintiff and its purported comparators are "similarly situated *in all relevant respects*." *Barrington Cove v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001).  As previously noted, Zogenix has not even alleged with reasonable particularity the class of opioid manufacturers in which it claims membership for purposes of its class-of-one claim, let alone the alleged similarities among class members.

Moreover, the First Circuit has affirmed the dismissal of equal protection claims where "the complaint included allegations which arguably intimated that [the plaintiff] was not similarly situated to the other applicants in several important respects." *Id.*; *see also Freeman v. Town of Hudson*, 714 F.3d 29, 39 (1st Cir. 2013).  Here, Zogenix admits that Zohydro "is the *first* single-entity *hydrocodone* product available on the market [and] the *first* extended release *hydrocodone* product. . . ."  TAC ¶ 6 (emphasis added).[11]  These allegations alone justify the State's differing treatment of Zohydro compared to other opioids, given the greater incidence of abuse of hydrocodone opioids, the higher dose of hydrocodone in Zohydro than in other hydrocodone products, and Zohydro's non-abuse-deterrent formulation. *See supra* at 1 - 2.  And Zohydro is also different precisely because it is new to the market.  Because the Boards' regulation of Zohydro has occurred simultaneously with Zohydro's introduction to the Massachusetts market, the Boards' regulations have not disrupted existing patient treatment plans as would comparable restrictions imposed with respect to other opioid analgesics.[12]

---

[11] As Zogenix's complaint reflects, Zohydro was also until very recently "the only hydrocodone product subject to schedule II controls," *id.*, having been singled out by federal regulators for such scheduling before the hydrocodone-combination opioid products were so scheduled. *See id.* ¶ 36 n. 1; Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products From Schedule III to Schedule II, 79 Fed. Reg. 49,661–01 (Aug. 22, 2014).  The Supreme Court has indicated that States may similarly single out particular drugs for regulation, observing that a "State no doubt could prohibit entirely the use of particular Schedule II drugs[.]" *Whalen v. Roe*, 429 U.S. 589, 603 (1977).

[12] DPH has, however, recently issued draft regulations that would require practitioners to utilize the PMP each time they prescribe any Schedule II or III drug that DPH determines is commonly misused or abused and necessitates additional safeguards. *See* http://goo.gl/5bDLjF.  And, in an August 28, 2014 letter to the Secretary of the U.S. Department of Health and Human Services (provided to the Court by Zogenix's counsel at the September 11, 2014 scheduling conference and attached hereto as Exhibit E), five New England governors (including Governor Patrick)

In light of these acknowledged distinctions, Zohydro simply is not "situated similarly in all relevant aspects" to any other class of opioid medications, however defined. *Cordi-Allen v. Conlon*, 494 F.3d 245, 250–51 (1st Cir. 2007).  And for these same reasons, Zogenix does not, and cannot, allege facts sufficient to demonstrate that its differential treatment lacked "rational basis." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006).[13]  Count II of Zogenix's complaint therefore fails to satisfy a single one of the prerequisites of a cognizable class-of-one equal protection claim, much less all of them, and it should be dismissed.

## III.     Zogenix Has Not Alleged a Viable Claim of Contract Impairment.

Count III of Zogenix's complaint alleges that, in violation of the Contracts Clause, the Boards' final regulations impair contracts the company signed with wholesalers who supply Zohydro to Massachusetts pharmacies and with Inflexxion, a company that tracks abuse of Zohydro in Massachusetts. TAC ¶¶ 102–03. The claim fails because, as a matter of law, any impairment of Zogenix's contracts is insubstantial and justified by the Boards' legitimate objective of preventing opioid abuse and addiction.

The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law . . . impairing the Obligation of Contracts." U.S. Const. art. 1, § 10, cl. 1.  Despite its absolute language, the Contracts Clause "does not operate to obliterate the police power of the States" because a State's "exercise of [its] sovereign right . . . to protect the lives, health, morals, comfort and general welfare of the people . . . is paramount to any rights under contracts between individuals." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978).  Accordingly, "the Contracts Clause

---

described ongoing cooperative efforts to address the opioid addiction epidemic in the region, including "regional data sharing among [PMPs], regional prevention campaigns directed to the public, regional prescribing guidelines and education campaigns to ensure safe opioid prescribing, expansion of treatment options across the region including medication assisted therapy, and increased and better coordinated law enforcement efforts." Ex. E at 1.

[13] Zogenix has also failed to allege a single fact that would demonstrate that Defendants harbor "personal hostility" toward Zogenix, *Tapalian v. Tusino*, 377 F.3d 1, 6 (1st Cir. 2004), or have undertaken a "malicious orchestrated campaign" with the intent of harming Zogenix, *Rubinovitz v. Rogato*, 60 F.3d 906. 912 (1st Cir. 1995), as additionally required by binding First Circuit precedent to support a class-of-one claim. *See Buchanan*, 469 F.3d at 178.  Zogenix's improper and inaccurate assertion of regulatory intent based on a single, mischaracterized statement by one individual at a BORIP meeting, *see* TAC, ¶ 96, does not begin to suffice. *See* Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, Doc. # 56, at 7–8.

'must be accommodated to the inherent police power of the State to safeguard the vital interests of its people.'" *Alliance of Automobile Mfrs. v. Gwadosky*, 430 F.3d 30, 42 (1st Cir. 2005) (quoting *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983)).

Analysis of a Contracts Clause claim proceeds in two steps.  First, a court must ask "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel*, 438 U.S. at 244.  That "inquiry elicits an affirmative answer only if 'a contractual relationship exists, that relationship is impaired by a change in the law, and the resultant impairment is substantial.'" *Gwadosky*, 430 F.3d at 42 (quoting *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir. 1999)).  Impairment is not substantial when the contracting parties operate in a regulated industry and should therefore expect that regulatory changes will affect their contracts. *Energy Reserves*, 459 U.S. at 414-16; *Gwadosky*, 430 F.3d at 42.  Second, if the state law does substantially impair a contract, the court must determine whether the impairment is "appropriate for, and necessary to, the accomplishment of a legitimate public purpose." *Town of Houlton*, 175 F.3d at 191.

Zogenix's claim fails at the first step of the analysis. While the complaint alleges that Zogenix is a party to contracts that the Boards' regulations have impaired, it does not, and cannot as a matter of law, allege any substantial impairment.  In assessing substantiality, "it is especially important whether or not the parties have been operating in a regulated industry." *Gwadosky*, 430 F.3d at 42.  Contracting parties operating in a regulated industry can anticipate that additions to the regulatory regime will impact their contracts, so the law requires courts to "look long and hard at the reasonable expectations of the parties." *Town of Houlton*, 175 F.3d at 190; *Gwadosky*, 430 F.3d at 42 ("parties' reasonable expectations are central to the issue of substantiality").

Zogenix indisputably operates in a heavily regulated industry, and therefore could reasonably expect the type of regulation it now contests.  States, including Massachusetts, pervasively regulate how FDA-approved prescription drugs are prescribed and dispensed.  The FDA, for instance, has approved the sale of drugs, like Sudafed®, that contain pseudoephedrine without a prescription, 21 U.S.C. §§ 802(45)(A), but at least two States nevertheless require a

11

prescription before a patient may obtain the drugs. *See* Miss. Code Ann. §§ 41-29-117(d), 41-29-137(b); Ore. Rev. Stat. §§ 475.185(2), 475.973(1)(a).   According to the Centers for Disease Control & Prevention ("CDC"), thirty-five states limit the number of days after a prescription is written that it may be filled, the quantity of a controlled substance that may be prescribed or dispensed, or the number of refills allowed. *See* CDC, Prescription Drug Overdose: State Laws, Types of Laws, http://goo.gl/JdNf1R.   Twenty-six states mandate tamper-resistant prescription forms for controlled substances. *Id.*   And forty-two states require physicians to conduct a physical examination, patient history, or patient evaluation before prescribing a controlled substance. *Id.* States also restrict:  who may prescribe controlled substances, *see* DOJ, DEA Office of Diversion Control, Mid-Level Practitioners Authorization by State, http://goo.gl/K4DxjT; how opioids may be prescribed, *see* Medscape, State-By-State Opioid Prescribing Policies, http://goo.gl/Acc77X; and the ability of pharmacists to decline to fill prescriptions based on moral or religious objections, *see* National Conference of State Legislatures, Pharmacist Conscience Clauses:  Laws & Information, http://goo.gl/qw5R0E. Moreover, key federal agencies—including the FDA[14] and the CDC[15]—have long recognized the validity of State regulation governing the prescribing and dispensing of prescription drugs.

Like other States, Massachusetts extensively regulates the prescribing and dispensing of controlled substances. *See generally* Mass. G. L. c. 94C; 105 CMR 700-701 and 720-722.  And Massachusetts is not the only State that has responded to the FDA's approval of Zohydro with restrictions specific to it.  Before Massachusetts issued its emergency regulations, Vermont had imposed extensive requirements on how Zohydro is prescribed in that state. *Rule Governing the Prescription of Extended Release Hydrocodones Manufactured Without Abuse-Deterrent*

---

[14] *See, e.g.*, Statement of Janet Woodcock, M.D., Director of the FDA Center for Drug Eval. & Research, Hearing Before the Subcomm. on Oversight & Investigations of the House Comm. on Commerce, 106th Cong. 99 (1999) ("FDA does not generally regulate the practice of pharmacy or the practice of medicine—the States traditionally have regulated both the prescribing and dispensing of drugs."); FDA, Legal Status of Approved Labeling for Prescription Drugs, 37 Fed. Reg. 16,503, 16,504 (Aug. 15, 1972) ("it is clear that Congress did not intend the [FDA] to regulate or interfere with the practice of medicine").

[15] *See* CDC, Prescription Drug Overdose: State Laws, Types of Laws, http://goo.gl/JdNf1R ("States have broad authority to regulate the prescribing and dispensing of prescription drugs and do so in a variety of ways.").

*Formulations*, http://goo.gl/LfUINu.    Delaware regulations similarly require that, before prescribing Zohydro, doctors must document that other treatment options are inadequate for pain management, counsel patients on the drug's risks of abuse and addiction, secure patient consent to urine screening and other abuse-prevention measures, and consult the Delaware PMP database. Delaware Department of State, *In re Emergency Rule Adoption Placing Requirements on the Prescription of ER Hydrocodone*, http://goo.gl/qT5xuM.    Indeed, when it approved Zohydro over the 11-2 contrary vote of its own Anesthetic and Analgesic Drug Products Advisory Committee, *see Summary Minutes of Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee*, at 6 (Dec. 7, 2012), http://goo.gl/cAZi44, the FDA itself indicated that it would seriously consider revoking the drug's approval once a non-abuse-deterrent formulation was available. TAC Ex. C at 32.    And the Attorneys General of 28 states and one territory immediately urged the FDA to reverse its approval of the drug. *See* Ltr. From Attorneys General to FDA Commissioner (Dec. 10, 2013), http://goo.gl/ZQQXS2.    As a result, Zogenix necessarily entered into its contracts knowing that Zohydro might have a limited life span and could face significant State restrictions.

In any event, because Zogenix operates in a highly regulated industry, the law assumes that it foresees that "addition[s] to th[e] regulatory regime" will disrupt its contractual obligations. *Gwadosky*, 430 F.3d at 42*.*  Under those circumstances, any impairment of a contract is, as a matter of law, insubstantial. *See, e.g.*, *Energy Reserves*, 459 U.S. at 413–15; *Gwadosky*, 430 F.3d at 42; *Town of Houlton*, 175 F.3d at 190 ("While [the plaintiff] and his garbage collection customers did business for many years uninhibited by any regulation precisely akin to the [challenged] Ordinance, they would have had to be troglodytes not to have known that the waste collection and disposal industry is subject to fairly pervasive regulation.").

Zogenix's Contracts Claim should be dismissed for this threshold reason. But even if the Court were to assume substantial impairment and move to the second step of the analysis, it should still find the claim legally defective.  Part of a "coordinated effort" to combat rampant prescription opioid abuse in Massachusetts, *see* Ex. A at 2, the Boards' regulations

unquestionably advance a legitimate public purpose.  It is simply beyond dispute that "[p]rotecting the health and safety of the community [is] an important governmental objective that falls squarely within the [government's] police powers." *Easthampton Savings Bank v. City of Springfield*, 874 F. Supp. 2d 25, 32 (D. Mass. 2012); *see also Town of Houlton*, 175 F.3d at 191 ("Health and safety are two mainstays of the police power.").

Furthermore, when "contracts at issue are private and no appreciable danger exists that the governmental entity is using its regulatory power to profiteer or otherwise serve its own pecuniary interests," *Town of Houlton*, 175 F.3d at 191, "courts properly defer to [the government's] judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves*, 459 U.S. at 412–13 (internal quotation omitted).  Here, the Boards are not parties to, and do not stand to benefit from, Zogenix's private contracts and the Court therefore owes deference to the Boards' judgment that their regulations are reasonable and necessary to protect public health and safety.  For these reasons as well, the Court should dismiss Zogenix's Contracts Clause claim.

## IV.     **Zogenix Has Not Alleged a Viable Claim Under the Dormant Commerce Clause.**

Count IV of Zogenix's complaint contends that the Boards' final regulations impose an undue burden on interstate commerce, in violation of the Commerce Clause. This claim fails as a matter of law because Zogenix complains only that the Boards' regulations burden an individual manufacturer, not an interstate market, and because Zogenix has not alleged that the regulations conflict with any other States' regulation of prescription drugs.

Within the constitutional provision authorizing Congress "[t]o regulate Commerce . . . among the several States," U.S. Const., Art. I, § 8, cl. 3, there exists a negative command, known as the dormant Commerce Clause, that "prohibits protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 10 (1st Cir. 2007) (internal quotation omitted). While a State law may violate the dormant Commerce Clause in one of three ways, *id.* at 10-11, Zogenix does not, and could not, allege that the Boards' regulations regulate conduct outside

Massachusetts' borders or discriminate on their face against interstate commerce.  Instead, Zogenix alleges that the regulations place an undue burden on interstate commerce, TAC ¶¶ 111–13, which is the type of dormant Commerce Clause claim, articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), that "engenders a lower level of scrutiny." *Wine & Spirits Retailers*, 481 F.3d at 11.  That version of the claim pertains when "the state [law] at issue regulates evenhandedly and has only incidental effects on interstate commerce." *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 312 (1st Cir. 2005).  In such a case, application of the *Pike* test involves three steps:  a court must evaluate "the nature of the putative local benefits advanced by the statute[,] . . . the burden the statute places on interstate commerce, [and] . . . whether the burden is 'clearly excessive' as compared to the putative local benefits." *Id.*  "The crucial inquiry [is] whether [the State law] is basically a protectionist measure." *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).  "State laws frequently survive this *Pike* scrutiny." *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008).

Zogenix's allegations fail as a matter of law to satisfy the second prong of the *Pike* test— i.e., that the Boards' regulations impose a burden on interstate commerce.  Zogenix complains only that the regulations burden itself, not an interstate market.  Indeed, a major theme of Zogenix's case is that the Boards have singled out this one drug for regulation. *E.g.*, TAC ¶¶ 1(iv), 14, 16, 59–61.  As a result, Zogenix alleges, it "stands to suffer substantial lost sales in Massachusetts." TAC ¶ 77.  However, the dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 474 (1981) (internal quotation omitted); *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–28 (1978).  The First Circuit has been clear that when "arguabl[y] the only burden imposed on interstate commerce by the . . . [state law] is its possible effects on the profits of the individual manufacturers,  . . . such a burden is not violative of the Commerce Clause." *Rowe*, 429 F.3d at 313.  Zogenix attempts to sidestep this rule by alleging that the Boards' regulations will impact patients, but its only complaint in this regard is that patients will have less access to Zohydro. TAC ¶ 112.  That is not a burden on the relevant

interstate *market*—i.e., the market for prescription drugs—but rather a complaint about the availability of a single drug in the market.  Zogenix simply has not alleged—nor could it—that the Boards' final regulations burden the interstate *market* of prescription drugs.

Unable to allege any actual burden on an interstate market, Zogenix speculates that "[i]f Massachusetts (and other states) are allowed to make determinations as to what drug formulations are appropriately safe and effective, the result *will be* a patchwork of state-specific regulation *governing how prescription drugs are designed and formulated*." TAC ¶111 (emphasis added).  But, of course, Massachusetts has not regulated how Zohydro is designed or formulated, but rather how it is prescribed and dispensed.  And differing state regulations governing the prescribing and dispensing of prescription drugs are commonplace, *see supra* at 11–13, and have not been found to pose an undue burden on interstate commerce.  But in any event, to allege a burden on interstate commerce "[i]t is not enough to point to a risk of conflicting regulatory regimes in multiple states; there must be an actual conflict between the challenged regulation and those in place in other states." *Nat'l Elec. Mfrs. Ass'n, Inc. v. Sorrell*, 272 F.3d 104, 112 (2d Cir. 2001).  Zogenix alleges no such actual conflict, and its speculation that other States may someday regulate Zohydro or other prescription drugs in a way that conflicts with Massachusetts' regulations does not give rise to a cognizable claim.  As Justice O'Connor has put it, "[t]his is not a hypothetical inquiry." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406 (1994) (O'Connor, J., concurring in the judgment).[16]

The second prong of the *Pike* test therefore requires dismissal of Zogenix's dormant Commerce Clause claim.  But even if Zogenix could concoct a purported burden on interstate commerce not apparent from its complaint, the first step of the *Pike* test—in which the court considers the nature of the putative local benefits advanced by the regulation—favors the Boards. As Zogenix admits, the stated purpose of the Boards' regulations is "to enhance the public health

---

[16] Moreover, the Supreme Court has already rejected the suggestion, made in the complaint, that a State runs afoul of the dormant Commerce Clause simply by regulating a market that is nationwide and regulated by a federal agency. TAC ¶ 110.  In *Exxon Corp. v. Governor of Maryland*, the Court dismissed the "novel suggestion," similar to the one advanced by Zogenix, "that because the economic market for petroleum products is nationwide, no State has the power to regulate the retail marketing of gas." 437 U.S. at 128.

and welfare by promoting optimum therapeutic outcomes, avoiding patient injury and eliminating medical errors." TAC ¶ 59.  Promotion of public health and welfare unquestionably advances an important local benefit. *See Town of Houlton*, 175 F.3d at 191.  And courts "should be particularly hesitant to interfere . . . under the guise of the Commerce Clause" where a local government engages in such a traditional government function. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 344 (2007); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (noting "the historic primacy of state regulations of matters of health and safety").

Zogenix speculates that the Boards' regulations will not actually achieve health benefits for Massachusetts residents, TAC ¶ 71, but its conjecture is irrelevant.  As the First Circuit explained, "[i]t is not the place of this court . . . to pass judgment on the wisdom of the policies adopted" by the state government. *Rowe*, 429 F.3d at 312–13; *accord Exxon Corp.*, 437 U.S. at 128.  And under the *Pike* test, "it is the *putative* local benefits that matter"; "[i]t matters not whether these benefits actually come into being at the end of the day." *Rowe*, 429 F.3d at 313.

At the end of the day, Zogenix's dormant Commerce Clause claim tries to fit a square peg into a round hole.  Zogenix does not contend that the Boards' regulations are "protectionist measures" designed to bolster in-state industry and burden out-of-state competitors, even though that is the "crucial inquiry." *Philadelphia*, 437 U.S. at 624.  This case instead involves regulations that "can fairly be viewed as . . . directed to legitimate local concerns, with effects upon interstate commerce that are only incidental," if present at all. *Id.*  As a result, Zogenix's dormant Commerce Clause claim is simply not a fit here, and it should be dismissed.

## V.      Zogenix Has Failed to State a Permissible, Viable Claim of Preemption.

Finally, in Count I, Zogenix has asserted a preemption claim that ignores the Court's prior rulings in this case and Zogenix's own prior concessions.  The doctrines of waiver, law of the case, and judicial estoppel all require dismissal of the claim except as to one provision of one of the Boards' final regulations, as to which Zogenix has failed to state a plausible claim of preemption.

**A.  Zogenix Has Already Conceded, and This Court Has Already Determined, That BORIM and BOROPA's Regulations Are Not Preempted.**

The Court should dismiss Zogenix's preemption claim insofar as it relates to BORIM's and BOROPA's regulations.  As the Court has previously recognized, BORIM and BOROPA, responding to concerns expressed by Zogenix, issued final regulations eliminating the provisions of their emergency regulations that had required Zohydro prescribers to verify that "other pain management treatments have failed," substituting the FDA's language that "other pain management treatments are inadequate." *See* Mem. Dec. Vacating PI, Doc. # 73, at 5–6.  During the preceding hearing on Defendants' motion to dismiss Zogenix's second amended complaint, Zogenix had advised the Court and Defendants that, with respect to its preemption claim, the "other . . . treatments have failed" language was the only part of BORIM and BOROPA's emergency regulations to which it objected.  Indeed, the Court walked Zogenix through each provision of those regulations, eliciting confirmation that the remaining provisions were not, in Zogenix's view, preempted:

> MR. HOLLMAN:  . . . [W]hen you couple that requirement of the letter of medical necessity with verification that treatment options have—that other treatment options have failed, that's different from the indication approved by the FDA and conflicts with that indication. It's not supported by the clinical work that was done—
>
> THE COURT: Is that the only part you object to?
>
> MR. HOLLMAN: That is the only aspect of the BORIM, the regulation of physicians' regulations to which we assert objections, your Honor.
> . . .
>
> THE COURT: Right. So, you do not object to the risk assessment?
>
> MR. HOLLMAN: No, your Honor.
>
> THE COURT: Part One. You don't object to discussing the risk and benefits with the patient?
>
> MR. HOLLMAN: No, your Honor.
>
> THE COURT: And the pain management—enter into a pain management treatment agreement. The part that is difficult here is the medical necessity based on treatment—
>
> MR. HOLLMAN: It's the aspect of the letter of medical necessity that requires the physician verify that other pain management treatments have already failed.
>
> THE COURT: Right. Right. And then the last one, document this information in the patient's medical records, you don't object to that either. That's done, in any event.
>
> MR. HOLLMAN: We do not, your Honor. Although we would note—and this is part of our equal protection argument. We would note that it seems unfair to us to single out

Zohydro Extended-Release from all of the other opioid medications that have contributed to what the Governor says was a public health crisis before Zogenix got into prescribing Zohydro in Massachusetts . . . .

Transcript, June 10, 2014 Hearing, ("June 10 Tr.") at 9–11.

Thus, Zogenix conceded that its preemption claim with respect to the BORIM and BOROPA regulations, as opposed to its equal protection claim, extended only to the "other . . . treatments have failed" requirement. On that basis Zogenix expressly limited the preliminary relief it requested to an injunction against that requirement and one provision of the separate BORIP regulations. *Id.* at 23 ("I'll conclude simply by asking that the Court enjoin the effectiveness of the regulations as they apply to the requirement that physicians verify that prior medical therapies have failed and as they impose on pharmacists the requirement that only pharmacists could handle the drug."). It would have made no sense for Zogenix to seek only this limited relief had it intended its preemption claim to extend beyond these specific regulatory provisions.[17]

In reliance on these and other concessions at the motion hearing, the Court's decision on Zogenix's second preliminary injunction request identified the only provisions of the Boards' regulations as to which Zogenix claimed preemption: (1) the aforementioned "other . . . treatments have failed" requirement; and (2) BORIP's regulation governing which pharmacy personnel may handle Zohydro (discussed below). *See* July 8 Dec. at 4. The Court enjoined only the first of these two restrictions. *Id.* at 10–11.

Once this Court became aware that BORIM and BOROPA's emergency regulations had been superseded by final regulations that eliminated the "other . . . treatments have failed" language, it vacated the preliminary injunction. Mem. Dec. Vacating PI at 1–2, 5–6. The Court explained that because the new regulations "omit[ ] the conflicting, troublesome language," the "obstacle" to Congressional objectives "has now been removed" and the new regulations do not

---

[17] Zogenix's limited request for relief also betrays its lack of confidence in its other three constitutional claims. Zogenix obviously would not have limited the scope of the requested preliminary injunction in this manner had it seriously contended that it was likely to succeed on the merits of its equal protection, Contracts Clause, and/or Commerce Clause claims, all of which had been briefed in connection with both Defendants' motion to dismiss the second amended complaint and Zogenix's motion for a preliminary injunction.

"offend the Supremacy Clause of the United States Constitution." *Id.*  Noting that Zogenix had "conceded that such a regulation passes constitutional muster," the Court indicated that the remarks of Zogenix's counsel at the June 10 hearing "sum[ ] it up neatly:  there is no conflict between state and federal law, and thus, no preemption." *Id.* at 6.  By its plain terms, the Court's holding applied to all of BORIM and BOROPA's final regulations, Zogenix having conceded that the regulations were otherwise not preempted. June 10 Tr. at 9–11.

Despite these prior proceedings, Zogenix asserts in its new complaint that BORIM and BOROPA's final regulations are preempted, allegedly in their entirety. TAC ¶¶ 85, 88.  The claim is waived and judicially estopped, and it flagrantly flouts the law of this case.[18]

Express concessions by counsel to a court constitute "quintessential example[s]" of "the intentional relinquishment of a known right which results in a waiver[.]" *United States v. DeLeon*, 704 F.3d 189, 193 (1st Cir. 2013) (internal quotations omitted).  This Court has recognized this fundamental principle. *See Cook v. Maloney*, CIVA03-12138-RWZ, 2010 WL 1381731, at *3 n. 7 (D. Mass. Mar. 30, 2010) ("Plaintiff abandoned these claims at oral argument, and they are therefore waived.").

Equally fundamental is the principle that "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Naser Jewelers, Inc. v. City of Concord,* 538 F.3d 17, 20 (1st Cir. 2008) (quoting *Arizona v. California*, 460 U.S. 605, 613 (1983)).  It would be tremendously wasteful of judicial and party resources if it were otherwise.  And where, as here, the prior holdings relied on a party's clear concessions and benefitted that party, the equitable doctrine of judicial estoppel mandates that

---

[18] The claim also appears to be based on a fundamental misunderstanding of the law of preemption.  Zogenix complains about an alleged "improper purpose" underlying the regulations and alleges that they "single out" Zohydro for these particular requirements. *Id.*  While these concepts have potential relevance to a class-of-one equal protection claim, neither has anything to do with preemption law.  Zogenix's preemption claim is concerned instead with whether the Boards' regulations serve as an obstacle to Congressional objectives. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  Indeed, Zogenix previously admitted that its complaint about "it seem[ing] unfair to . . . single out Zohydro" was made as "part of [its] equal protection argument," not in connection with its preemption claim. June 10 Tr. at 11.

the law of the case control.  "[J]udicial estoppel . . . operates to prevent a litigant from taking a position that is inconsistent with a litigation position successfully asserted by him in an earlier phase of the same case or in an earlier court proceeding." *Perry v. Blum*, 629 F.3d 1, 8 (1st Cir. 2010).  Its purpose "is to protect the integrity of the judicial process" when "a litigant tries to play fast and loose with the courts." *Id.*

All of the elements of judicial estoppel are met here. The doctrine requires that "a party's earlier and later positions . . . be clearly inconsistent," which is undeniably the case here, and that the party "have succeeded in persuading a court to accept the earlier position." *Id.*  This second requirement is also satisfied here, Zogenix having persuaded the Court that BORIM and BOROPA's emergency regulations were preempted to the extent they required verification that other treatment options had "failed." *See* July 8 Dec. at 10–11.  Third, "the party seeking to assert the inconsistent position must stand to derive an unfair advantage if the new position is accepted by the court." *Perry*, 629 F.3d at 8.  Here, BORIM and BOROPA modified their emergency regulations when promulgating their final regulations to address Zogenix's concern about the "other . . . treatments have failed" language, which Zogenix repeatedly emphasized was by far the greater of its two objections to the Boards' regulations on preemption grounds. *See, e.g.,* Plaintiff's Verified Second Amended Complaint, Doc. # 51, ¶ 63.  It would be the height of unfairness if Zogenix, having benefitted from both judicial and State actions based on its prior position, were now able to reverse course.

In any event, as this Court has already held, BORIM and BOROPA's final regulations, having eliminated the "other . . . treatments have failed" provision, are entirely consistent with federal law and therefore do not stand as an obstacle to Congressional objectives. Mem. Dec. Vacating PI at 5–6.  Accordingly, even if the claim that BORIM and BOROPA's regulations are preempted had not already been decided adversely to Zogenix, the claim is not sustainable as a matter of law and should be dismissed.  Zogenix's counsel has "sum[med] it up neatly:  there is no conflict between state and federal law, and thus, no preemption." *Id.* at 6.

**B.  Zogenix's Preemption Challenge to BORIP's Regulations Should Be Dismissed.**

Zogenix's preemption claim should also be dismissed as to BORIP's final regulations.

Again, Zogenix's concessions at the June 10 hearing are key:

> THE COURT: And which part or all of the pharmacy regulation do you object to?
>
> MR. HOLLMAN: The pharmacy restrictions that require that only the pharmacist himself, not certified pharmacy technicians, pharmacy technicians, pharmacy technician trainees or pharmacy interns, anyone else who works in the pharmacy, but only the physician [*sic*] may handle Zohydro in a non-abuse-deterrent formulation. So, the licensed pharmacist is the one who has to unpack, stock and re-stock in special locked cabinets, fill every prescription, and hold it in a locked cabinet until the patient comes to pick it up, ring up every sale at the register, and hand every prescription to a customer. The others we don't challenge and we don't quibble with.
> . . .
>
> MR. HOLLMAN: Putting an opioid in a locked cabinet, certainly we don't object to that. We think that's good practice for all opioids. Requiring that it be only the pharmacist who can put the medication in the locked cabinet, yes, that's objectionable, your Honor.
>
> THE COURT: Okay. Requiring that it be dispensed in a childproof container, you don't by itself object to that?
>
> MR. HOLLMAN: Certainly not, your Honor.
>
> THE COURT: And requiring pharmacists to review a letter of necessity, I assume you object to that?
>
> MR. HOLLMAN: Well—
>
> THE COURT: I mean, I don't know what you—
>
> MR. HOLLMAN: —it's not the pharmacist reviewing the letter of medical necessity. Certainly, the pharmacist making sure that there is a letter of medical necessity supporting the filling of the prescription, fine. No, we don't object to that, your Honor, but requiring that the medical necessity have the content prescribed by the regulations, that we do object to.
>
> THE COURT: And requiring them to provide written warnings regarding the specific dangers of Zohydro.
>
> MR. HOLLMAN: We're told that the warnings are the same as the FDA-approved warnings, and that's not a problem for us, since they made clear what the content of the warnings has to be.
>
> THE COURT: Do the regulations specify how the pharmacists are to counsel patients on the dangers of Zohydro?
>
> MR. HOLLMAN: I don't believe they're that specific, your Honor.
>
> THE COURT: And requiring pharmacists to check the patient's PMP history, you also object to, or not?
>
> MR. HOLLMAN: Do not object to that, your Honor.

June 10 Tr. at 9–10, 12–13.

Thus, Zogenix conceded that its preemption claim with respect to the BORIP regulations

was limited to (1) their incorporation of the "other . . . treatments have failed" requirement and (2) their restriction, codified at 247 CMR 8.05(3), on the pharmacy personnel able to handle Zohydro.[19]   As was noted previously, the first objection has been addressed with the substitution in the final regulations of the "are inadequate" FDA language, *see* Mem. Dec. Vacating PI at 5–6, leaving the restriction on Zohydro handling as the only possible subject of a remaining preemption claim given the doctrines of waiver, law of the case, and judicial estoppel. *See supra* at 20–21.   Moreover, BORIP responded to Zogenix's complaint about the handling provision when it adopted its final regulations, revising the provision to permit pharmacy interns to handle Zohydro, along with pharmacists.   In this way as well, Zogenix benefitted from changed regulations based on its prior position and is estopped from reversing course now.

Zogenix's only potential remaining preemption claim, given the prior proceedings in this case, was a challenge to BORIP's final handling regulation, codified at 247 CMR 8.05(3), a claim that would lie only against BORIP and that has not been plausibly alleged.   Before BORIP promulgated even its emergency regulations, all pharmacy technicians other than certified technicians were already prohibited from handling any Schedule II drugs under BORIP's pre-existing regulation at 247 CMR 8.05(2).   And certified technicians were already prohibited from handling any Schedule II drug except under a pharmacist's supervision. *See id.*   As a result, BORIP's new final handling regulation has the sole effect of preventing one class of pharmacy technicians (certified technicians), who could otherwise have handled Zohydro only under a pharmacist's supervision, from handling it at all, while both pharmacists and pharmacy interns remain free to handle the drug. 247 CMR 8.05(3).   Because the regulation has nothing whatsoever to do with prescriber practices (as opposed to pharmacy practices), the regulation has no impact on the issuance of Zohydro prescriptions.   To set forth any kind of a claim that BORIP's regulation prevents patient access to Zohydro, therefore, Zogenix must plausibly allege

---

[19]   Again, Zogenix expressly limited its injunction request, as regards the BORIP regulations, to these two provisions. June 10 Tr. at 23.

that because certified pharmacy technicians (who would necessarily have been supervised by pharmacists in handling Zohydro anyway) are now unable to handle it, patients are unable to fill Zohydro prescriptions in Massachusetts.  Any such suggestion would defy credulity; and Zogenix does not, in fact, allege that a single patient has had this experience to date, even though Zohydro is admittedly being prescribed in the Commonwealth. *See* Plaintiff's Supplemental Submission Regarding the Actual Effects of the Government's Regulation, Doc. # 64, at 2.

Zogenix attempts to divert attention from the real issue – the dispensing of Zohydro (i.e., the filling of prescriptions) – with allegations that instead discuss *stocking* of the drug and supposed reservations on the part of certain pharmacies to do so. *See, e.g.*, TAC ¶ 85.  But the issue is not whether pharmacies will keep Zohydro on hand, but rather whether they will order it upon being presented with valid prescriptions and dispense the drug as prescribed.  The complaint contains no allegation that a single Massachusetts pharmacy (let alone a sufficient number to prevent patient access to Zohydro) has, as a result of this extremely limited BORIP handling restriction, refused to order and dispense Zohydro or indicated that it will do so. Absent such an allegation, Zogenix has not begun to allege a viable preemption claim based on the only Board regulation that was still potentially subject to such a challenge when Zogenix filed its most recent complaint.

The bottom line is that Zogenix has no preemption claim to bring at this stage.  BORIP's final handling regulation (less restrictive even than its predecessor emergency regulation) simply cannot be viewed as creating, vis-à-vis federal law, a "repugnance or conflict . . . so direct and positive that the two [laws] cannot be reconciled or consistently stand together." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 101–02 (2d Cir. 2013) (internal quotation omitted).  If that conclusion could possibly attach to such a limited restriction, how could it be that States impose, unchallenged on preemption grounds and with the express acquiescence of federal authorities, far greater restrictions on the prescribing and dispensing of FDA-approved drugs? *See supra* at 11–13.  How could it be that States may "up-schedule" drugs, *see* http://goo.gl/alPQ9z (reflecting that numerous States, including Oregon, Arizona,

Washington, New Hampshire, and Pennsylvania, schedule as controlled substances drugs scheduled differently, if at all, by federal authorities), triggering substantial restrictions and controls not applicable pursuant to federal law?  A preemption challenge to this sole BORIP final regulation, the only preemption claim that Zogenix could possibly pursue at this stage, cannot be reconciled with these realities.  There is simply no principled distinction between this BORIP regulation and far more restrictive State laws that Zogenix could draw in support of its claim.  If this unexceptional BORIP regulation poses a conflict so direct and positive that it cannot "consistently stand together" with the FDA's new-drug-approval process, no State will be able to regulate the prescribing and dispensing of FDA-approved drugs. *Id.*  That unprecedented outcome would expand obstacle preemption beyond recognition.

Zogenix's preemption claim fails against BORIP, just as it fails with respect to the other Boards.

## CONCLUSION

Zogenix's Third Amended Complaint should be dismissed in its entirety.

DEFENDANTS
By their counsel,
MARTHA COAKLEY
ATTORNEY GENERAL

  /s/ Jo Ann Shotwell Kaplan
Jo Ann Shotwell Kaplan (BBO #459800)
Assistant Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
 (617) 963-2085; fax: (617) 727-5785
October 10, 2014               JoAnn.Kaplan@state.ma.us

Certificate of Service

The undersigned counsel hereby certifies, this 10th day of October 2014, that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to any non-registered parties so indicated on the NEF.

  /s/ Jo Ann Shotwell Kaplan
Jo Ann Shotwell Kaplan